UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Glenn Graff | : | |
| 2013 Back Road | : | CASE NO:_____1:09-cv-670___ |
| Franklin Furnace, Ohio 45269 | : | |
| | : | JUDGE:____Bertelsman____ |
| And | : | |
| | : | |
| Kelly Graff | : | |
| 2013 Back Road | : | |
| Franklin Furnace, Ohio 45269 | : | COMPLAINT |
| | : | |
| And | : | |
| | : | |
| Hildreth Maddox | : | |
| 2529 Back Road | : | |
| Franklin Furnace, Ohio 45269 | : | |
| | : | |
| And | : | |
| | : | |
| | : | |
| Peggy Maddox | : | |
| 2529 Back Road | : | |
| Franklin Furnace, Ohio 45269 | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| Haverhill North Coke Company | : | |
| 2446 Gallia Pike | : | |
| Franklin Furnace, Ohio 45629 | : | |
| Statutory Agent: | : | |
| CT Corporation System | : | |

```
    1300 E. 9th Street              :
      Cleveland, Ohio 44114         :
                                    :
And                                 :
                                    :
Suncoke Energy, Inc.                :
11400 Parkside Drive                :
Knoxville, TN 37934                 :
Statutory Agent:                    :
   CT Corporation System            :
   800 S. Gay Street, Suite 2021    :
   Knoxville, TN 37929-9710         :
                                    :
         Defendants.                :
```

## INTRODUCTION

1.  Glenn Graff, Kelly Graff, Hildreth Maddox, and Peggy Maddox (hereinafter

    "Plaintiffs") bring this action because gaseous chemical clouds and haze, sludge-

    like deposits, strong odors, particulate dust emissions, sulfur dioxide emissions,

    nitrogen oxide emissions, and other hazardous substances and other pollutants

    (hereinafter collectively referred to as "Noxious and Hazardous Substances")

    have been and continue to be released from the Haverhill North Coke Company

    plant into the environment at and about the plant.  That plant is located at 2446

    Gallia Pike in Franklin Furnace, Ohio 45629 and at the NW Corner of Gallia Pike

    and Ironton Avenue in Franklin Furnace, Ohio 45636 ("Facility"). The Noxious

    and Hazardous Substances also have migrated and continue to migrate into the

    homes of the Plaintiffs and other area residents and onto the property of

    Plaintiffs and other area residents, all in violation of the Federal Clean Air Act, 42

U.S.C. § 7401 through 42 U.S.C. 7671 ("CAA"), the Ohio State Implementation

Plan (the "Ohio SIP"), and/or the Ohio Revised Code ("O.R.C."), the Ohio

Administrative Code ("O.A.C."), and the Facility's existing permits. Said

releases have endangered and continue to endanger the health, safety, and

welfare of the public, including the Plaintiffs, and have caused and continue to

cause unreasonable injury and damage to property. The Facility's unauthorized

releases, violations of law and regulation, and unauthorized invasion of the

Plaintiffs' property will continue unless abated and restrained.

2. Haverhill North Coke Company owns and operates the Facility. SunCoke

Energy, Inc., the parent company of Haverhill North Coke Company, also owns

and operates the Facility. The Facility is an operating plant that operates 200 non-

recovery coke ovens, which are used to produce thousands of tons of coke

annually. One hundred coke ovens began operation in 2005; the second hundred

of the coke ovens at the Facility began operation in July 2008. As part of its

operations, the Facility has coke and coal storage piles and coke and coal

handling systems.

3. Poor operation, a systemic breakdown of operations, and reckless/negligent

operational practices at the Facility have allowed and continue to allow the

Noxious and Hazardous Substances, including coke, coal, and related

particulates to be deposited onto nearby properties, including the Plaintiffs' properties.

4. Defendants' repeated and multiple violations of a wide spectrum of permit requirements demonstrate Defendants' past and continuing disregard for the law (including the CAA), disregard for the impacts of its operations on the community, and disregard for the Facility's impacts on the quality of air in the region.

## JURISDICTION AND VENUE

5. This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the United States Constitution and the laws of the United States and 42 U.S.C. § 7604(a) as a result of the claims made under the CAA, 42 U.S.C. § 7401, et seq. and the Ohio State Implementation Plan ("SIP"). Further, this Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1355 (action for penalty), and 28 U.S.C. § 2201 (declaratory judgment).

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 7604(c) in that the violations have occurred in this District, and the Facility that is the subject of this Complaint is located in this District.

7. This Court has supplemental jurisdiction, under 28 U.S.C. § 1367, over any claims that arise under the laws of the State of Ohio.

8. Neither the United States Environmental Protection Agency nor a State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standards or limitations described herein.

**THE PARTIES**

9. Plaintiff Glenn Graff and Plaintiff Kelly Graff own property and reside at 2013 Back Road, Franklin Furnace, Ohio 45629. The Graffs also own and rent a house, located at 2013A Back Road, Franklin Furnace, Ohio 45629, to tenants.  The Graffs reside and own property within the zone of influence of the Facility's release or threat of release of the Noxious and Hazardous Substances into the air. They have been and will continue to be exposed to injury due to the continuing emissions from the Facility in violation of federal and Ohio law. The Maddox Plaintiffs are the parents of Kelly Graff.

10. The impacts of the Noxious and Hazardous Substances are a particular burden on Plaintiff Kelly Graff, who already suffers from a brain tumor and needs her full physical resources to aid in her recovery.  In other words, Kelly Graff's body is particularly ill-suited to fight off her chronic and sub-chronic exposure to the carcinogenic and other deleterious agents released from the Facility.

11. Plaintiff Hildreth Maddox and Plaintiff Peggy Maddox own property and reside at 2529 Back Road, Franklin Furnace, Ohio 45629. Plaintiffs Hildreth and Peggy Maddox also own about 100 acres of adjoining land that is part of their farm that has been used by their family for six generations and owned by their family for three generations. They reside and own property within the zone of influence of the Facility's release or threat of release of Noxious and Hazardous Substances into the air. They have been and will continue to be exposed to injury due to the continuing emissions from the Facility in violation of federal and Ohio law.

12. The impacts of these Noxious and Hazardous Substances are a particular burden on Hildreth and Peggy Maddox because both are elderly and their bodies are ill-suited for chronic and sub-chronic exposure to the carcinogenic and other deleterious agents released from the Facility.

13. The Plaintiffs have protectable environmental, aesthetic, and conservation interests in their surrounding environment.  This includes an interest in protecting their health and welfare, as well as their property.

14. Similarly, the Plaintiffs have an interest in the quality of the air they breathe and are continually threatened by the release of Noxious and Hazardous Substances, including the coke, coal, and related particulates from the Facility.

15. Further, Plaintiffs have an economic interest in protecting their real and personal property and have suffered and will continue to suffer damage to their real and

personal property due to the continuing emissions from the Facility in violation of federal and Ohio law.

16. Defendant Haverhill North Coke Company is a Delaware corporation that is licensed to transact business, and does transact business, in the State of Ohio. It has an Ohio address of 2446 Gallia Pike, Franklin Furnace, Ohio 45629 and a principal business address of Parkside Plaza, 5th Floor, 11400 Parkside Drive, Knoxville, Tennessee. Defendant Haverhill North Coke Company is an owner and operator of the Facility. Defendant Haverhill North Coke Company is a subsidiary of Defendant SunCoke Energy, Inc.

17. Defendant SunCoke Energy, Inc. is a Delaware corporation, with a principal business address also located at 11400 Parkside Drive, Knoxville, TN 37934. Defendant SunCoke Energy, Inc. is an owner and operator of the Facility. In addition, Defendant SunCoke Energy, Inc. exercises pervasive control over the Facility and its subsidiary, Defendant Haverhill North Coke Company. SunCoke Energy, Inc. has caused, participated in, controlled, and/or directed the violations of law described in this Complaint. Defendant SunCoke Energy, Inc. knew or should have known about these violations and had the authority to prevent or stop these violations, but failed to do so. It is therefore directly liable for the environmental violations occurring at the Facility.

18. Furthermore, Defendant SunCoke Energy, Inc. has disregarded the corporate

form for Haverhill North Coke Company, so that Haverhill North Coke

Company has no mind of its own. SunCoke Energy has used its control over

Haverhill North Coke Company to perpetrate the environmental violations

described in this Complaint. Therefore, the corporate veil for Haverhill North

Coke Company should be disregarded and liability assessed against Defendant

SunCoke Energy, Inc. for these environmental violations. It is therefore indirectly

liable for the environmental violations occurring at the Facility.

## NOTICE

19. More than sixty days before the filing of this action under 42 U.S.C. § 7604, the

Plaintiffs gave written notice of the violations and their intent to sue by letter of

July 2, 2009, to the Defendants and all other persons required to be notified.  Each

Defendant received this notice on July 6, 2009. The Defendants' statutory agents

each received this notice on July 7, 2009. Governmental officials and agencies

received the July 2, 2009 notice on or before July 10, 2009.

## STATUTORY BACKGROUND – THE  CAA

20.  As set forth in 42 U.S.C. § 7401(b)(1), the CAA is designed to protect and

enhance the quality of the nation's air in order to protect and promote the public

health and welfare and the productive capacity of the nation's population.

21. Pursuant to the CAA, 42 U.S.C. § 7409, the U.S. EPA promulgated national ambient air quality standards ("NAAQS") necessary to protect the public health and welfare.

22. The U.S. EPA has promulgated such NAAQS standards for air pollutants for which air quality criteria have been issued.  These pollutants include: ozone, particulate matter, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead.

23. The CAA's regulation of NAAQS pollution demonstrates Congressional recognition of the importance of regulating such pollutants.  Such regulation is needed to protect public health, including the health of sensitive populations, such as asthmatics, children and the elderly, as well as to protect the public welfare.

24. The CAA, 42 U.S.C § 7410(a)(1), requires each state to adopt and submit to U.S. EPA for approval a state implementation plan ("SIP") that provides for the implementation, maintenance, and enforcement of the NAAQS.

25. After the U.S. EPA's promulgation of the NAAQS quality standards, the State of Ohio submitted to the U.S. EPA the Ohio SIP for achieving and maintaining said air quality standards.

26. The Ohio SIP was first approved by the U.S. EPA on May 31, 1972 and was incorporated by reference into the Code of Federal Regulations at 40 C.F.R. §52.1870, thereby becoming enforceable as a matter of federal law.

27. Each section of the Ohio Administrative Code that is referred to in and/or relevant to this Complaint is incorporated into Ohio's approved SIP at 40 C.F.R. Part 52.

28. The Ohio SIP is required (under 42 U.S.C. § 7471 of the CAA) to contain emission limitations and such other measures as may be necessary to prevent significant deterioration of air quality.

29. In order to prevent the significant deterioration of air quality as required under section 7471 of the CAA, federal regulations, including inter alia, 40 C.F.R. 52.21 ("PSD regulations") preclude the construction of new major sources or major modifications without a "prevention of significant deterioration" permit ("PSD permit").

30. The Facility is such a major source and/or has constructed such major modifications.

31. The authority to apply and enforce the PSD regulations has been delegated to the Ohio Environmental Protection Agency. PSD regulations for Ohio are set forth in O.A.C. §§ 3745-31-01 through 3745-31-20. Any Ohio regulations approved as part of Ohio's SIP constitute federal law enforceable under the CAA. Pursuant to 40 C.F.R. § 52.1884, the federal PSD regulations set forth in 40 C.F.R. § 52.21 are also incorporated and made a part of Ohio's SIP. Thus, the Facility is subject to the applicable provisions of the PSD regulations as promulgated by the U.S. EPA.

32. The Facility holds a PSD permit, including the PSD permit effective December 11, 2003, and subsequent modifications that include, inter alia, the June 11, 2004, June 27, 2006, January 15, 2008, and November 10, 2008 modifications ("PSD Permit").

33. The citizen suit provision of the CAA, 42 U.S.C. § 7604, authorizes "any person" to commence a civil action against "any person" who is alleged to be in violation of any "emission standard or limitation under this Act", including any requirement in any approved SIP, any permit term or condition in effect under the CAA or an approved SIP, or a condition or requirement of a PSD permit.

34. 42 U.S.C. § 7602(e) of the CAA defines the term "person" as an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agency, or employee thereof.

35. Each Plaintiff is a "person" within the meaning of 42 U.S.C. § 7602(e) and 42 U.S.C. § 7604(a).

36. Each Defendant is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e) and 42 U.S.C. § 7604(a).

**DEFENDANTS' EMISSIONS**

37. As a result of the Facility's operations, large quantities of NAAQS pollutants are emitted, including particulate matter, sulfur dioxide ("$SO_2$"), and carbon monoxide ("CO"). The Facility also releases nitrogen oxides ("$NO_x$"), volatile organic compounds ("VOCs"), lead, mercury, and hydrochloric acid ("HCL"), and benzene. The harmful effects associated with these pollutants are well known.

38. For example, $NO_x$ has numerous adverse effects on health, welfare, and the environment. $NO_x$ reacts with other pollutants and sunlight to form ground level ozone, which scientists have long recognized as being harmful to human health and the environment. Ozone can cause decreases in lung function (especially among children who are active outdoors) and respiratory problems leading to increased hospital admissions and emergency room visits. Ozone can cause inflammation and permanent damage to the human lung. In addition, ozone causes damage to vegetation.

39. Nitrogen dioxide ("$NO_2$"), one type of $NO_x$, is a noxious and hazardous pollutant that can cause people to have difficulty breathing by constricting lower respiratory passages. It may also weaken a person's immune system, causing increased susceptibility to pulmonary and other forms of infections. While children and asthmatics are the primary sensitive populations, individuals

suffering from bronchitis, emphysema, and other chronic pulmonary diseases have a heightened sensitivity to $NO_2$ exposure.

40. Emissions of $SO_2$ and $NO_x$ form fine nitrate and sulfate particles. Inhalation of these fine particles is associated with respiratory distress, cardiovascular disease, and premature mortality.

41. Particulate matter is the term for solid or liquid particles found in the air. Particulate matter with a diameter of 10 micrometers or less is referred to as "$PM_{10}$." Particulate matter with a diameter of 2.5 micrometers or less is referred to as "$PM_{2.5}$." Breathing air containing $PM_{10}$ or $PM_{2.5}$ increases the incidence of premature death, cancer, respiratory disease, and lung damage. $PM_{2.5}$ poses even greater health risks than $PM_{10}$. The elderly, children, and people with chronic lung disease, influenza, or asthma, tend to be especially sensitive to the effects of $PM_{2.5}$ and $PM_{10}$.

42. Emissions of CO can cause harmful health effects by reducing oxygen delivery to the body's organs (including the heart and brain) and tissues. The health threat from lower levels of CO is most serious for those who suffer from cardiovascular diseases such as clogged arteries, angina, or congestive heart failure.

43. $NO_x$ and $SO_2$ interact in the atmosphere with water and oxygen to cause sulfuric and nitric acids, commonly known as acid rain. Acid rain and other acid deposition cause damage to trees and vegetation, exacerbate the corrosion of

metals, degrade other building materials, and accelerate the decay of buildings and other outdoor structures.

44. Additionally, coke oven emissions are Category A human carcinogens, and benzene, integrally related to coking operations at the Facility, is a Category A human carcinogen.

45. Mercury increases the risk of nervous system damage and birth defects in humans consuming fish that have accumulated mercury deposited into waterways from the air.

46. Paragraphs 37 through 45 of this Complaint detail the adverse effects that Noxious and Hazardous Substances being emitted from the Facility can have and are having on health, welfare, and the environment, including flora and fauna.

## CONSEQUENCES OF DEFENDANTS' UNLAWFUL ACTIONS

47. The Facility's emissions are endangering the health, safety, and welfare of the public, including the Plaintiffs.

48. The Facility's operations have and continue to cause Plaintiffs and other area residents to be repeatedly exposed to chemical clouds, haze, and strong odors.

49. During multiple recurring events from 2005 to the present, the Facility emitted and released blue/gray clouds or haze at and/or in close proximity to the Facility.

50. These clouds and haze consist of Noxious and Hazardous Substances.

51. From 2005 to the present, these clouds or hazes have repeatedly touched the ground at one or more of Plaintiffs' properties and other properties in the area. During these releases, Plaintiffs and other property owners are generally subjected to foul odors that include burnt-rubber odors, sulfur odors, a rotten egg odor, chemical odor, coal odor, tar odor, and coke oven odors.

52. From 2005 to the present, as a result of the Facility's ongoing emissions, Plaintiffs and other Franklin Furnace residents have repeatedly experienced and continue to experience burning sensations in their eyes and throats, sore throats, headaches, problems breathing, and/or have been subjected and continue to be subjected to extremely strong odors during coke oven operations including, but not limited to, the undercooking of coke in the coke ovens.

53. In addition to the chemical clouds, haze, and odors being released as a result of operations at the Facility, the Facility – at recurring time periods from 2005 to the present – has emitted and continues to emit black and/or gray materials that were and are being deposited on homes, porches, cars, outdoor furniture, decks, lawns, barns, farm land, and swimming pools in close proximity to the Facility, including in the Franklin Furnace, Ohio area.  These materials include, at least, coke, coal, fly ash, and other contaminants (collectively referred to herein as "Deposits").  Plaintiffs are among the adversely affected residents.

54. The Deposits have caused and continue to cause unreasonable injury or damage to property in the vicinity of the Facility, including the Plaintiffs' property, and have interfered and continue to interfere with the use of that property.

55. For example, the Deposits have entered residential homes, including the Plaintiffs' homes, forcing the Plaintiffs and other local residents to frequently shut their windows to reduce the accumulation of deposits in their homes.

56. Additionally, Hildreth and Peggy Maddox and other area pool owners have incurred and continue to incur significant damage to their swimming pools as a result of the Deposits.  For example, the Deposits have formed and continue to form a black sludge build-up on pool floors and pool covers; have damaged and continue to damage pool filters; and, repeatedly form a ¼ to ½ inch black incrustation inside pool filters. The pattern of pool damage has resulted in the loss of use of property for Plaintiffs and other area pool owners.  Kelly and Glenn Graff visit the pool owned by Hildreth and Peggy Maddox.

57. The release of these Deposits has repeatedly occurred and continues to occur frequently.

58. Since July 2008, there has been an increase in the frequency of days with visible accumulations of Deposits occurring, a general increase in the speed at which the Deposits accumulate, and a generally heavier consistency to these deposits.

59. A white ash-like material has also been repeatedly deposited on residences, cars, and swimming pools located near the Facility. Plaintiffs are among the adversely affected residents.

60. Based on 2008 and 2009 sampling and analyses performed by the Portsmouth Local Air Agency and the Hamilton County Department of Environmental Services, the Deposits sampled from the Graff Plaintiffs' porch area match the samples of the coke fines/breeze and coal at the Facility. The testing results show that the substances in the Deposits sampled consisted mainly of coke particulates.

61. In an August 19, 2008 letter to the Facility, the Portsmouth Local Air Agency noted that the 2008 sampling is "a direct indicator" that the continued malfunctions at the Facility "are impacting the surrounding residents."

62. Additionally, the Facility has and continues to emit excess sulfur dioxide and particulate emissions, as identified in, e.g., paragraphs 71 through 80 herein.

63. As described herein, the Facility's emission of the Deposits, the white ash-like material, sulfur dioxide, particulate matter, odors, toxic blue/gray haze or clouds, flue gas, and carcinogenic coke oven and benzene emissions violate the requirements of the CAA, including the provisions of the Ohio SIP and the terms of the Facility's PSD Permit, and constitute a public nuisance under O.A.C. § 3745-15-07.

**First Claim – Violations of Facility's PSD Permit, Ohio SIP, the CAA and the CAA's Regulations**

64. Each of the allegations in the above paragraphs is incorporated by reference as if fully set forth herein.

65. The Facility operates 200 non-recovery coke ovens designated as Batteries A, B, C, and D.   Batteries A and B, identified by the Facility's PSD Permit as emission unit P901, consist of a set of 100 ovens constructed in 2004.  Batteries C and D, identified by the Facility's PSD Permit as emissions unit P902, consist of another set of 100 ovens constructed in 2008.

66. P901 has by-pass vent stacks (VS1-VS5) that are subject to emission limits. When these vent stacks are open, Noxious and Hazardous Substances are emitted.

67. P902 has by-pass vent stacks (VS6-VS10) that are subject to emission limits. When these vent stacks are open, Noxious and Hazardous Substances are emitted.

68. As a part of its operation, the Facility has coal and coke storage piles (unit F002), a coal handling, processing, and transfer system (unit F003), and a coke and breeze handling and processing system (unit F004).

69. The Facility's PSD Permit contains emissions limits and operational standards for emission units, including, inter alia, P901, P902, F002, F003, and F004.

70.  Since the Facility began operation, Defendants have repeatedly violated and will foreseeably continue to regularly and sweepingly violate the emission limits and operational standards in the Facility's PSD Permit. Collectively, these violations

demonstrate the Defendants' wanton and reckless operation of the Facility,

which releases Noxious and Hazardous Substances, in clear violation of law and

regulation. The regular, sweeping, and ongoing nature of the Defendants'

violations is further evidenced by Defendants' demonstration of noncompliance

with the NOx mass emission rate for P902 during the spring of 2009.

*Exceedences of Sulfur Dioxide and Particulate Emissions Limits for Bypass Vents (Coke
Batteries A, B, C, and D - Units P901 and P902)*

71. The Facility's PSD Permit requires that annual $SO_2$ emissions from the Heat

    Recovery Steam Generator (HRSG) by-pass vent stacks (VS1-VS5) of P901 be no

    greater than 192 tons/year $SO_2$.

72. The Facility's PSD Permit requires that annual $SO_2$ emissions from the HRSG by-

    pass vent stacks (VS6-VS10) of P902 be no greater than 192 tons/year $SO_2$.

73. The PSD permit requires that $PM_{2.5}$ and $PM_{10}$ (collectively "PM/$PM_{10}$") emissions

    from P901's bypass vent stacks be no greater than 10.8 tons per year.

74. The PSD Permit also requires that $PM_{2.5}$ and as $PM_{10}$  emissions from P902's

    bypass vent stacks be no greater than 10.8 tons.

75. Each of these $SO_2$ and PM/$PM_{10}$ emission limits in the Facility's PSD Permit are

    emission standards or limitations under 42 U.S.C. § 7604(f)(1), 42 U.S.C. §

    7604(f)(3), and 42 U.S.C. § 7606(f)(4).

76. The Facility has emitted at least 723 excess tons of $SO_2$ and at least 47.6 excess tons of $PM/PM_{10}$ from units P901 and P902's bypass vent stacks since July 2005.

77. Excess $SO_2$ and $PM/PM_{10}$ emissions resulted during at least 1,323 hours of bypassing venting following the stack collapse of P901 in February 2009 and 1,555 hours of bypassing venting of P902 in December 30, 2008 through January 13, 2009 when the Facility's Spray Dryer Absorber was shut down. These additional bypassing hours also caused excess $SO_2$ and $PM/PM_{10}$ emissions.

78. Defendants have violated and will foreseeably continue to violate the annual $SO_2$ limits in the Facility's PSD Permit by emitting $SO_2$ from P901 and P902's bypass vent stacks in excess of the annual tonnage emission limits set forth in the Facility's PSD Permit.

79. The Defendants have violated and will foreseeably continue to violate the annual $PM/PM_{10}$ limits in the Facility's PSD Permit by emitting $PM/PM_{10}$ through P901 and P902's bypass vent stacks in excess of the limits set forth in the Facility's PSD Permit.

80. Therefore, the Defendants have violated and will foreseeably continue to violate the Facility's PSD Permit, the Ohio SIP, 40 C.F.R. § 63.6(e)(1)(i), and the CAA through the Facility's excess $SO_2$ and $PM/PM_{10}$ emissions.

*Sulfur Dioxide Emission Limits Violations from the Waste Gas Stack (Coke Batteries A and B – Unit P901 and Coke Batteries C and D- Unit P902)*

81. Under the Clean Air Act, the Ohio Revised Code, and Haverhill North Coke's PSD Permit, unit P901 and P902 are subject to waste gas stack emission limits for $SO_2$.

82. The Facility's PSD Permit requires that $SO_2$ emissions from the waste gas stack of unit P901 be no greater than: (a) 422.40 lbs/hr.; (b) 506.88 lbs/hr. as a 3-hour block average; and (c) 770.88 tons/year $SO_2$ as a rolling 12-month summation.  The PSD Permit underwent administrative modification effective June 27, 2006 to revise limits on $SO_2$ emissions from unit P901's waste gas stack and require that $SO_2$ emissions from the waste gas stack of unit P901 be no greater than:  (a) 192 lbs/hour as a 3-hour block average, and (b) 700.80 tons/year as a rolling 12-month summation.

83. The Facility's PSD Permit contains the same limits on $SO_2$ emissions from the waste gas stack of unit P902 as it does for the waste gas stack of unit P901.

84. Each of these $SO_2$ emission limits described in paragraphs 82 and 83 is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

85. The Defendants have repeatedly exceeded and, thus, violated the PSD Permit's 3-hour rolling $SO_2$ emissions limit for P901. These violations will foreseeably continue.

86. Since 2008, the Defendants have repeatedly exceeded and, thus, violated the Facility's 3-hour rolling $SO_2$ emissions limit for unit P902. These violations will foreseeably continue.

87. Defendants have violated and will foreseeably continue to violate the Facility's PSD Permit, the Ohio SIP, the CAA, and 40 C.F.R. § 63.6(e)(1)(i) through the Facility's excess $SO_2$ emissions from the waste gas stacks of P901 and P902.

*PM/PM$_{10}$ Hourly Emissions Rate Violations for the HRSG By-pass Vent Stacks (P901)*

88. The Facility's PSD Permit requires that $PM/PM_{10}$ emissions from the Heat Recovery Steam Generator's (HRSG) by-pass vent stacks of P901 be no greater than 12.86 lbs./hour.

89. This permit term is an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

90. Defendants' own stack testing demonstrates noncompliance with this emission limit.

91. Defendants' Facility has repeatedly exceeded and will foreseeably continue to intermittently exceed and therefore violate the PSD Permit's 12.86lbs/hr PM/$PM_{10}$ emissions limit for P901.

92. Thus, Defendants have repeatedly violated and will foreseeably continue to violate the Facility's PSD Permit, the Ohio SIP, and the CAA by emitting PM/$PM_{10}$ from the Heat Recovery Steam Generator's (HRSG) by-pass vent stacks of P901 at greater than 12.86 lbs./hour.

*Visible Emissions Violations for the Waste Gas Stack on Emissions Unit P902*

93. The PSD Permit prohibits visible particulate emissions from the waste gas exhaust stack(s) from exceeding 10% opacity as a 6-minute average.

94. This requirement constitutes an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

95. The Defendants have repeatedly exceeded and will foreseeably continue to intermittently exceed and therefore violate the visible emissions requirements.

96. Therefore, Defendants have repeatedly violated and will foreseeably continue to violate the PSD Permit, O.A.C. § 3745-31-05(A)(3), the Ohio SIP, and the CAA through visible particulate emissions from the waste gas exhaust stack(s) in excess of 10% opacity as a 6-minute average.

*Failure to Employ Required Control Measures, and Visible Emissions Violations (F002, F003, and F004)*

97. The Facility's PSD Permit and Permit to Install # P0104223 for the Facility require best available control measures that are sufficient to minimize or eliminate emissions of fugitive dust from coke and coal storage piles.

98. The Facility's PSD Permit and Permit to Install # P0104223 require best available control measures for the load-in and load-out operations associated with coke and coal storage piles.

99. The Facility's PSD Permit and Permit to Install # P0104223 require no visible emissions except for one minute in an hour for coke and coal storage piles.

100. The Facility's PSD Permit and Permit to Install # P0104223 require no visible particulate emissions of fugitive dust that exceed 20% opacity as a 3 minute average for coke and breeze handling and processing, identified as emissions unit F004.

101. These permit limits , conditions, or requirements in the Facility's PSD Permit and Permit to Install # P0104223 each constitute an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

102. Since 2005, Defendants have repeatedly failed and will foreseeably continue to fail to employ best available control measures sufficient to minimize

or eliminate emissions of fugitive dust from coke and coal storage piles at the Facility.

103.    Since 2005, Defendants have repeatedly failed and will foreseeably continue to fail to employ best available control measures, resulting in repeated events during which visible emissions could be observed for greater than the visible emission permit limits for sources F004 (coke and breeze handling and processing), F003 (coal handling and processing), and F002 (coal and storage piles).

104.    During each such event, Defendants have violated the Facility's PSD Permit, Permit to Install # P0104223, O.A.C. § 3745-31-05(A)(3), the Ohio SIP, and the CAA. Defendants will foreseeably continue to violate these requirements.

*Violating Continuous Emission Monitoring (CEM) Requirements (Coke Batteries A and B - Unit P901 and Coke Batteries C and D – Unit P902)*

105.    The PSD Permit requires the Facility to operate and maintain equipment to continuously monitor and record $SO_2$ emissions from P901 and P902 in accordance with the requirements of 40 C.F.R. Part 60.13.

106.    This operational restriction constitutes an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7606(f)(4).

107.    The Facility has a Continuous Emissions Monitoring System (CEMS) that is designed to monitor and record $SO_2$ emissions from P901 and P902.

108.    Since 2005, Defendants have repeatedly violated and will foreseeably continue to violate the continuous $SO_2$ monitoring requirements through excessive CEMS downtime, in which the CEMS fails to monitor and record $SO_2$ emissions from P901 and P902.

109.    The Defendants have repeatedly violated and will continue to violate the Facility's PSD permit, the Ohio SIP, PSD regulations promulgated in 40 C.F.R. § 52.21, Ohio Revised Code § 3704.05, 40 C.F.R. Part 60.13, through excessive CEMS downtime.

*Violations of Requirements to Not Open More Than One Bypass Vent Simultaneously, and Excessive Bypass Venting (P901 and P902)*

110.    The Facility's PSD permit requires that there shall be no more than one bypass vent stack in use (open) at any time.

111.    This operational restriction constitutes an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

112.    Since 2005, the Defendants have repeatedly opened more than one bypass stack vent simultaneously more than 50 times on P901 and more than 54 times on

P902 and will foreseeably continue to open more than one bypass stack

simultaneously unless the relief requested herein is fully granted.

113.      The Defendants have repeatedly violated and will foreseeably continue to

violate the Facility's PSD Permit, the Ohio SIP, and the CAA by opening more

than one bypass stack vent simultaneously on P901 and P902.

*Exceedences of Bypass Venting Limits (P901 and P902)*

114.      The Facility's PSD permit limits bypassing venting from units P901 and

P902 to 192 hours per bypass vent stack, per rolling 12 month period.

115.       This operational restriction constitutes an "emission standard or

limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. §

7606(f)(4).

116.      Since July 2005, the Defendants have repeatedly and regularly used their

bypass vents over the allowable hours (in total at least 7000 hours of unpermitted

"extra" use of the bypass vents) and will foreseeably continue to use their bypass

vents well in excess of the allowable hours if the relief requested herein is fully

granted.

117.      The excess bypass venting from units P901 and P902 since 2005

collectively constitutes over 200 rolling months of failure to comply with

operational standards of the Facility's PSD permit.

118.     Defendants have repeatedly violated and will continue to violate the

Facility's PSD Permit, the Ohio SIP, PSD regulations promulgated in 40 C.F.R.

52.21, and the CAA by exceeding the 192 hours per bypass vent stack limits.

*Failure to visually inspect each oven prior to "pushing," and "pushing" without visual inspection indicating that there is no smoke (P901 and P902) and failure to maintain records relating to such inspections*

119.     The Facility's PSD permit and 40 C.F.R. § 63.7293(a) require Defendants to

(1) visually inspect each oven prior to "pushing" by opening the door damper

and observing the bed of coke; and (2) not push the oven unless the visual

inspection indicates that there is no smoke in the open space above the coke bed

and that there is an unobstructed view of the door on the opposite side of the

oven.

120.     Each of these operational restrictions constitutes an "emission standard or

limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. §

7604(f)(4).

121.     The failure to adhere to these requirements results in "green pushes"

(incomplete combustion or incomplete burning off of volatile organic

compounds and/or other coke constituent chemicals in the process of cooking

coke in the coke ovens) and/or odors and/or associated headaches, burning

throat sensations, burning eye sensations, and difficulties breathing for area residents, including the Plaintiffs.

122.     Since October 2005, the Defendants have repeatedly and regularly failed to conduct the required visual inspection prior to "pushing" coke, resulting in an observed "green push" and will foreseeably continue to fail to conduct such inspections, as required in their PSD Permit, if the relief requested herein is not fully granted.

123.     The green pushing events have led and will continue to lead to odors and/or associated headaches, burning throat and eyes, and breathing difficulties for area residents, including Plaintiffs.

124.     Defendants have repeatedly violated and will continue to violate the Facility's PSD Permit, the Ohio SIP, PSD regulations promulgated in 40 C.F.R. 52.21, and the CAA by "pushing" the oven without the visual inspection indicating that there is no smoke in the open space above the coke bed and that there is an unobstructed view of the door on the opposite side of the oven.

125.     40 C.F.R. § 63.7334(c) requires that for each non-recovery coke oven battery a facility must demonstrate continuous compliance by maintaining records that document each visual inspection of an oven prior to "pushing" and that the oven was "not pushed" unless there was no smoke in the open space above the coke bed and there was an unobstructed view of the door on the opposite side of the oven.

126.     This requirement to maintain records under National Emission Standards for Hazardous Air Pollutants (NESHAP) for Coke Ovens constitutes an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

127.     The Defendants have repeatedly violated and will foreseeably continue to violate this emission standard or limitation.  Each such failure is a violation of the Ohio SIP, PSD regulations promulgated in 40 C.F.R. 52.21, and the CAA.

*Exceeding  Maximum Daily Wet Coal Usage  Rate of 2400 ton per day limit for  P901 and P902*

128.     The Facility's PSD Permit imposes a maximum daily wet coal usage rate of 2400 tons per day for P901 and 2400 tons per day for P902.

129.     Each of these requirements constitutes an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

130.     Defendants have repeatedly exceeded the maximum daily wet coal usage rate for P901 and P902 at the Facility and will foreseeably continue to exceed that usage rate unless the relief request herein is fully granted.

131.     Therefore, Defendants have repeatedly violated and will foreseeably continue to violate the PSD permit, the Ohio SIP, and the CAA by exceeding the maximum daily wet coal usage rate for P901 and P902 at the Facility.

*FGD Baghouse Pressure Drops Outside the Specified Permit Range (P901 and P902)*

132.     The Facility's PSD Permit requires that the pressure drop for the Flue Gas

Desulfurization ("FGD") Baghouse be within 3 to 12 inches of water for P901 and

to be within 3 to 12 inches of water for P902.

133.     Each of these requirements constitutes an "emission standard or limitation"

under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

134.     During 2008 and 2009, Defendants have repeatedly failed to maintain the

pressure drop on the FGD Baghouse within the required range for P901 and P902

and will foreseeably continue to fail to maintain the required range of pressure

unless the relief request herein is fully granted.

135.     Defendants have repeatedly violated and will foreseeably continue to

violate the PSD permit, the Ohio SIP, and the CAA by failing to maintain the

pressure drop on the FGD Baghouse within the required range for P901 and

P902.

*Hot Car Multiclone Pressure Outside Specified Permit Range (P901)*

136.     The Facility's PSD permit requires that the hot car multiclone pressure be

within the 2 to 6 inch range for P901.

137.     This requirement constitutes an "emission standard or limitation" under 42

U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

138.     Defendants have repeatedly failed to maintain the hot car multiclone

pressure within the specified range for P901 and will foreseeably continue to fail to maintain the proper pressure unless the relief request herein is fully granted.

139.     Defendants have repeatedly violated and will foreseeably continue to violate the Facility's PSD permit, the Ohio SIP, and the CAA by failing to maintain the hot car multiclone pressure within the specified range for P901.

*Common Tunnel Temperature Outside Specified Permit Range (P901)*

140.     The Facility's PSD Permit requires a minimum common tunnel temperature.

141.     This requirement constitutes an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

142.     The Defendants have repeatedly failed to maintain the common tunnel temperature minimum temperature and will continue to fail to maintain said temperature unless the relief request herein is fully granted.

143.     Defendants have repeatedly violated and will foreseeably continue to violate the Facility's PSD Permit, the Ohio SIP, and the CAA by failing to maintain the minimum common tunnel temperature.

*Excessive Downtime for Sorbet Trap Monitoring System (P902)*

144.     The Facility's PSD Permit requires a Sorbet Trap Monitoring System for the main stack of P902 to continuously monitor mercury emissions data.

145.     This requirement to continuously monitor mercury emissions constitutes an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7606(f)(4).

146.     During 2009, Defendants have repeatedly violated this requirement by allowing the mercury monitoring system to be inoperable and will foreseeably continue to fail to continuously monitor mercury emissions.

147.     Defendants have repeatedly violated and will foreseeably continue to violate the Facility's PSD permit, the Ohio SIP, and the CAA by allowing the Sorbet Trap Monitoring System for the main stack of P902 to be inoperable.

*Failure to Process Waste Gas from Coking with the Use of Lime Spray Dryer (P901 and P902)*

148.     The Facility's PSD Permit requires that waste gas from coke gas be processed with the use of a lime dryer for units P901 and P902.

149.     This requirement constitutes an "emission standard or limitation" under 42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

150.     Defendants have repeatedly violated this emission standard or limitation, including during at least the illegal simultaneous bypassing events described in this Complaint, and Defendants will foreseeably continue to violate this emission standard or limitation.

151.     Defendants have repeatedly violated and will foreseeably continue to

violate the Facility's PSD Permit, the Ohio SIP, and the CAA by failing to process

waste gas from coke gas with the use of a lime dryer.

*Failure to Use Lime Spray Dryer with a Baghouse for PM Control to Process Waste Gas from Coking (P901 and P902)*

152.     The Facility's PSD Permit requires that waste gas from coke gas be

processed with the use of a lime dryer with a baghouse in order to control

$PM/PM_{10}$. This requirement applies to P901 and P902.

153.     This requirement constitutes an "emission standard or limitation" under

42 U.S.C. § 7604(f)(1), 42 U.S.C. § 7604(f)(3), and 42 U.S.C. § 7604(f)(4).

Defendants have repeatedly failed to process waste gas from coke gas with the

use of a lime dryer with a baghouse for P901 and P902 and will foresseably

continue to fail to do so unless the relief request herein is fully granted. For

example, Defendants failed to properly process their waste gas during the illegal

simultaneous bypassing events described in this Complaint.

154.     Defendants have repeatedly violated and will foreseeably continue to

violate the Facility's PSD Permit, the Ohio SIP, and the CAA through their failure

to  process waste gas from coke gas with the use of a lime dryer with a baghouse

for P901 and P902.

### Second Claim – Violations of Malfunction Reporting Requirements

155.     Each of the allegations in the above paragraphs is incorporated by

reference as if fully set forth herein.

156.     O.A.C. § 3745-15 includes, inter alia, requirements or conditions related to

malfunctions at stationary sources, maintenance schedules, and reporting.

157.     O.A.C. § 3745-15 and its subsections were approved by U.S. EPA as part of

the federally enforceable Ohio SIP on November 1, 1982.

158.     O.A.C. § 3745-15-06 requires that, in the event that any emission source,

air pollution control equipment, or related facility breaks down in such a manner

as to cause the emission of air contaminants in violation of any applicable law,

the person responsible for such equipment shall immediately notify the Ohio

EPA district office or delegate agency of such failure or breakdown.

159.     The failure and malfunction reporting requirements in O.A.C. § 3745-15-

06 constitute an "emission standard or limitation" under 42 U.S.C. § 7604(f).

160.     Numerous equipment failures and malfunctions have occurred at the

Facility throughout the four years of its operation.   These failures and

malfunctions include, at least:

   a. a July 2005 "operational failure" resulting in a bypass of the entire Flue

       Gas Desulphurization system;

b. July 6, 2008 and July 15, 2008 coke-screening baghouse failures observed

by the Portsmouth Local Air Agency;

c. A February 8, 2008 atomizer operational failure;

d. Three malfunction events occurring in 2006, 2007, and 2008, the details of

which are known by the Facility but have not yet been identified to the

Plaintiffs; and,

e. Additional equipment failures and malfunction events known to

Defendants that have not yet been identified to Plaintiffs.

161.     Each of these equipment failures and malfunctions caused the emission of

air contaminants in violation of the CAA, Defendants' PSD permit, the Ohio

Administrative Code, and the Ohio SIP, including inter alia, Ohio's prohibition

against air pollution nuisances, O.A.C. § 3745-15-07, which is part of Ohio's SIP

and is therefore federally enforceable.

162.     In direct violation of O.A.C. § 3745-15-06, Defendants failed to

immediately notify the Ohio EPA district office or delegate agency of these

equipment failures and malfunctions.

163.     Each of Defendants' failures to immediately report such equipment

failures and malfunctions constitutes a violation.

164.     Thus, Defendants have repeatedly failed to comply with the malfunction

reporting requirements of O.A.C. § 3745-15-06 and will continue to fail to comply

with those requirements in the future unless the relief requested herein is fully granted.

### Third Claim – Air Pollution Nuisance Prohibition Violations

165.     Each of the allegations in the above paragraphs is incorporated by reference as if fully set forth herein.

166.     The emissions from the Facility, as described herein (see paragraphs 37 through 46, above), have been and continue to be released in such a manner or in such amounts as to endanger the health, safety or welfare of the public, including the Plaintiffs, and have and continue to cause unreasonable injury or damage to property, including the Plaintiffs' property(see paragraphs 47 through 63, above).

167.     Thus, the emissions from the Facility constitute an ongoing public nuisance and are a violation of Ohio's prohibition against air pollution nuisances, O.A.C. § 3745-15-07.

168.     Under O.A.C. § 3745-15-07, "…the emission or escape into the open air from any source or sources whatsoever, of smoke, ashes, dust, dirt, grime, acids, fumes, gases, vapors, odors, or any other substances or combinations of substances, in such manner or in such amounts as to endanger the health, safety or welfare of the public, or cause unreasonable injury or damage to property, is

hereby found and declared to be a public nuisance. It shall be unlawful for any person to cause, permit or maintain any such public nuisance."

169.     O.A.C. § 3745-15-07 was approved by U.S. EPA as part of Ohio's federally enforceable SIP on October 12, 1984.  Additionally, compliance with the nuisance prohibition of O.A.C. § 3745-15-07 is an enforceable term of the Facility's PSD Permit and its September 26, 2008, Permit to Install (#P0104223).  Thus, O.A.C. § 3745-15-07 is federally enforceable by Plaintiffs through Ohio's SIP and under the Facility's permits.

170.     The Ohio air nuisance prohibition in O.A.C. § 3745-15-07 constitutes an "emission standard or limitation" under 42 U.S.C. § 7604(f).

171.     Each Defendant is a "person" under O.A.C. § 3745-15-07.

172.     The public nuisance caused by Defendants is ongoing and Defendants will foreseeably continue to violate Ohio's prohibition against air pollution nuisances.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.  Declare that Defendants have violated and are violating the CAA and the Ohio SIP, including the CAA's Prevention of Significant Deterioration program requirements, the approved PSD program requirements in the Ohio SIP, the Ohio Air Nuisance Prohibition in O.A.C. § 3745-15-07, and the Ohio malfunction reporting

requirements in O.A.C. § 3745-15-06;

B.   Declare that Defendants have violated and are violating the Facility's permits;

C.   Order Defendants promptly to take all steps necessary to comply with the foregoing laws,  regulations, and the Facility's permits;

D.   Permanently enjoin Defendants from operating their facility except in accordance with the CAA, the Ohio SIP, and the Facility's permits;

E.   Issue injunctive relief requiring Defendants to remediate the environmental damage and ongoing impacts resulting from their violations;

F.   Assess civil penalties against Defendants of $27,500 per day for each violation occurring before March 15, 2004, $32,500 per day for each violation occurring between March 16, 2004 and January 12, 2009, and $37,500 per day for each violation after January 12, 2009;

G.   Retain jurisdiction of this action to ensure compliance with the Court's Order;

H.   Award Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

I.   Grant such other relief as the Court deems just and proper.


Respectfully Submitted,

D. David Altman, *Trial Attorney* (0021457)
Amy J. Leonard  (0040611)
Brett A. Kravitz (0069101)

Amy M. Hartford (0074836)
Justin D. Newman (0080968)
D. DAVID ALTMAN CO., L.P.A.
15 E. 8th Street, Suite 200W
Cincinnati, Ohio  45202
(513) 721-2180
daltman@one.net