# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

GLENN GRAFF, et al.,                          Case No. 1:09-cv-670
      Plaintiffs                         Dlott, J.
                                         Litkovitz, M.J.

      vs

HAVERHILL NORTH
COKE COMPANY, et al.,                         **ORDER**
      Defendants


Plaintiffs Glenn Graff, Kelly Graff, Hildreth Maddox, and Peggy Maddox bring this action under the Clean Air Act, 42 U.S.C. § 7401 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., and state law seeking civil penalties, injunctive relief, and damages.  Defendants are Haverhill North Coke Company (HNCC) and SunCoke Energy, Inc. (SunCoke).  HNCC is a coke processing plant in the vicinity of plaintiffs' real property. Plaintiffs allege that certain excess emissions from the HNCC plant violate their rights under federal law.  This matter is before the Court concerning the parties' dispute as to whether approximately 1,500 documents listed on defendants' privilege log are discoverable.

On August 8, 2011, the undersigned determined that defendants' privilege log was deficient in several respects and ordered defendants to produce an adequate privilege log to account for the following deficiencies:

> 1. The log must identify the roles of the individuals named in the log (*i.e.*, client, attorney, other third person) and the type of document (email, report, memorandum, letter, etc.) to enable the Court and plaintiffs to assess whether the documents qualify for protection under the attorney-client privilege or as work product.
>
> 2. The log must identify the author and recipient of privileged/protected documents and of documents defendants identify as attachments to emails.

3.  The log must cross-reference the request or interrogatory to which each document is responsive.

4.  The log must specify in the "Description" sufficient information showing the purpose of the document to adequately convey that the document was prepared in anticipation of litigation or in the course of adversarial litigation or to provide legal advice; the log must also identify the documents by bates stamp number.

5.  The privilege log must identify documents that contain or incorporate *non-privileged* underlying facts which are discoverable.

(Doc. 125).

Subsequent to defendants' production of the revised privilege log, the Court ordered defendants to produce a pared down and reorganized privilege log, excluding duplicate entries. (Doc. 157, April 5, 2012 Order).  Defendants were directed to reorganize the log under two broad categories of documents that defendants assert are protected by:  (1) the settlement privilege; and (2) the attorney-client privilege and/or work product doctrine.  Within these broad categories, defendants were directed to divide the documents into sub-categories, with the documents for which defendants assert a settlement privilege to be organized into six sub-categories:  (1) draft letters; (2) general communications; (3) Notice of Violation (NOV) presentations, including spreadsheets and graphs; (4) "root cause" write-ups; (5) report/study/technical (not related to an audit); and (6) general.   Documents that defendants assert are privileged under the attorney-client privilege or work product doctrine were to be organized into the following five categories: (1) draft letters; (2) general communications; (3) compliance-related audits; (4) "litigation"/2008 URS audits and updates; and (5) documents relating to the instant litigation (*Graff* litigation documents).

The Court then directed the parties to submit ten representative documents from each

2

category to the Court for *in camera* review, with plaintiffs and defendants each choosing five documents from each of the eleven categories, for a total of 110 documents.[1]  The Court determined that this sampling process would hasten resolution of the discovery dispute related to the documents listed in the privilege log as it will provide both the parties and the Court with a greater understanding of the types of documents at issue without engaging in the arduous task of engaging in an *in camera* review of over 1,500 individual documents.

The parties were then directed to submit briefs addressing the bases for the asserted privilege, including the sufficiency of the privilege log.  This matter is now before the Court on the parties' briefs and supporting exhibits (Docs. 161, 162, 163, 170, 171, 180) and reply memoranda (Docs. 174, 175) and is ripe for review.

At issue are whether the documents in question are protected from discovery by plaintiffs under the work product doctrine, the attorney-client privilege, and the settlement privilege.  The Court shall address these issues in connection with the exemplar documents submitted by the parties by category.  Initially, the Court will set forth a timeline of the relevant events involving HNCC which is useful in assessing the various claims of privilege in this case:

•July 2005:  Ohio Environmental Protection Agency (OEPA) issues a Notice of Violation (NOV) to HNCC.

•January 2007:  OEPA issues a NOV to HNCC.

•July 6, 2008:  Director of Portsmouth Local Air Agency (PLAA), Cindy Charles, allegedly witnesses emissions in the coke screening area at HNCC; Charles directly contacts HNCC's control room but HNCC fails to report the malfunction to the OEPA in violation of its permits.

---

[1] The number of documents subject to *in camera* review as originally contemplated in the Order was 110, but has been jointly revised by plaintiffs and defendants to 99 based on later categorization and analysis of the documents at issue.

•July 15, 2008: OEPA visits the facility and during this visit Charles observes a coke screening baghouse failure that is not reported to OEPA by HNCC.

•July 25, 2008: Michael Thomson, SunCoke's President, asks Mark McCormick, SunCoke's General Counsel, to obtain an audit of HNCC, assess any potential concerns, and provide him with legal counsel regarding his findings.

•July 25, 2008: General Counsel McCormick sends a memorandum to Delauna Pack, SunCoke's Director of Corporate Health, Environmental, and Safety (HES) and Carolyn Green, Vice President of Regulatory Affairs at Sunoco, reiterating Thomson's request and stating that SunCoke's Law Department would be assisted in this matter by outside counsel at Barnes & Thornburg, URS Corporation, and others.

•July 30, 2008: SunCoke retains URS, a third-party consultant, to conduct the audit.

•August 6, 2008: PLAA Director Charles meets with Director of Corporate HES Pack, about Kelly Graff (a named plaintiff in the instant case), noting:

> -Graff had been the most vocal citizen complaining about HNCC and had been asked to testify against SunCoke's air permit application for the Middletown, Ohio facility;

> -after running some tests, PLAA believes that coal and coke breeze from HNCC is similar to samples of "black dust" found on Graff's property; and

> -OEPA had ordered Charles to meet with Middletown residents on August 14, 2008 to answer questions about citizen complaints against HNCC and its history of noncompliance.

•August 13 and 15, 2008: URS conducts an audit at HNCC.

•August 19, 2008: OEPA issues a NOV to HNCC.

•September 30, 2008: the United States Environmental Protection Agency (USEPA) conducts an unannounced visit to HNCC.

•October 1, 2008: OEPA issues a NOV to HNCC.

•October 19, 2008: PLAA notifies defendants that Kelly Graff has lodged complaints of "green oven" smells, other odors, and particulate releases allegedly from HNCC.

•December 4, 2008: USEPA issues a Request to Provide Information Pursuant to Section 114(a) of the Clean Air Act, 42 U.S.C. § 7414(a), to HNCC and SunCoke.

4

•December 8, 2008:  USEPA issues its first federal NOV to HNCC.

•January 29, 2009:  SunCoke meets with USEPA to discuss resolution of the NOV.

•February 10, 2009:  USEPA issues a Request to Provide Information Pursuant to Section 114(a) of the Clean Air Act, 42 U.S.C. § 7414(a), to HNCC and SunCoke.

•April 15, 2009:  USEPA issues a federal NOV to HNCC and SunCoke.

•July 1, 2009:  HNCC receives plaintiffs' notice of intent to sue.

•July 17, 2009:  OEPA issues a NOV to HNCC.

•September 14, 2009:  Plaintiffs file a complaint in federal district court.

•December 4, 2009:  USEPA issues a Request to Provide Information Pursuant to Section 114(a) of the Clean Air Act, 42 U.S.C. § 7414(a), to HNCC and SunCoke.

•December 11, 2009:  OEPA issues a NOV to HNCC.

•May 10, 2010:  USEPA issues a Request to Provide Information Pursuant to Section 114(a) of the Clean Air Act, 42 U.S.C. § 7414(a), to HNCC.

## I.  THE 2008 URS AUDIT[2] DOCUMENTS

### A.  Work product protection (Tabs 41-50)

An attorney's work product is reflected "in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways. . . ."  *Hickman v. Taylor*, 329 U.S. 495, 511 (1947).  Work product is protected to ensure that a lawyer can "work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel," and to allow the attorney to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal

---

[2]Defendants label the URS audit as a "litigation" audit, while plaintiffs call it a "compliance" audit.  The Court declines to use either moniker to describe the 2008 URS audit as both imply the legal result desired by each litigant in this case.

5

theories and plan his strategy without undue and needless interference."  *Hickman*, 329 U.S. at

510-11.  "The work-product doctrine protects an attorney's trial preparation materials from

discovery to preserve the integrity of the adversarial process."  *In re: Professional's Direct Ins.*

*Co.*, 578 F.3d 432, 438 (6th Cir. 2009) (citing *Hickman*, 329 U.S. at 510-14).

With certain exceptions, Rule 26(b)(3)[3] protects from disclosure all:  (1) "documents and

tangible things"; (2) "prepared in anticipation of litigation or for trial"; (3) "by or for another

party or its representative (including the other party's attorney, consultant, surety, indemnitor,

insurer, or agent)."  Fed. R. Civ. P. 26(b)(3)(A).  Under the Federal Rules, the work product

protection under Rule 26(b)(3) is not limited to attorneys, but has been extended to documents

and tangible things prepared by or for the party and the party's representative, as long as such

documents were prepared in anticipation of litigation.  *Id.  See Eversole v. Butler County*

*Sheriff's Office*, No. 1:99-cv-789, 2001 WL 1842461, at *2 (S.D. Ohio Aug. 7, 2001) ("Rule

26(b)(3) is not limited solely to attorneys" and "documents and things prepared by the party or

his agent fall within the work product rule.") (citing 8 Wright & Miller, Federal Practice &

Procedure, § 2024.  Rule 26(b)(3) excludes from work product protection "[m]aterials

---

[3]Rule 26(b)(3) provides:

(A) Documents and Tangible Things.  Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).  But, subject to Rule 26(b)(4), those materials may be discovered if:

(i) they are otherwise discoverable under Rule 26(b)(1); and

(ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

Fed. R. Civ. P. 26.

assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes."  Advisory Committee Notes to the 1970 Amendments of Rule 26.

Whether a document has been prepared "in anticipation of litigation" and is protected work product depends on:  "(1) whether that document was prepared 'because of' a party's subjective anticipation of litigation, as contrasted with ordinary business purpose; and (2) whether that subjective anticipation was objectively reasonable."  *In re Professionals Direct Ins. Co.*, 578 F.3d at 439 (quoting *United States v. Roxworthy*, 457 F.3d 590, 594 (6th Cir. 2006)).  "If a document is prepared in anticipation of litigation, the fact that it also serves an ordinary business purpose does not deprive it of protection, but the burden is on the party claiming protection to show that anticipated litigation was the 'driving force behind the preparation of each requested document.'"  *In re Professionals Direct Ins. Co.*, 578 F.3d at 439 (quoting *Roxworthy*, 457 F.3d at 595, 598-99) (internal citations omitted).

Whether a party reasonably anticipated litigation at a particular point in time does not answer the question of whether a disputed document was prepared "because of" litigation or not.  *In re Professionals Direct Ins. Co.*, 578 F.3d at 439.  If the document was created as part of the ordinary business of a party and the ordinary business purpose was the "driving force" or impetus for creation of the document, then it is not protected by the work product doctrine.  *Id*. (citing *Roxworthy*, 457 F.3d at 595).  In other words:

> The document must be prepared because of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation.  Thus, we have held that materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes are not documents prepared in

7

anticipation of litigation within the meaning of Rule 26(b)(3).  Following any industrial accident, it can be expected that designated personnel will conduct investigations, not only out of a concern for future litigation, but also to prevent reoccurrences, to improve safety and efficiency in the facility, and to respond to regulatory obligations.  Determining the driving force behind the preparation of each requested document is therefore required in resolving a work product immunity question.

*National Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 984 (4th Cir. 1992) (internal citation omitted).  In determining whether a document has been prepared in anticipation of litigation, the Court examines the documents themselves and the context within which they were prepared.  *In re Professionals Direct Ins. Co.*, 578 F.3d at 439.

Finally, opinion work product is entitled to near absolute protection against disclosure, while fact work product may be discoverable upon a showing by a party of substantial need for the materials to prepare its case and that it cannot, without undue hardship, obtain substantially equivalent materials by other means.  Fed. R. Civ. P. 26(b)(3)(A).  *See In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 294 (6th Cir. 2002).

Defendants assert that documents related to an audit performed by URS in August 2008 are protected from disclosure under the work product doctrine and the attorney-client privilege. The Court will first address whether these documents may be withheld as work product.

Defendants hired URS to conduct an audit of HNCC's facility on August 13 and 15, 2008.  Defendants assert the purpose of the audit was to obtain a "legal" audit of HNCC and to provide outside counsel (Anthony Sullivan of Barnes & Thornburg) with opinions about HNCC's compliance with regulations and laws.  Plaintiffs assert that the audit was conducted for ordinary business purposes and arose not out of a concern for litigation, but out of heightened concern over compliance issues in light of the upcoming expansion of HNCC, *i.e.*, a business

8

concern.

The Court has reviewed the documents at issue, including those submitted *in camera*, and finds that defendants have not met their burden of showing the 2008 URS audit was requested in anticipation of litigation, rather than for regular business purposes. The audit was requested by SunCoke's President on July 25, 2008. (Doc. 162, Ex. 6). Defendants cite to the following pre-July 25, 2008 events in support of their argument that they believed HNCC faced the threat of a civil suit or enforcement action challenging its operations and environmental compliance: the issuance of NOVs in July 2005 and January 2007 from the OEPA; citizen complaints about HNCC emissions; the public posting of a video of alleged "green pushes" (*i.e.*, excess emissions) from HNCC; the alleged personal observations of visible emissions from HNCC by PLAA Director Charles on July 6, 2008; and the alleged personal observations of visible emissions by Charles on a July 15, 2008 visit to HNCC.

These events, in themselves, do not indicate that a threat of litigation was the driving force behind the request for the audit when viewed in the context of the July 25, 2008 memorandum by SunCoke's President requesting the audit, the scope of the audit, and the subsequent use of the audit by defendants. The memorandum indicates the purpose of the audit was to assess general compliance with regulatory requirements and company policies, which are primarily business concerns for a regulated entity like HNCC, and not because of a threat of Clean Air Act litigation. The memo does not indicate a concern over a threatened enforcement action by any governmental entity or a concern over litigation. In addition, the "mid-2008" events cited by defendants in support of their contention occurred *after* the request for the audit had already been made by SunCoke's President and could not have motivated defendants to seek

the URS audit out of a fear of litigation. (Doc. 161, App. A at 9-10).[4] Additionally, the scope of the audit exceeds that which would be anticipated if the driving force behind the audit was litigation. The audit was described as "generic" by the Director of Corporate HES and covered all aspects of the facility[5], bolstering the conclusion that the purpose of the audit was to assess regulatory compliance in the ordinary course of business, and not because of the threat of litigation.[6]

Moreover, the Court finds the Audit Updates (Tabs 42, 46-49), described by defendants as "designed to help track the status of corrective actions that SunCoke and HNCC were taking to remedy problems" (Doc. 161 at 11; *see also* Doc. 161, App. B, Pack Decl., ¶¶ 37-39), were not created in anticipation of litigation, but rather as a management tool to follow compliance with and completion of the deficiencies noted in the 2008 URS Audit.

---

[4] Defendants cite to an August 6, 2008 meeting between Charles and Pack detailing "vocal" citizen complaints, testing by the PLAA regarding "black dust" found on plaintiffs' property, and an order by the OEPA to Charles to meet with Middletown residents on August 14, 2008, to address citizen complaints about HNCC. (Doc. 161 at 9, App. B, Pack Decl., ¶ 73). Defendants also cite to NOVs issued by the OEPA and USEPA (Doc. 161 at 9, citing Tab 24; Exs. 3, 4), which again occurred *after* the audit was requested.

[5] For example, the audit included evaluation of medical services and first aid, safety standards for electrical systems, maintenance of industrial trucks, and occupational noise exposure.

[6] That SunCoke had not previously retained an outside consultant to perform an HES audit does not persuade the Court that the audit was motivated by the threat of litigation. *Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252 (3rd Cir. 1993), cited by defendants, does not stand for the proposition that "commissioning a non-routine and privileged consultant report is evidence of a party's subjective anticipation of litigation" as defendants state. (Doc. 161 at 17). In *Martin*, a Bally's employee complained to OSHA about safety issues in the hotel kitchen; OSHA directed the defendant to investigate; and OSHA was dissatisfied with the results of the defendant's investigation. The matter was referred to Bally's counsel, who concluded that Bally's risked claims from the affected employees, their union, and OSHA. Counsel directed Bally's to hire a consultant to test certain emissions. In his memo, counsel "referred to 'certain allegations raised by OSHA concerning' the emissions and instructed [Bally's] to contact an 'appropriate testing service to . . . provide us with the necessary data to be utilized in defense of the . . . matter.'" The *Martin* Court held that the correspondence and testimony showed the consultant's report was commissioned "in response to OSHA's inquiry and out of concern that either OSHA or the employees would bring suit," and thus in anticipation of litigation. *Id*. at 1261. Unlike *Martin,* the memo requesting the audit in the instant case expresses concern that HNCC operate in compliance with applicable law and Company policy and was not commissioned in response to any particular inquiries from a governmental agency or citizen complaint nor in response to any concern of litigation.

10

A review of the documents submitted *in camera* to the Court does not convince the undersigned that a threat of litigation was the driving force behind the request for the 2008 URS audit, but rather the audit was requested to insure that HNCC was operating in compliance with the laws and regulations governing the plant, as well as with corporate policy.  "[D]ocuments prepared by a corporation as part of efforts to ensure compliance with federal regulatory agencies . . . and not because of possible litigation, are not protected by work-product doctrine."  *In re Avandia Marketing, Sales Practices and Products Liability Litigation*, No. 07-md-01871, 2009 WL 4641707, at *3 (E.D. Pa. Dec. 7, 2009) (citing *In re Grand Jury Subpoena*, 220 F.R.D. 130, 157 (D. Mass. 2004) (ordinary compliance work of regulated industries constitutes the ordinary course of business and falls outside of work product protection)).  The Court is not persuaded that defendants reasonably anticipated litigation at the time the URS audit was commissioned.

Therefore, documents contained at Tabs 41-50 and those like them are not protected under the work product doctrine because they consist of documents created not for "litigation," but to assess HNCC's compliance with regulatory and corporate requirements in the ordinary course of its business.  Defendants have not met their burden of proof of showing the 2008 URS audit documents are entitled to work product protection.

### B.  Attorney-client privilege (Tabs 41-50)

The attorney-client privilege is intended to encourage full and open communication between clients and their attorneys.  *Upjohn Co. v. U.S.,* 449 U.S. 383, 389 (1981);  *In re Grand Jury Proceedings October 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1996).  "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."  *Upjohn*, 449 U.S.

11

at 390.  Because the privilege reduces the amount of discoverable information in the course of a

lawsuit, the privilege is narrowly construed, *In re Grand Jury Proceedings*, 78 F.3d at 254, and

the "burden of establishing the existence of the privilege rests with the person asserting it."  *In re

Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 450 (6th Cir. 1983).

The Sixth Circuit has held that the following criteria must be satisfied in order to hold

that a communication is protected under the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal advisor in
> his capacity as such, (3) the communications relating to that purpose, (4) made in
> confidence (5) by the client, (6) are at his instance permanently protected (7) from
> disclosure by himself or by the legal advisor, (8) unless the protection is waived.

*Reed v. Baxter*, 134 F.3d 351, 355-56 (6th Cir. 1998) (citing *Fausek v. White*, 965 F.2d 126, 129

(6th Cir. 1992)).

The attorney-client privilege applies in the corporate context and extends to

communications between attorneys and corporate employees regardless of their position within

the corporation where the communications concern matters within the scope of the employees'

corporate duties and the employees are aware that the communication was for purposes of

obtaining legal advice.  *Upjohn*, 449 U.S. at 394.  *See also In re Perrigo Co.*, 128 F.3d 430, 437

(6th Cir. 1997).  The attorney-client privilege extends to factual investigations conducted by an

attorney at the request of the corporate client for purposes of providing legal advice to the

corporate client.  *Upjohn*, 449 U.S. at 394, 395 (where "[t]he communications at issue were made

by Upjohn employees to counsel for Upjohn acting as such, at the direction of corporate

superiors in order to secure legal advice from counsel," the "communications must be protected

against compelled disclosure.").  Thus, factual information conveyed by an employee to the

12

attorney in the course of the factual investigation is protected because the attorney-client

privilege protects "not only the giving of professional advice to those who can act on it but also

the giving of information to the lawyer to enable him to give sound and informed advice."

*Upjohn*, 449 U.S. at 390.  Courts have extended the protection outlined in *Upjohn* to

communications between non-attorney corporate employees where the communications were

made for purposes of securing legal advice from counsel.  *See U.S. ex. rel. Fry v. The Health*

*Alliance of Greater Cincinnati*, No. 1:03-cv-167, 2009 WL 5033940, at *2 (S.D. Ohio Dec. 11,

2009) (citing *Upjohn*, 449 U.S. at 394).  *See also In re New York Renu with Moistureloc Product*

*Liab. Litig.*, No. 2:06MN77777, 2008 WL 2338552, at *10 (D.S.C. May 6, 2008)

("communications among non-lawyer corporate personnel are protected if the dominant intent is

to prepare the information in order to get legal advice from the lawyer"); *Williams v.*

*Sprint/United Management Co.*, 238 F.R.D. 633, 638 (D. Kan. 2006) (The "attorney-client

privilege extends to communications made within a corporation if those communications are

made for the purpose of securing legal advice.") (and cases cited therein); *SmithKline Beecham*

*Corp. v. Apotex Corp.*, 232 F.R.D. 467, 477 (E.D. Pa. 2005) ("In the case of a corporate client,

privileged communications may be shared by non-attorney employees in order to relay

information requested by attorneys."); *Santrade, Ltd. v. General Elec. Co.*, 150 F.R.D. 539, 545

(E.D.N.C. 1993) (same).  As explained by the Court in *Santrade*:

> A document need not be authored or addressed to an attorney in order to be
> properly withheld on attorney-client privilege grounds.  First, in instances where
> the client is a corporation, documents subject to the privilege may be transmitted
> between non-attorneys to relay information requested by attorneys.  Second,
> documents subject to the privilege may be transmitted between non-attorneys
> (especially individuals involved in corporate decision-making) so that the
> corporation may be properly informed of legal advice and act appropriately.

*Id*. (internal citations omitted).

Defendants contend that certain documents associated with the 2008 URS audit (Tabs 41-50) are protected from disclosure by the attorney-client privilege.  *See* Doc. 161 at 10-11, 16-17; Doc. 161, App. A at 45-52.  However, to the extent defendants claim that Tabs 42, 46, 47, 48, and 49 are protected by the attorney-client privilege, *see* Doc. 161, App. A at 47-48, these claims are not well-taken as the attorney-client privilege was not specifically asserted in the privilege log.

Where a party fails to assert the attorney-client privilege on its privilege log, the privilege is waived.  *Banks v. Office of Senate Sergeant-at-Arms*, 241 F.R.D. 376, 386 (D.D.C. 2007) (citing *Carey-Canada v. California Union Ins. Co.*, 118 F.R.D. 242, 248-49 (D.D.C. 1986)).  *See also Rhoads Indus., Inc. v. Bldg. Materials Corp. of Am.*, 254 F.R.D. 216, 221, *order clarified*, 254 F.R.D. 238 (E.D. Pa. 2008) ("Failure to assert a privilege properly may amount to a waiver of that privilege.") (internal citations omitted).  Defendants failed to assert that Tabs 42, 46, 47, 48, and 49 are protected by the attorney-client privilege in their privilege log, despite having numerous opportunities to do so.  (*See* Privilege Logs found at Doc. 91, Ex. 5 (version 1); Doc. 104, App. 5 (version 2); Doc. 146, referencing September 16, 2011 version (version 3) and November 28, 2011 version (version 4); February 15, 2012 version (version 5) produced to the Court in re: April 5, 2012 conference and Order (Doc. 157); April 10, 2012 version (version 6) produced to the Court in relation to the instant discovery dispute).  Only after the sixth version of the log was completed, plaintiffs sought the purportedly protected documents, the Court ordered briefings, and the documents were submitted for *in camera* review did defendants assert in their briefing that the attorney-client privilege applies to these items.  Defendants offer no explanation

in their briefings for their prior failures to assert the privilege and, consequently, the undersigned

finds they have waived the attorney-client privilege for Tabs 42, 46, 47, 48, and 49.  As the Court

has determined, *supra*, that these URS documents and those like them (*i.e.*, documents for which

defendants assert only work product protection) are not otherwise protected by the work product

doctrine, defendants are ordered to produce these documents to plaintiffs.

The Court now turns to the parties' arguments regarding the remaining URS documents at

issue, Tabs 41, 43, 44, 45, and 50.

Defendants contend that Tabs 41 and 45, the final version and a revised draft of the 2008

URS audit, respectively, are subject to protection under the attorney-client privilege.  The revised

draft version, Tab 45, was withheld from plaintiffs in its entirety; however, the final version, Tab

41, was produced with redactions to disclose the underlying factual information that was

incorporated into the audit.  Defendants contend that the draft version and the redacted portions

of the final version of the URS audit contain privileged and confidential draft conclusions,

impressions, and assessments made by URS, which was retained by defendants' outside counsel

to provide a professional opinion regarding HNCC's compliance with applicable laws and

regulations and to assist legal counsel in providing advice requested by defendants.

Plaintiffs assert that defendants have failed to make the necessary showing for applying

the attorney-client privilege to these documents.  Relying on *Intl. Brotherhood of Elec. Workers

Loc. 212 v. American Laundry Machinery, Inc.*, No. 07-cv-324, 2009 WL 81114 (S.D. Ohio Jan.

9, 2009), plaintiffs contend that the attorney-client privilege does not extend to "communications

made to secure or provide environmental advice. . . ."  *Id.*, at *3.  Plaintiffs argue that the

independent observations of URS are not confidential communications between an attorney and

15

client and the draft and final versions of the URS audit are not shielded from disclosure.

Here, the first question the Court must answer is whether the URS audit documents found at Tabs 41 and 45 contain legal advice of any kind sought from a professional legal adviser in his capacity as such.  The answer is "yes."  As explained above, in July 2008, SunCoke's president directed in-house counsel to conduct an HES audit of HNCC to assess its compliance with regulatory requirements and company policies and to provide SunCoke with legal advice based on such findings.  In addition, correspondence from SunCoke's outside counsel, Andrew Sullivan, to URS establishes that the audit was requested by counsel for SunCoke so that URS's investigation, analyses, and opinions could be used by counsel to provide legal advice to SunCoke.  (Tab 43).  Further, a review of the documents reveals that the audit reports contain more than raw information and/or data and include the advice and opinions of URS personnel directed to SunCoke on legal compliance issues.

The next inquiry is whether the URS audit was related to the request for legal advice and communicated in confidence.  Again, the answer is "yes."   Mr. Sullivan's communication to URS demonstrates that the audit information was to be communicated only to necessary SunCoke employees and was otherwise to be considered privileged and confidential.  (Tab. 43).  Ms. Pack's affidavit confirms that the audit was prepared to assist counsel with providing legal advice to SunCoke.  (Doc. 161, App. B, Pack Decl., ¶ 40).  Further, URS was advised that the audit documents should be discretely maintained and not intermingled with any other day-to-day business as the information contained therein was intended to aid counsel in providing legal advice.  *Id*.  Consequently, the documents provided by URS to SunCoke's counsel "for the specific purpose of explaining or interpreting technical data so as to allow counsel to provide

legal advice" to SunCoke are protected by the attorney-client privilege. *Andritz Sprout-Bauer, Inc. v. Beazer East, Inc.,* 174 F.R.D. 609, 635 (M.D. Penn. 1997). *See also U.S. ex. rel. Fry v. The Health Alliance of Greater Cincinnati*, No. 1:03-cv-167, 2009 WL 5033940, at \*4 (S.D. Ohio Dec. 11, 2009) (citing *In re Bieter*, 16 F.3d 929, 938-39 (8th Cir. 1994)) ("As long as the independent contractor has a role similar to that of an employee . . ., communications between the contractor and attorneys for the purpose of seeking legal advice are privileged.").

To the extent that plaintiffs rely on *Intl. Brotherhood of Elec. Workers Loc. 212* for the proposition that information provided by environmental consultants is not protected by the attorney-client privilege, this assertion is not well-taken.  First, the decision in *Loc. 212* contains little explanation of the particular facts presented in that matter and focuses on whether the Magistrate Judge's conclusion was clearly erroneous or contrary to law; consequently, the undersigned is unable to conclude that the court was faced with a situation substantially similar to the instant matter.  *See Loc. 212*, 2009 WL 81114, at \*3.  Further, *Loc. 212* relied on *In re Grand Jury Matter,* 147 F.R.D. 82, 84-85 (E.D. Penn. 1992), which recognized that the attorney-client privilege extends to third party agents, such as environmental consultants, who assist an attorney in giving legal advice.  However, the Pennsylvania court cautioned that the privilege is limited and "when a client's goal is not legal advice, but is rather accounting, medical, or environmental advice, the privilege is inapplicable."  *Id*. at 85.  In that case, the court found no evidence that the information provided by the environmental consultant was for the purpose of assisting counsel in providing legal advice.  Here, in contrast, the memo from SunCoke's President directing in-house counsel to obtain an audit and provide legal advice on HNCC's compliance with regulatory matters, the letter from SunCoke's counsel to URS, and the

declaration of Delauna Pack establish that the URS audit was obtained by SunCoke for the express purpose of assisting its counsel in providing legal advice on environmental compliance matters.  Consequently, the undersigned finds that the URS audit documents, in both the final and draft forms, are protected by the attorney-client privilege.

Turning to Tab 43, the undersigned finds that this document, the "retainer" letter from SunCoke's outside counsel seeking advice and opinions from URS, is also protected by the attorney-client privilege.  The letter from Mr. Sullivan explains URS's role as a consultant to SunCoke's attorneys for the purpose of providing legal advice to SunCoke.  The letter also specifies that the information gathered and opinions formulated are considered confidential and privileged and are to be communicated only to a small group of individuals tasked with advising SunCoke.  While the fact that URS was retained by Attorney Sullivan for SunCoke is not in itself a privileged communication, the letter includes "the motive of the client in seeking representation [and] the specific nature of the services" to be provided; consequently, the communication is protected by the privilege.  *Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.*, 258 F.R.D. 95, 101 (S.D.N.Y. 2009).  *See also In re Grand Jury Witness*, 695 F.2d 359, 362 (9th Cir. 1982) (retainer letters including the ultimate motive for retaining an attorney and confidential communications between attorney and client made in order to obtain legal assistance are privileged).  As URS was retained by SunCoke's attorney to assist him in providing legal advice to his client, his "retainer letter" to URS, containing his motive and the nature of the services sought, is privileged and not subject to disclosure.

Tab 44 consists of notes taken by Delauna Pack during a post-audit debriefing meeting reflecting the impressions, conclusions, and opinions of the URS auditors.  (Doc. 161, App. B,

18

Pack Decl., ¶ 36).  Defendants contend that these notes are protected by the attorney-client privilege as they are Ms. Pack's recordings of URS's opinions, which were gathered to assist SunCoke's attorneys in providing legal advice.  Ms. Pack is the Director of Corporate HES at SunCoke and she was selected as one of the few corporate individuals who was to work with its attorneys and the URS consultants to advise SunCoke on their environmental obligations.  *(Id.* at ¶¶ 5, 7, 10, 14, 32-36, 40).  Given Ms. Pack's position, the nature of her work with SunCoke's attorneys, and the content of her notes contained in Tab 44 - her thoughts on the opinions provided by URS - the notes are properly characterized as documents generated "in order to relay information requested by attorneys" and, thus, are privileged.  *SmithKline Beecham Corp.*, 232 F.R.D. at 477.

Lastly, defendants assert that Tab 50, a summary of information gathered during the URS audit, is protected by the attorney-client privilege.  The document was authored by Andrew Broadbent, the Sunoco auditing manager and member of the URS audit team (Doc. 161, App. B, Pack Decl., ¶ 32), and directed to SunCoke's prior in-house counsel, Mark McCormick, and several other SunCoke corporate officers and employees.  The document is a one-page enumerated summary of key URS findings and is marked as being subject to the attorney-client privilege.  On its face, the document is unmistakably a communication to SunCoke's counsel explaining Broadbent's understanding of the URS audit findings for the purpose of providing counsel the audit information needed to provide legal advice to SunCoke.  As the document contains attorney-client communications related to SunCoke's counsel's role as a legal adviser, it is protected by the attorney-client privilege.

In sum, the 2008 URS audit documents for which defendants assert work product

19

protection only are not protected and must be produced to plaintiffs.  The URS audit documents

for which defendants assert the attorney-client privilege are protected and need not be produced.

## II.  COMPLIANCE AUDITS

### A.  2006 audit report (Tabs 1, 4-7)

Defendants assert that certain documents associated with a February 2006 Health,

Environmental and Safety (HES) Audit of HNCC are protected by the attorney-client privilege.

The final version of the 2006 Audit[7] was produced in its entirety to plaintiffs, while certain

memoranda and other documents were withheld under the attorney-client privilege.  (Tab 1).

Defendants withheld from production a March 29, 2006 memorandum from Mark McCormick

(SunCoke's General Counsel) to Stan Wash (HNCC General Manager) (Tab 1 at 1); a March 20,

2006 memorandum from Roseann Keatley (Sunoco HES Audits and Best Practices) to General

Counsel McCormick (Tab 1 at 2); and narrative responses to each audit finding regarding the

steps HNCC had taken to correct each finding and possible future actions, along with follow-up

comments and opinions by General Counsel McCormick and Delauna Pack (SunCoke's Director

of HES) (Tabs 4-7).

Plaintiffs contend that defendants have failed to meet their burden of showing that the

withheld memos either request or reflect legal advice from or by counsel.  They also contend that

defendants fail to establish that the employee and counsel "comments" and review of the 2006

corporate audit findings involve or were made for the purpose of providing legal advice.

Plaintiffs argue that the communications appear to relate to technical, compliance, or business

---

[7]The stated scope of the compliance audit by the Corporate HES Auditing Group was "a review of actions relevant to state and federal regulations covering all HES areas, as well as applicable Sunoco standards."  (Tab 1 at 3).

advice, not legal advice, and as such, defendants have not established that the documents are entitled to protection under the attorney-client privilege.

In the instant case, the first question the Court must answer is whether legal advice of any kind was sought from a professional legal adviser in his capacity as such. The answer is "yes." The March 29, 2006 memorandum from General Counsel to the HNCC General Manager shows that in January 2006, SunCoke's then-President Dingus specifically requested a legal opinion from SunCoke's Legal Department regarding HNCC's compliance with HES laws and regulations. (Tab 1 at 1). General Counsel then requested that an audit be undertaken to provide the factual basis for the requested legal opinion. (Tab 1 at 1, 2).

The second question to be answered is whether the communications were related to the request for legal advice and made in confidence by the client. In other words, did the corporate employee make the communication for purposes of obtaining or providing legal advice? Again the answer is "yes." The memos (Tab 1 at 1, 2) relate to the request for legal advice by SunCoke's Legal Department and were made in confidence as reflected by the substance of the memos (specifically restricting access to the audit report to people who have "a direct need to know" to address the audit items for purposes of maintaining confidentiality and the attorney-client privilege). The disputed memoranda reflect the communication of legal advice by General Counsel McCormick or communications to General Counsel McCormick acting as a legal advisor for the purpose of obtaining legal advice. Therefore, they are protected by the attorney-client privilege.

The other withheld documents are likewise protected by the attorney-client privilege. General Counsel requested that HNCC and SunCoke personnel, restricted to those with a "need

21

to know," address the audit's findings and provide him with comments and an update regarding their review of the audit.  (Tab 1 at 1).  Tabs 4-7 are emails and attached comments and tracking changes to the 2006 Audit Report requested by General Counsel, acting in his capacity as legal counsel.  The information was requested in narrative form as a response to each finding.  (Ex. 23 to defendants' brief submitted *in camera*) (cover mail to Tab 6).  The distribution lists on the emails are limited to SunCoke's General Counsel and senior HES corporate representatives with knowledge of the facts at issue in the 2006 Audit.  The audit findings, comments, and tracking changes constitute the factual predicates underlying the provision of legal advice by SunCoke's Legal Department to assess HNCC's compliance with state and federal HES regulations.  As noted by the Supreme Court in *Upjohn*, "The first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant."  449 U.S. at 390-91.  The withheld documents reflect the factual information from employees with knowledge of audit findings; their responses to the findings or actions taken in response; and that such information was transmitted to counsel for the purpose of providing legal advice to SunCoke on HNCC's compliance with HES requirements.  Plaintiffs argue that the evidence suggests at most that Pack and McCormick were providing technical, business-related advice which is not protected.  Even if the information is characterized as "technical" or "business-related," those communications were gathered at the request of counsel for the primary purpose of aiding counsel in providing legal services to SunCoke.  The Court notes that:

> [L]egal and business considerations may frequently be inextricably intertwined.
> This is inevitable when legal advice is rendered in the context of commercial
> transactions or in the operations of a business in a corporate setting.  The mere
> fact that business considerations are weighed in the rendering of legal advice does
> not vitiate the attorney-client privilege.

22

*Picard Chem. Profit Sharing Plan v. Perrigo Co.*, 951 F. Supp. 679, 686 (W.D. Mich. 1996)

(citation omitted).  There is no evidence or hint that the memos, emails, or documents were

"funneled" through SunCoke's attorney for purposes of creating a privilege for otherwise

nonprivileged business documents.  Factual investigations undertaken by attorneys *as attorneys*

for purposes of providing legal advice to a client are protected by the attorney-client privilege.

The withheld documents reflect that the information gathered by corporate employees and

transferred to General Counsel was done so at counsel's request and in furtherance of counsel's

provision of legal advice.  The documents at Tabs 4-7 are therefore protected by the attorney-

client privilege.[8]  *Upjohn*, 449 U.S. at 394.

      Therefore, documents contained at Tabs 4-7, and those like them, are protected by the

attorney-client privilege and may be withheld from plaintiffs.[9]

### B.  2009 ERM audit (Tabs 2, 3, 8-10)[10]

---

[8]As the Court concludes that Tab 4 is protected by the attorney-client privilege, the Court declines to reach the question of whether it is also protected as work product.

[9]The attorney-client privilege does not shield the discovery of underlying facts.  As the Supreme Court explained:

> [T]he protection of the privilege extends only to communications and not to facts.  A fact is one thing and a communication concerning that fact is an entirely different thing.  The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.

*Upjohn Co.*, 449 U.S. at 395-396 (internal citation omitted).  Here, plaintiff were provided the 2006 Audit Report and have the underlying facts forming the basis of the audit.  To the extent plaintiffs wish to discover what action defendants took or failed to take in response to the audit, they may seek such factual information through deposition testimony of appropriate witnesses.

[10]To the extent defendants argue in their brief that the documents found at Tabs 2, 3, 8, and 10 are protected by the work product doctrine (Doc. 161 at 18-19), the Court denies any request to withhold the documents on this basis.  The only privilege claimed in the privilege log for Tabs 2, 3, 8, and 10 is the attorney-client privilege.  The Court cannot permit withholding of documents for a reason not set forth on the privilege log and defendants have had ample opportunity to accurately set forth in their privilege log the basis for any claimed privilege.

Defendants withheld certain documents relating to a 2009 audit of HNCC performed by Environmental Resources Management (ERM), a firm hired by SunCoke's outside counsel, Shumaker, Loop & Kendrick LLP, at the request of defendants. (Doc. 161, App. B, Tosi Decl., ¶ 10). ERM was retained to provide assistance in assessing HNCC's compliance with federal regulations and to support a certification by defendants that HNCC was in compliance with all applicable air regulations in anticipation of SunCoke's application for a prevention of significant deterioration (PSD) permit for SunCoke's Middletown, Ohio facility. (*Id*. at ¶¶ 10-12). Defendants assert they anticipated litigation in connection with the Middletown, Ohio facility PSD permit because a prior permit was challenged by private parties, a not-for-profit entity, and the City of Monroe in both judicial and administrative proceedings and those same parties expressed opposition to the new permit. (*Id.* at ¶¶ 13-14).

The sample documents are found at Tabs 2, 3, 8-10. Tab 2 is an August 11, 2009 email from Director of HES Pack to Louis Tosi (outside counsel) and Lisa Runyon (in-house counsel) and reflects a communication with counsel about the retention of an agent (ERM). Tosi and Runyon served as counsel for SunCoke and HNCC in the ERM Audit process. (Doc. 161, App. B, Tosi Decl., ¶¶ 7-11). Pack's communications with ERM and counsel regarding ERM's assessments were within the scope of her position as Director of HES and Pack was aware that the ERM assessment was confidential and being conducted in order for SunCoke to obtain legal advice regarding HNCC's compliance status. (Doc. 161, App. B, Tosi Decl., ¶16; *see* Tab 2 ("We will be providing the background documents (under privilege) tomorrow.")).

Plaintiffs object to the withholding of the email, asserting there is no evidence that the communication withheld at Tab 2 was made to seek legal advice. The Court disagrees. An *in*

24

*camera* review of the document reflects a confidential communication from the client (Pack) to counsel relating to a request for legal advice and for the purpose of providing information to counsel to secure legal services. *Upjohn,* 449 U.S. at 394. Because the primary purpose of the email communication was to secure legal advice, it is protected by the attorney-client privilege.

Tabs 3 and 8 are each single page email chains, with each chain consisting of two email communications. (Privilege log at 6.) Tabs 3 and 8 reflect an identical initial email dated August 20, 2009 from Delauna Pack to SunCoke's in-house counsel and top management officials.[11] The email relays outside counsel's (Tosi's) impressions of ERM's initial feedback on the audit and counsel's "bottom line" opinion regarding HNCC's compliance. Tab 3 contains a second "reply all" email in response from Michael White (SunCoke's Vice President of Operations) providing his commentary on Pack's report of outside counsel's impressions. Tab 8 contains a second reply email from White to Pack providing his commentary on Pack's report of outside counsel's impressions.

Plaintiffs object to the withholding of these documents stating that defendants improperly claim the attorney-client privilege over the entire email chain without establishing that any communication in the email chain was made for the purpose of obtaining or providing legal advice.

After reviewing these documents *in camera*, the Court finds defendants have met their burden of showing the email communications are protected by the attorney-client privilege. The email communications from Pack reflect outside counsel's initial legal impressions and opinions

---

[11] These include HNCC's General Manager, HNCC's Environmental Manager, SunCoke's Senior Vice President of Operations & Engineering, SunCoke's President and Chief Operating Offer, SunCoke's Director of Operations, and SunCoke's Corporate Environmental Manager.

about the ERM audit findings and HNCC's compliance with legal requirements.  Pack then

communicated that legal advice to other corporate personnel who appear to be responsible for

environmental compliance operations related to air emissions or who were senior managers.

(Doc. 161, App. C-Key Players List).  The ERM audit process was within the scope of the duties

of these employees who were aware that the audit was confidential and being performed to

obtain legal compliance advice from outside counsel.  (Doc. 161, App. B, Tosi Decl., ¶¶ 15-17).

*See Upjohn*, 449 U.S. at 394 ("The [protected] communications concerned matters within the

scope of the employees' corporate duties, and the employees themselves were sufficiently aware

that they were being questioned in order that the corporation could obtain legal advice.").  *See*

*also Wrench LLC v. Taco Bell Corp.*, 212 F.R.D. 514, 517 (W.D. Mich. 2002) ("while corporate

executives may share legal advice with lower-level corporate employees without waiving the

privilege, the privilege extends only to those employees with a 'need to know,' including those

employees with general policymaking authority and those with specific authority for the subject

matter of the legal advice"); *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 518 (D. Conn.), *appeal*

*dismissed*, 534 F.2d 1031, 1032 (2d Cir. 1976) ("A privileged communication should not lose its

protection if an executive relays legal advice to another who shares responsibility for the subject

matter underlying the consultation.").  As such, these documents are protected by the attorney-

client privilege.

Tab 9 is a draft copy of the ERM Audit.  Tab 10 is an email chain dated August 25-26,

2009, transmitting the draft ERM Audit from ERM to defendants' outside counsel (Tosi and

Budzynski) and to Ken Weiss and David Fewell (of ERM), and then to defendants' corporate

representatives (Delauna Pack, Chris Sharp, SunCoke's Corporate Environmental Manager, and

Anna Tang, SunCoke's Corporate Environmental Engineer).  Both in-house counsel (Runyon) and outside counsel (Tosi) requested that Pack review the audit (Doc. 161, App. B, Tosi Decl., ¶ 17), and Pack in turn requested the assistance of Tang and Sharp.  (Tab 10).  The documents contained at Tabs 9 and 10 were withheld by defendants on the basis of attorney-client privilege and work product.[12]

Plaintiffs object to the withholding of the draft audit, but not the email chain (Tab 10), on the basis of attorney-client privilege.  (Doc. 163 at 21).  Therefore, Tab 10 is protected by the attorney-client privilege and the Court will address the withholding of the draft audit (Tab 9) only.

Plaintiffs contend that the draft audit is not protected by the attorney-client privilege because the factual observations of a consultant like ERM are not the type of client confidences that fall within the privilege, citing *U.S. Postal Service v. Phelps Dodge Refining Corp.*, 852 F. Supp. 156 (E.D.N.Y. 1994).  *Phelps* is distinguishable from the instant case.  The court in *Phelps* recognized the general rule that the attorney-client privilege extends to agents of an attorney who are "hired to assist in the rendition of legal services."  *Id.* at 161 (quoting *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)).  The protection did not apply in *Phelps* because the consultants in that case "were not employed by Phelps Dodge attorneys specifically to assist them in rendering legal advice," but rather "were hired by defendants to formulate a remediation plan acceptable to the NYSDEC and to oversee remedial work at the Property.  Their function was not to put information gained from defendants into usable form for their attorneys to render

---

[12] As the Court concludes that the draft ERM Audit is protected by the attorney-client privilege, the Court declines to reach the question of whether it is also protected as work product.

legal advice. . . ." *Id.*

Here, in contrast, ERM was specifically hired by outside counsel (Tosi) for the very purpose of performing an audit to assist Tosi in the rendition of legal advice on compliance issues. The attorney-client privilege extends to agents of the attorney where the confidential communication was made for the purpose of assisting the attorney in rendering legal advice to the client. *See Arkwright Mut. Ins. Co. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 93-3084, 1994 WL 58999, at *5 (6th Cir. Feb. 25, 1994) (citing *United States v. Kovel*, 296 F.2d 918, 921-22 (2nd Cir. 1961) (Friendly, J.) (attorney-client privilege extends to communications made to an attorney's agent for the purpose of ultimately receiving legal advice)). *See also Cottillion v. United Refining Co.*, 279 F.R.D. 290, 299 (W.D. Pa. 2011) ("courts have taken an expansive view of protected communications between independent contractors and counsel where the outside consultant functions like an employee in providing information which facilitates the obtaining of legal advice") (citations omitted); *Broessel v. Triad Guar. Ins. Corp.*, 238 F.R.D. 215, 218-219 (W.D. Ky. 2006) ("[C]onfidential communications disclosed to or made in the presence of certain agents of the attorney (*e.g.*, accountants, engineers, or experts) to further the rendition of legal advice or in connection with the legal representation are subject to the attorney-client privilege.") (citing *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)); *Abdallah v. Coca-Cola Co.*, No. 1:98cv3679, 2000 WL 33249254, at *3 (N.D. Ga. Jan. 25, 2000) ("Where counsel seeks and obtains outside consulting services, the attorney-client privilege has been extended to such third parties 'employed to assist a lawyer in the rendition of legal services.'") (and cases cited therein). Because the presence of an agent or consultant who provides information to the lawyer to enable the lawyer to give sound and informed legal advice

28

does not destroy the confidential nature of the communication, the draft ERM audit is protected by the attorney-client privilege.[13]

### C.  Waiver of attorney-client privilege for nondisclosed ERM audit documents

Plaintiffs argue that by producing a copy of the final ERM Audit during discovery and in connection with defendants' litigation relating to its Middletown, Ohio plant, defendants waived the attorney-client and/or work product privilege for all drafts of the ERM Audit and related communications that defendants seek to withhold in the *Graff* litigation.

Rule 502 of the Federal Rules of Evidence governs the issue of whether an intentional waiver by a party of a document protected by the attorney-client privilege or work-product doctrine constitutes a general subject matter waiver as to other similar documents:

> When the disclosure is made in a federal proceeding . . . and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal . . . proceeding only if:
>
> (1) the waiver is intentional;
>
> (2) the disclosed and undisclosed communications or information concern the same subject matter; and
>
> (3) they ought in fairness to be considered together.

Fed. R. Evid. 502(a).

There is no question that defendants voluntarily waived the attorney-client privilege for the final version of the ERM Audit.  Defendants acknowledge that the privilege was waived because the final version of the ERM Audit was used in SunCoke's recent litigation relating to its Middletown, Ohio plant (Doc. 161, App. A at 9) and defendants voluntarily disclosed the final

---

[13]The Court notes that the final version of the ERM Audit was produced to plaintiffs as Bates range HNCC037934-655.  (Doc. 161 at 9).

29

ERM Audit to plaintiffs during discovery.  (Doc. 174 at 9).

The Court also finds that the draft versions of the ERM Audit concern the same subject matter as the final version of the ERM Audit.  Defendants describe the draft audit as a document that "communicates confidential draft conclusions, impressions, and assessments of ERM to Defendants' outside counsel. . . ."  (Doc. 161, App. A at 9).  This assertion by defendants acknowledges that the withheld drafts of the ERM Audit concern the same subject matter of the final ERM Audit produced to plaintiffs.[14]  With respect to the related communications for which plaintiffs assert the attorney-client privilege and work product protection have been waived by the disclosure of the final ERM audit, the Court finds the withheld email communications found at Tabs 3 and 8 concern the same subject matter as the final ERM Audit as they concern the impressions of counsel on ERM's initial feedback on the audit and counsel's "bottom line" opinion regarding HNCC's compliance.  However, the email at Tab 2 reflects a communication with counsel about the retention of ERM and does not reflect audit findings such as emission limitations or pollution control requirements.  Therefore, the email at Tab 2 does not concern the same subject matter as the final ERM Audit and is not subject to any potential waiver under Rule 502(a).

The only remaining question is whether in fairness the undisclosed communications and drafts should be disclosed.  The Sixth Circuit has determined that "litigants cannot hide behind the privilege if they are relying upon privileged communications to make their case.  '[T]he attorney-client privilege cannot at once be used as a shield and a sword.'"  *In re Lott*, 424 F.3d

---

[14] Although neither party has submitted a copy of the final ERM Audit, plaintiffs state that the final ERM Audit discusses emission limitations and pollution control requirements, which has not been disputed by defendants.

30

446, 454 (6th Cir. 2005) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir.

1991)).  The Advisory Committee Notes to Subdivision (a) of Rule 502 explain that "a subject

matter waiver (of either privilege or work product) is reserved for those unusual situations in

which fairness requires a further disclosure of related, protected information, in order to prevent

a selective and misleading presentation of evidence to the disadvantage of the adversary."

Advisory Committee Notes to the 2007 Amendments of Rule 502.  "The idea is to limit subject

matter waiver to situations in which the privilege holder seeks to use the disclosed material for

advantage in the litigation but to invoke the privilege to deny its adversary access to additional

materials that could provide an important context for proper understanding of the privileged

materials."  8 Charles Alan Wright, *et al.*, Federal Practice and Procedure § 2016.2 (3d ed., 2010

update).

Defendants assert that they have not offered the audit as evidence in this litigation and

thus subject matter waiver of the attorney-client privilege for ERM audit materials is not

necessary to prevent a selective or misleading presentation of such materials.  On the other hand,

plaintiffs argue that the final ERM audit concludes that HNCC was "compliant" with air

pollution laws and because defendants' affirmative defenses directly place at issue their

compliance with environmental laws (Doc. 19 at ¶¶ 285, 290), fairness dictates that disclosure of

the other ERM audit materials must be compelled.

The undersigned finds that it would be unfair to permit defendants to produce the final

version of the ERM audit which concludes that HNCC was compliant with regulatory

requirements, yet withhold the draft versions of the audit and other communications that may

undermine or help explain the factual basis for this conclusion.  While defendants disclaim any

tactical advantage by voluntarily disclosing the final ERM audit because they "have not put the

audit at issue" in this case, the absence of such a tactical use does not essentially mandate a

finding of no waiver.  *See In re OM Securities Litigation*, 226 F.R.D. 579, 590-91 (N.D. Ohio

2005) ("The Court must consider, not only whether there is a tactical benefit, but whether it is

fair to uphold the privilege considering the nature of the disclosure.").  Although the "audit"

itself may not be "at issue," whether HNCC has been compliant with state and federal regulations

during the relevant time frame in this lawsuit is at issue – an issue the final version of the ERM

audit specifically addresses.  Additionally, defendants' affirmative defenses assert that  HNCC

has been in substantial compliance with federal, state, and local statutes and regulations, and by

making the subject matter of the final ERM audit (compliance with regulatory requirements) a

defense in this action, defendants have placed the subject matter of the audit at issue.  *See New

Phoenix Sunrise Corp. v. C.I.R.*, 408 F. App'x 908, 919 (6th Cir. 2010).[15]

Defendants voluntarily disclosed the final ERM audit and it would be unfair to permit

defendants to withhold the documents underlying the audit – documents that would provide

additional information and context to properly understand the final ERM Audit.  Accordingly,

the Court finds that subject matter waiver is warranted under Rule 502(a) for the draft versions of

---

[15] *Smith & Nephew, Inc. v. New Hampshire Ins. Co.*, No. 2:04-cv-03027, 2011 WL 1930703 (W.D. Tenn. May 19, 2011), cited by defendants, is inapposite.  The court in *Smith* declined to reach the question of whether any asserted privilege had been waived pursuant to Rule 502, stating that the "question of waiver is more appropriately determined if and when either party attempts to present arguably privileged information as substantive evidence, either upon motion for summary judgment or at trial, because it is at this point in the litigation that the District Court would determine whether or not certain materials 'ought in fairness to be considered together' to avoid a 'selective and misleading presentation of evidence to the disadvantage of the adversary.'" *Id*. at *2.  The *Smith* court failed to cite any authority in support of this proposition.  In addition, the undersigned finds that delaying a finding on the Rule 502 waiver issue until summary judgment or trial would substantially prejudice plaintiffs.  Discovery would have already concluded and plaintiffs would be unable to probe the import of the previously undisclosed documents through deposition discovery.  Even if discovery were reopened on the eve of summary judgment or trial to permit the taking of additional evidence, this would only serve to further delay, unnecessarily, the proceedings in this case.

the ERM Audit and any email communications like those found in Tabs 3 and 8.

## III.  GENERAL COMMUNICATIONS (TABS 21-30)[16]

### A.  Tab 21

Tab 21 is an email chain that was produced in part to plaintiffs.  The Court's review of the redacted portion of the email reflects legal advice from corporate in-house counsel to an internal group of defendants' employees.  This document is clearly protected by the attorney-client privilege and need not be produced to plaintiffs.

### B.  Tab 22

Tab 22 is an email from Director of Corporate HES Pack to a group of client representatives and in-house counsel.  The email concerns pre-construction activities permitted prior to obtaining a final permit-to-install for SunCoke's Middletown, Ohio facility, and not the HNCC facility.  (Doc. 161, App. B, Pack Decl., ¶ 57).  Related Ohio regulations attached to the email were produced to plaintiffs.  Defendants assert this email was inadvertently deemed responsive to plaintiffs' document requests and placed on the privilege log, when in reality the email is not relevant to the instant case.  Plaintiffs argue that defendants have "conceded" the relevance of the document by placing it on the privilege log and request the Court to reject defendants' belated relevance argument.  (Doc. 175 at 18).  The Court's *in camera* review of the document indicates it is simply not relevant to plaintiffs' Document Requests Nos. 90 and 6[17] (*see* Doc. 175 at 18) and need not be produced to plaintiffs.

_____

[16]Defendants have withdrawn their claim of privilege and produced the notes at Tab 30 to plaintiffs. Therefore, Tab 30 is no longer in dispute.

[17] These document requests seek information about "facility" operations, environmental compliance, maintenance, and emissions.  As the term "facility" necessarily means the facility at HNCC, documents relating to another facility are not relevant.

### C.  Tab 23

Tab 23 is a "Legal Memorandum regarding future permitting at HNCC" that was authored by outside counsel, Anthony Sullivan, and transmitted to Pack, Chris Sharp (SunCoke's Corporate Environmental Manager) and Katherine Gates (SunCoke's outside counsel).  The Court's review of the memorandum reflects legal advice from outside counsel to an internal group of defendants' employees.  In addition, the memorandum reflects counsel's thought processes on strategy and reflects it was prepared because of the ongoing *Graff* litigation.  It is therefore protected as work product.  *See In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 294 (6th Cir. 2002).  This document is clearly protected by the attorney-client privilege and the work product doctrine and need not be produced to plaintiffs.

### D. Tab 24

Tab 24 is a memorandum dated July 21, 2008 from in-house counsel Mark McCormick to SunCoke's President and copied to SunCoke's VP of Commercial Operations, VP of Human Resources, and Director of HES.  The memo was created at the request of SunCoke's President following the PLAA's July 15, 2008 visit to HNCC, which raised a variety of HES issues at the plant as well as a baghouse failure and observable emissions.  McCormick elicited assistance from Pack who was present at the July 15 visit and requested she draft a report of her visit.  McCormick and Pack collaborated on a more formal memorandum which resulted in the document at Tab 24.  The memo from in-house counsel relates his opinions on the performance of Stan Wash, the General Manager of HNCC, on environmental compliance, among others.  (Doc. 161, App. B, Pack Decl., ¶¶ 24-30).  Wash was terminated the following day.  (*Id.*, ¶ 31).

Defendants assert the communication is protected by the attorney-client privilege and as

work product.  Plaintiffs contend there is no evidence that in-house counsel was providing legal, as opposed to business, advice on an employment related issue, and that to be protected, the predominant purpose of the communication must be to give legal advice.  (Doc. 163 at 30, citing *Cooey v. Strickland*, 269 F.R.D. 643, 650 (S.D. Ohio 2010)).  Plaintiffs also contend that defendants have not met their burden of showing the memorandum was created in anticipation of litigation for purposes of protection under the work product doctrine.

The Court determines that the memorandum found at Tab 24 is protected by the attorney-client privilege.  The memorandum was created based on factual information from Pack to in-house counsel at the direction of a corporate superior for the purpose of securing legal advice. *See Upjohn*, 449 U.S. at 394.  It is apparent from the context of the circumstances surrounding the creation of the memorandum, as well as its content reflecting an assessment of compliance with health, environmental and safety regulations, that in-house counsel was rendering legal advice.  *See Cooey*, 269 F.R.D. at 650 (assessment of compliance with legal obligation by lawyer is legal advice).  The memorandum was held in confidence with senior SunCoke management personnel (Doc. 161, App. B, Pack Decl., ¶ 30) and may be withheld on the basis of the attorney-client privilege.  *Reed*, 134 F.3d at 355-56.

### E.  Tab 25

Tab 25 is a memorandum dated July 28, 2009 from Boris Reyes, SunCoke Corporate Engineer and Project Manager, to Director of Corporate HES Pack, that is included within a larger file.  Defendants assert the attorney-client privilege for the first four pages of the document.  Defendants assert that the remainder of the document is (i) not-privileged, and also is not responsive because it relates to SunCoke's facility in Brazil or (ii) not privileged but

responsive, and produced as HNCCE-00147371-373 and HNCCE-00124006.  Plaintiffs

acknowledge that defendants affirmatively state that the memorandum was prepared so that in-

house counsel could provide legal advice, and request the Court verify the same through its *in*

*camera* review.

 Defendants have met their burden of showing the document is protected under the

attorney-client privilege.  This memorandum was attached to a transmittal email

from Reyes to Jennifer Guthrie, SunCoke In-House Counsel, in which Reyes states that Pack

requested that he prepare and treat the memorandum as privileged.  (Ex. 25, submitted *in camera*

to the Court).  Pack requested Reyes to prepare this memo regarding the feasability of lowering

coal charges in HNCC ovens in his capacity as SunCoke's Project Manager.  SunCoke sought

legal advice regarding the legal implications of lower coal charges which directly impact the

emissions generated by HNCC's operations.  (Doc. 161, App. B, Pack Decl., ¶¶ 61-63).  The

memorandum contains confidential communications made for purposes of enabling counsel to

provide legal advice to defendants and is protected by the attorney-client privilege.  *See Upjohn*,

449 U.S. at 394.  Therefore, the document contained at Tab 25 is protected by the attorney-client

privilege and may be withheld from plaintiffs.

 **F.  Tab 26**

 Tab 26 is a report that was prepared in December 2009 by URS, along with Chris Sharp

and Delauna Pack, at the request of in-counsel, Lisa Runyon.  (Doc. 161, App. B, Pack Decl., ¶

70).  The report concerns a "potential baghouse modeling issue" identified by URS and contains

an analysis of compliance issues within the context of stack modeling.  In-house counsel

requested the report to support her evaluation of the legal risks associated with the potential

issue.  *Id*.  Defendants assert work product protection for this document.

The Court's *in camera* review of the document, along with the evidence presented by defendants (*Id.*), indicates that the report is protected work product.  The potential modeling issue discussed in the report relate directly to HNCC's compliance with its Clean Air Act permit.  Viewing the creation of the document in the context of the circumstances facing HNCC at the time (in October 2009), the report was prepared "because of" the *Graff* litigation, which had been filed the previous month, and the state and federal NOVs received in 2008 and 2009.  As the *Graff* complaint raised issues with various aspects of HNCC operations, including stack-related issues, as well as its compliance with the CAA, defendants objectively and subjectively anticipated the baghouse modeling issue could impact the litigation.  *In re Professionals Direct Ins. Co.*, 578 F.3d at 439.  Therefore, the document at Tab 26 is protected under the work product doctrine.

Even where a document qualifies as work product under Rule 26(b)(3), a party may secure its disclosure upon a showing of a "substantial need" for the document and that it cannot obtain the "substantial equivalent" through other means without "undue hardship."  Fed. R. Civ. P. 26(b)(3)(A)(ii).  In determining whether documents are subject to disclosure under the Rule, the Court must determine whether the requesting party has a substantial need for them, taking into account their relevance and importance and the availability of the facts from other sources.  *National Union Fire Ins.*, 967 F.2d at 984-85.

Plaintiffs contend they have a substantial need for the December 2009 URS report "to the extent the report contains facts or otherwise describes conditions that cannot be duplicated."  (Doc. 163 at 32).  Plaintiffs assert they would not be able to obtain the substantial equivalent of

37

facts or conditions from unique periods of time as it is unlikely the exact conditions could ever be duplicated.  (Doc. 163 at 32-33).

The Court's review of Tab 26 indicates that the report does not relate to any fact or condition from any unique period of time.  Defendants assert that stack modeling is a component of permitting requirements and the underlying factual data is publicly available.  (Doc. 174 at 15).  Plaintiffs do not dispute defendants' assertion in this regard.  (Doc. 175 at 17-18). Accordingly, the Court determines that plaintiffs have not met their burden of showing a substantial need for the document or that they cannot obtain the substantial equivalent through deposition discovery or by retaining their own consultant.

### G.  Tab 27

Tab 27 is a compliance matrix created by Director of Corporate HES Pack at the request of in-house counsel McCormick in March 2005.  The document lists HNCC's permit requirements, potential deviations or violations, proposed corrective actions, and an assessment of the severity of such violations or threat of violations.  (Doc. 161, App. B, Pack Decl., ¶ 15). Pack used the matrix in meetings with McCormick and the former SunCoke VP of Operations to communicate the status of HNCC's compliance with permit requirements and potential consequences of noncompliance, including the receipt of NOVs.  (*Id.*, ¶¶ 15-16).  Pack understood such communications to be confidential.  (Id., ¶ 14).

The Court determines that the document found at Tab 27 is protected by the attorney-client privilege.  The attorney-client privilege applies where a corporate employee provides information to a lawyer to enable counsel "to give sound and informed advice."  *Upjohn*, 449 U.S. at 390.  The matrix at Tab 27 reflects factual information from a corporate employee with

38

knowledge of particular compliance findings and proposed corrective actions.  Such information

was transmitted to counsel at his request for the purpose of providing legal advice to SunCoke on

HNCC's compliance with HES requirements.  *Upjohn*, 449 U.S. at 394.  The withholding of Tab

27 is proper.

### H.  Tab 28

Tab 28 is a February 12, 2009 email chain from Delauna Pack to HNCC General

Manager John Essman and SunCoke's VP of Operations Michael White.  The email forwards

four earlier emails, all of which were produced to plaintiffs except the earliest email.  This

earliest email, dated February 11, 2009, is from SunCoke's President Thomson to (and copying)

senior management at SunCoke and HNCC, including SunCoke General Counsel McCormick

and Sunoco General Counsel Kuritzkes. This email notifies counsel and senior management of a

significant incident at HNCC that resulted in the collapse of a stack.  Defendants assert it was

standard protocol to notify the Legal Department of any incidents giving rise to legal

ramifications.  Defendants assert the attorney-client privilege as the basis for withholding this

document.

Defendants have not shown that the email to senior management and general counsel was

for the purpose of seeking legal advice or was made at the request of counsel for the purposes of

rendering legal advice.  There is no evidence that corporate counsel were acting in a legal

capacity "in order for Defendants to obtain the full realm of advice and facts it would need to

handle the situation."  (Doc. 161, App. A at 34).  *See Amway Corp. v. Procter & Gamble Co.*,

No. 1:98-cv-726, 2001 WL 1818698, at *5 (W.D. Mich. April 3, 2001) ("Where . . . in-house

counsel appears as one of many recipients of an otherwise business-related memo, the federal

courts place a heavy burden on the proponent to make a clear showing that counsel is acting in a professional legal capacity and that the document reflects legal, as opposed to business, advice."). Defendants have failed to meet their burden of showing that SunCoke's President shared this email with in-house counsel and others for the predominant purpose of seeking legal advice, as opposed to notifying senior management and others of the stack collapse at HNCC in accordance with general protocol. Because defendants have not established that the communication was made to corporate counsel in order for defendants to secure legal advice, *Upjohn*, 449 U.S. at 394, the attorney-client privilege does not apply. Therefore, Tab 28 must be provided to plaintiffs.

    **I.  Tab 29**

    The chart found at Tab 29 reflects a comparison of levels of allowable air emissions under two different types of air permits for SunCoke's Middletown, Ohio facility. Defendants assert that the document was created at the request of outside counsel, Cheri Budzynski, and that the chart was sent to URS, with copies to senior management and counsel. Defendants also assert that the May 27, 2009 chart is not related to HNCC's operations or permits. (Doc. 161, App. B, Pack Decl., ¶ 59).

    Defendants assert this chart was inadvertently deemed responsive to plaintiffs' document requests and placed on the privilege log, and that the chart is not relevant to the instant case. Plaintiffs argue that defendants have "conceded" the relevance of the document by placing it on the privilege log and request the Court to reject defendants' belated relevance argument. (Doc. 175 at 18). The Court's *in camera* review of the document indicates it is simply not relevant to plaintiffs' Document Requests Nos. 90 and 6 (*see* Doc. 175 at 18) and need not be produced to

40

plaintiffs.

## IV.  DRAFT LETTERS TO REGULATORS (TABS 11-20, 51-60)

Defendants seek protection for draft letters to federal and state environmental regulators that were created by SunCoke's Corporate Environmental staff at counsel's request, asserting such draft letters are protected by the attorney-client privilege and work product doctrine.  These documents are represented by Tabs 11-19.[18]  Defendants contend that because counsel directed the letter-writing process for purposes of educating counsel about the facts necessary to develop legal advice, the drafts are protected even if counsel did not always draft the letters.  (Doc. 161 at 20).

Plaintiffs contend that emails or documents sent to attorneys and non-attorneys for general "review" that do not reflect that legal advice was given or sought are not protected by the attorney-client privilege, and that where a lawyer acts as a mere conduit for otherwise non-privileged documents, *i.e.*, where counsel is one of many recipients of an otherwise business related memo, defendants may not withhold the documents under the attorney-client privilege. (Doc. 161 at 6-7).  Plaintiffs also argue that a lawyer's mere editorial comments are not protected by attorney-client privilege because the lawyer is not providing legal, but rather editorial advice. (*Id*. at 6).

### A.  Draft letters to the Portsmouth Local Air Agency (Tabs 11, 12, 13, and 18)

Tabs 11, 12, 13, and 18 consist of draft letters to the Portsmouth Local Air Agency (PLAA), along with various e-mails between client and counsel transmitting drafts of the letters.

---

[18] Defendants have withdrawn their claim of privilege for Tab 20 and this document is no longer in dispute. (Doc. 161, App. A at 17; Doc. 163 at 28).

Tab 11 includes (i) an email, dated January 11, 2010, from Corporate Environmental Manager Sharp to Director of Corporate HES Pack, HNCC's Environmental Manager Kinder, and HNCC's General Manager Essman, copying in-house counsel Runyon, that forwards an email chain from outside counsel, Tosi and Budzynski; and (ii) a draft letter attached to the preceding email to OEPA, through the PLAA, responding to a NOV, prepared by counsel. Tab 12 consists of an email, dated January 12, 2010, from Budzynski to Sharp and Kinder, and copying Tosi. Tab 13 consists of a subsequent draft of the letter included in Tab 11 to the OEPA, prepared by counsel with client comment. Tab 18 consists of a preliminary draft of the letter to the OEPA prepared by Kinder. (Ex. 17 to defendants' brief submitted *in camera*) (cover email to Tab 18). The draft letters respond to a NOV from the OEPA that HNCC received on December 11, 2009. *See* Tab 13.

Outside counsel Tosi provided legal advice to defendants in connection with their response to the December 2009 NOV received from the OEPA. (Doc. 161, App. B, Tosi Decl., ¶ 22). Tosi requested that defendants provide him with an initial draft response letter to the OEPA's December 2009 NOV as a means to communicate the supporting facts to him and colleague Cheri Budzynski. (*Id.*, ¶ 23; Sharp Decl., ¶ 42). In response, Sharp requested that Kinder, HNCC's Environmental Manager, prepare an initial draft of this letter based on his knowledge of HES matters at HNCC. (Doc. 161, App. B, Sharp Decl., ¶ 43). In response, Kinder prepared the draft letter at Tab 18. Outside counsel then edited the draft letters to incorporate language to ensure defendants' responses were based on sound legal and advocacy positions. (Doc. 161, App. B, Tosi Decl., ¶ 24). These corporate representatives often worked with counsel to obtain legal advice and understood that communications with counsel regarding

42

responses to NOVs were confidential and subject to the attorney-client privilege and work product protection.  (Doc. 161, App. B, Pack Decl., ¶¶ 13-14; App. B, Sharp Decl., ¶¶ 12-13).

As an initial matter, both parties agree that *draft* letters and documents may be protected by the attorney-client privilege even where the final letter or document is sent to a third party. (Doc. 174 at 8).  Plaintiffs do not contend that draft documents may never be privileged when the final is sent to third parties; rather, they assert that the draft documents must reflect that legal advice is being sought or obtained in confidence before the attorney-client privilege will attach and that any attorney-client communications that appear in a final, non-privileged letter are no longer privileged.  (Doc. 175 at 10).

The Court's *in camera* review of the documents contained at Tabs 11, 12, 13, and 18 reflects that the draft letters created by corporate employees and revised by counsel, as well as the emails transmitted to and from counsel, were at counsel's request and in furtherance of counsel's provision of legal advice to defendants and fall squarely within the protection of the attorney-client privilege outlined by the Supreme Court in *Upjohn*.[19]  Outside counsel specifically requested information from corporate employees with knowledge of the factual circumstances that precipitated the December 2009 NOV to enable counsel to provide legal advice to respond to the NOV.  The draft letter at Tab 18 was created by HNCC's Environmental Manager, within the scope of his duties, at the request of counsel for purposes of obtaining legal advice to respond to the December 2010 NOV.  *See Upjohn*, 449 U.S. at 394.  Obtaining this information was the first step in assessing the necessary factual background for counsel to provide legally relevant advice

---

[19]Because the Court determines these documents are protected by the attorney-client privilege, there is no need to determine whether they are also documents prepared in anticipation of litigation and qualify as work product.

to defendants.  *See Upjohn*, 449 U.S. at 390-91.  The revised drafts and emails contain

confidential communications made for purposes of enabling counsel to provide legal advice to

defendants in response to the NOV.  Therefore, the documents contained at Tabs 11, 12, 13, and

18,  and those like them, are protected by the attorney-client privilege and may be withheld from

plaintiffs.[20]

**B.  Draft letters responding to the October 2009 PLAA Notice (Tabs 14, 15, and 19)**

On October 19, 2009, defendants received an email from the PLAA regarding a citizen

complaint by Kelly Graff about HNCC operations.  (Doc. 162, Ex. 10; Doc. 161, App. B, Sharp

Decl., ¶¶ 36-38; Doc. 161, App. B, Tosi Decl., ¶20).  Outside counsel Tosi provided legal advice

to defendants in connection with their response to the October 2009 PLAA Notice.  (Doc. 161,

App. B, Tosi Decl., ¶ 18).  Tosi and in-house counsel Runyon requested that defendants provide

them with an initial draft response letter to the October 2009 PLAA Notice as a means to

communicate the supporting facts to them to respond to the citizen complaint.  (*Id.*, ¶ 19; Sharp

Decl., ¶ 38).  In response to counsels' request, Sharp requested that Kinder, HNCC's

Environmental Manager, prepare an initial draft response to the October 2009 PLAA Notice.

(Doc. 161, App. B, Sharp Decl., ¶ 39).   Tab 19 is the draft letter response prepared by Kinder.

Kinder's draft letter was reviewed by Sharp (Doc. 161, App. B, Sharp Decl., ¶ 40), who emailed

it to outside counsel Tosi for review and comment.  (*Id.*; Tab 14, email from Sharp to Tosi; Tab

15, draft letter attached to email).

---

[20]As previously indicated, the attorney-client privilege does not shield the discovery of underlying facts.
*See Upjohn*, 449 U.S. at 395-396.   Plaintiffs have been provided the final version of the privileged drafts.
Defendants state that the only difference between the draft and final versions is that the final version lacks the
confidential information and communications that support the assertion of the privilege.  The Court has no reason to
dispute this assertion and to the extent plaintiffs may wish to challenge this assertion, they may do so through
deposition testimony of appropriate witnesses, as opposed to a redaction of the draft versions.

Defendants assert that the documents at Tabs 14, 15 and 19 are protected by the attorney-client privilege.  As an initial matter, defendants' privilege log asserts only work product protection for Tab 15.  As defendants have waived the attorney-client privilege for this document, Tab 15 cannot be withheld by defendants on the basis of attorney-client privilege.  *See Banks*, 241 F.R.D. at 386; *Rhoads Indus.*, 254 F.R.D. at 221, 226.  Nonetheless, Tabs 14 and 19 are protected by the attorney-client privilege.  The email communication from client to outside counsel (Tab 14) seeks the advice of counsel in responding to the October 2009 PLAA Notice and the draft letter (Tab 19) was created by a corporate employee, within the scope of his duties, who had knowledge of the factual circumstances that precipitated the October 2009 citizen complaint and PLAA Notice, to enable counsel to provide legal advice to the client.  The Kinder draft and email to outside counsel contain confidential communications made for purposes of enabling counsel to provide legal advice to defendants in response to the October 2009 PLAA Notice and are protected by the attorney-client privilege.  *See Upjohn*, 449 U.S. at 394.  Therefore, the documents contained at Tabs 14 and 19, and those like them, are protected by the attorney-client privilege and may be withheld from plaintiffs.

Defendants claim that Tab 15 – the draft of the response to the October 2009 PLAA Notice that was created by Pack and Sharp from the Kinder draft  –  is work product and protected.[21]  Defendants argue that because suit had already been filed by plaintiffs (Kelly Graff and others) in September 2009, they reasonably believed that Kelly Graff's complaint to the

---

[21]While defendants argue that the draft response to the October 2009 PLAA Notice found at Tab 19 is also protected as work product, the privilege log claims only attorney-client privilege for Tab 19.  Therefore, defendants have waived any claim for work product protection for Tab 19.  *See Banks*, 241 F.R.D. at 386; *Rhoads Indus.*, 254 F.R.D. at 221, 226.

PLAA would be used by plaintiffs to support their claims in the instant case.  (Doc. 161, App. B, Tosi Decl., ¶ 21).  Plaintiffs contend that the draft letter was prepared in response to the October 19, 2009 Notification and therefore the draft letter would have been prepared in substantially the same manner regardless of the litigation.

The resolution of whether the draft letter found at Tab 15 is protected as work product depends on whether the draft letter was prepared in anticipation of litigation.  *See In re Professionals Direct Ins. Co.*, 578 F.3d at 439.  In other words, the Court must determine whether the draft letter was generated "because of" the *Graff* litigation that was filed one month previous, or whether the draft response would have been created regardless of the litigation.  "[A] document will not be protected if it would have been prepared in substantially the same manner irrespective of the anticipated litigation."  *Roxworthy*, 457 F.3d at 593-94 (citing *United States v. Adlman*, 134 F.3d 1194, 1205 (2d Cir. 1998)).  The "because of" standard does not protect from disclosure "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation."  *Adlman*, 134 F.3d at 1202 (citing Fed. R. Civ. P. 26(b)(3), Advisory Committee's Note; *National Union Fire Ins. Co.*, 967 F.2d at 984).  If a document was created in the ordinary course of business, it is not protected as work product "even if the party is aware that the document may also be useful in the event of litigation."  *Smith v. Conway Organization, Inc.*, 154 F.R.D. 73, 78 (S.D.N.Y. 1994) (citations and quotations omitted).  *See also State of Maine v. U.S. Dept. of Interior*, 298 F.3d 60, 70 (1st Cir. 2002); *Adlman*, 134 F.3d at 1202.

Here, the Court determines that the draft response found at Tab 15 is protected as work product.  In reaction to the October 2009 PLAA Notice/email from Ms. Charles, defendants

elicited the assistance of outside counsel to formulate a response. Counsel, in turn, requested

defendants to provide them with an initial draft response letter as a means to communicate the

supporting facts to them to respond to the citizen complaint. Tab 15 is the resulting draft letter.

Viewing the creation of the document in the context of the circumstances facing HNCC, the draft

response was prepared "because of" and in anticipation of the *Graff* litigation. The email to

HNCC relates several specific dates of "green oven" smells perceived by the complainant (Kelly

Graff) on several dates in August, September and October 2009, and the consequences thereof

(inability to go outside, raise the house windows, give riding lessons). The PLAA requested

HNCC to provide information on emissions and potential causes thereof for the specific dates

relayed by the complainant. The Graffs had filed their federal court complaint just one month

prior to the October 20, 2009 email from Ms. Charles of the PLAA. As the PLAA was seeking

information directly related to the Clean Air Act lawsuit filed by the Graffs and in response to

complaints by one of the plaintiffs in the *Graff* litigation, HNCC could reasonably anticipate that

any information it provided in response to the PLAA, a public agency, would likely be used to

prosecute the *Graff* litigation. Because defendants were facing actual claims in an existing

lawsuit, their subjective anticipation of litigation was objectively reasonable. *In re Professionals

Direct Ins. Co.*, 578 F.3d at 439. Therefore, the document at Tab 15 and any other like

documents are protected as work product.

### C. Substantial Need for Document Found at Tab 15

To the extent plaintiffs may seek production of the document found at Tab 15 despite the

Court's finding of work product protection, that request is denied. Plaintiffs must show a

"substantial need" for the document and that plaintiffs cannot obtain the "substantial equivalent"

through other means without "undue hardship."  Fed. R. Civ. P. 26(b)(3)(A)(ii).  Defendants

assert that a final copy of the letter was produced to plaintiffs in this case.  (Doc. 161 at 20).

Thus, plaintiffs have been provided with the underlying factual information responsive to the

PLAA's request for information and the Court cannot discern any remaining substantial need for

the draft response to the PLAA's October 2009 request.

### D.  Notice of Violation (NOV) from the Ohio EPA (Tabs 16 and 17)

Tabs 16 and 17 are email chains dated September 21 and 22, 2009, regarding a Notice of

Violation from the Ohio EPA in July 2009.  (Doc. 162, Ex. 14).  Tab 16 is an email chain

between Corporate Environmental Manager Sharp and Director of Corporate HES Pack.  Tab 17

is an email chain between outside counsel Tosi, Sharp, and Pack concerning draft language

responding to a request from Director of PLAA Cindy Charles, that was sent to Tosi on

September 2, 2009.  *See* Tab 16; Ex. 24 to defendants' brief submitted *in camera* (cover email to

Tab 20, attached to Tab 16, referencing their response to a letter sent on September 2, 2009 and

the need to submit to "Cindy").  Defendants claim these communications are protected by the

attorney-client privilege and as work product.

Defendants cannot withhold the communication found at Tab 16 on the basis of attorney-

client privilege as the privilege log claims only work product and settlement protection for this

document.  *See Banks*, 241 F.R.D. at 386; *Rhoads Indus.,* 254 F.R.D. at 221, 226.  Likewise,

defendants cannot withhold the communication found at Tab 17 as work product because no such

privilege was asserted on the privilege log; the only privilege claimed on the log was the

attorney-client privilege.  *Id.*

The Court finds that the email communication found at Tab 17 is protected by the

attorney-client privilege.  After receiving the July 2009 NOV, Pack and Sharp sought legal

advice from outside counsel Tosi for purposes of formulating a response to the NOV.  Sharp and

Pack drafted the initial version of the response to convey facts to counsel, then worked with

counsel to revise and prepare a satisfactory response and final version.  (Doc. 161, App. B, Pack

Decl., ¶¶ 17-19, Sharp Decl., ¶¶ 14-16; Tab 17).  These corporate representatives often worked

with counsel to obtain legal advice and understood that communications with counsel regarding

responses to NOVs were confidential and subject to the attorney-client privilege and protection

for work product.  (Doc. 161, App. B, Pack Decl., ¶¶ 13-14; App. B, Sharp Decl., ¶¶ 12-13).  The

email chain at Tab 17 contains confidential communications between outside counsel and client

corporate representatives made for purposes of enabling counsel to provide legal advice to

defendants in response to the NOV.  *Upjohn*, 449 U.S. at 394.  Therefore, the document

contained at Tab 17 and documents like those found at Tab 17 are protected by the attorney-

client privilege and may be withheld from plaintiffs.

Defendants seek to withhold the email chain at Tab 16 on the basis of work product

protection.  The email chain is between Pack and Sharp and contains draft text to be used in a

response to the NOV.  (Tab 16).  As the work product protection applies to documents prepared

by or for the party in anticipation of litigation, Fed .R. Civ. P. 26(b)(3), the remaining question

on Tab 16 is whether it was prepared in anticipation of litigation.

Defendants argue that the email contains draft text to be used in response to an OEPA

NOV and "a draft response to the NOV is an advocacy piece that expresses opinions and

strategies for addressing the allegations in the NOV."  (Doc. 161, App. A at 19).  They assert that

the email language was drafted in late September 2009, shortly after plaintiffs filed their

complaint in the instant case. Defendants also state that the OEPA in the NOV letter alleged violations of HNCC's permit limitations in connection with a failed stack test. (Doc. 162, Ex. 14). Defendants contend that their response to the NOV "played in directly to the claims and defenses it could make in its ongoing litigation with Plaintiffs. . . ." (Doc. 161, App. A at 20).

Plaintiffs argue that defendants have not established that the response to the NOV was prepared for litigation or because of anticipated litigation. Plaintiffs assert that the fact that the timing of defendants' response to the NOV coincides with the *Graff* litigation is not enough to show that the driving force behind the response was the litigation. They also assert that given the practice of regulators to request a response to a NOV, defendants would have prepared the document in substantially similar form regardless of litigation.

Defendants have met their burden of showing the email chain found at Tab 16 is protected as work product.[22] In response to the OEPA's July 17, 2009 NOV, defendants elicited the assistance of outside counsel to formulate a response. The participation of counsel is one factor that weighs in favor of a finding that a document is work product. *See Transocean Deepwater, Inc. v. Ingersoll-Rand Co.*, No. 08-4448, 2010 WL 5374744, at *3 (E.D. La. Dec. 21, 2010); *Elec. Data Sys. Corp. v. Steingraber*, No. 4:02 CV 225, 2003 WL 21653414, at *5 (E.D. Tex. July 9, 2003); *Wikel v. Wal–Mart Stores, Inc.*, 197 F.R.D. 493, 495 (N.D. Okla. 2000). Counsel, in turn, requested Pack and Sharp to draft the initial letter in response to the NOV to provide counsel with the relevant factual background. The emails that followed contain draft language to be included in the response to the NOV, as well as comments and opinions about the draft language. Viewing the emails in Tab 16 in the context of the factual circumstances

---

[22] The Court declines to reach defendants' claim of settlement privilege for this document.

underlying defendants' response to the NOV, the Court determines that the emails were prepared because of the prospect of litigation[23]:  the plaintiffs had sent defendants a Citizen Suit Notice pursuant to the federal Clean Air Act and Resource Conservation and Recovery Act on July 1, 2009, advising defendants of their intention to file a citizen suit against defendants within 90 days for violations of federal law (Doc. 162, Ex. 13); the OEPA NOV was issued approximately two weeks later, on July 17, 2009, advising defendants of violations of federal and state regulatory requirements in contravention of the Permit to Install and the Ohio Revised Code; the OEPA NOV identifies the same monitor downtimes for certain emissions that form the basis, in part, of the claims alleged in plaintiffs' Citizen Suit Notice; and the NOV requested a response by defendants to specify, *inter alia*, the cause of and corrective actions to be taken in response to excessive monitor downtimes and that acceptance of defendants' response did not constitute a waiver of the OEPA's authority to seek civil penalties for alleged violations of specific emissions standards.  The circumstances present more than a remote prospect of future litigation when the email communications were prepared.  Also, the emails were not prepared in the ordinary course of business, but rather in response to a potential civil action for alleged violations of the PTI and Ohio law as expressly set forth in the July 2009 NOV.  *See Cambrians for Thoughtful Dev., U.A., v. Didion Milling, Inc.,* No. 07-C-246-C, 2007 WL 5618671, at *2 (W.D. Wis. Nov. 27, 2007) (emails exchanged with lawyer and consultants discussing response to notice of violation from state department of natural resources were not prepared in ordinary course of business and protected by work product).  *See also Briggs & Stratton Corp. v. Concrete Sales & Servs.,* 174

---

[23] "Litigation" includes "proceedings before administrative tribunals if they are of an adversarial nature."  8 Wright & Miller, Federal Practice & Procedure, § 2024.

F.R.D. 506, 509 (M.D. Ga. 1997) (materials prepared after EPA had identified potentially responsible parties in an environmental cleanup were prepared in anticipation of litigation). Given the series of events faced by defendants in July 2009, when presented with a Citizens Suit Notice by plaintiffs and a NOV by the OEPA based on the same facts and legal theories, defendants faced potential claims for violations of federal and state air quality laws that reasonably could result in litigation.  The likelihood that the OEPA might take legal action against defendants was more than a remote possibility and, in light of the plaintiffs' Notice of Citizen Suit, the likelihood that the NOV and defendants' response thereto would form part of the claims or defenses in a citizen suit demonstrate that the response was prepared because of the prospect of litigation.  In view of the nature of the emails and the factual circumstances surrounding their creation, the emails can fairly be said to have been prepared because of the prospect of litigation.  The email chain found at Tab 16 is therefore protected work product.

**E. Substantial Need for Document Found at Tab 16**

Defendants' final response to the OEPA NOV is a matter of public record which plaintiffs have already or may in fact obtain.  Plaintiffs thus have or can obtain the underlying factual information responsive to the NOV and the Court cannot discern any remaining substantial need for the email communications relating to the draft NOV response.  *See* Fed. R. Civ. P. 26(b)(3)(A)(ii).

**F.  Responses to federal NOVs and Clean Air Act Section 114 information requests from the USEPA Administrator (Tabs 51-60)**

The documents included as Tabs 51-60 consist of a cover email, draft letters, and draft tables (as attachments to the draft letters), all of which were created in connection with

defendants' responses to federal NOVs and Clean Air Act Section 114 information requests from the USEPA Administrator.  Defendants assert their responses to the federal NOVs and Section 114 requests are protected from disclosure by the attorney-client privilege, by the settlement privilege, and as work product.

Defendants cannot withhold the communications found at Tabs 51, 52, 54, 55, 56, 58, and 59 on the basis of attorney-client privilege because the privilege log claims only work product and settlement privilege protection for these documents.  Therefore, defendants have waived the attorney-client privilege for these documents.  *See Banks*, 241 F.R.D. at 386; *Rhoads Indus.,* 254 F.R.D. at 221, 226.  Likewise, defendants cannot withhold the communications found at Tab 53 as work product or under the settlement privilege because these privileges were not asserted on the privilege log; the only privilege claimed on the log is the attorney-client privilege. *Id*.

### 1.  Documents responsive to Section 114 requests (Tabs 51, 52, 60)

Section 114(a) of the Clean Air Act (CAA), 42 U.S.C. § 7414(a)[24], empowers the USEPA

---

[24]Under Section 114(a) of the Clean Air Act, 42 U.S.C. § 7414(a), the USEPA Administrator or authorized representative may require any person who owns or operates any emission source, on a one-time, periodic or continuous basis to:

(A) establish and maintain such records;

(B) make such reports;

(C) install, use, and maintain such monitoring equipment, and use such audit procedures, or methods;

(D) sample such emissions . . . ;

(E) keep records on control equipment parameters, production variables or other indirect data when direct monitoring of emissions is impractical;

(F) submit compliance certifications in accordance with subsection (a)(3) of this section; and

Administrator or authorized representative to require the owner or operator of an emission

source, on a one-time, periodic or continuous basis, to issue requests to companies for

information the EPA requires to develop regulations and determine compliance.  These requests

are typically referred to as Section114 requests, and the company's responses as Section 114

responses.

Unlike NOVs, the Section 114 requests do not include specific claims of violations of the

law.  Rather, the requests are issued by the USEPA to gather factual information pursuant to its

statutory authority to develop regulations or assess compliance.  Section 114 requests are issued

for purposes of developing or assisting in the development of implementation plans, standards of

performance, and emission standards, or in determining whether a company is in violation of any

such standard or implementation plan.  42 U.S.C. § 7414(a).

On December 4, 2009, the USEPA issued a Request to Provide Information Pursuant to

Section 114(a) of the Clean Air Act, 42 U.S.C. § 7414(a), to defendants.  (Doc. 162, Ex. 15).

The Section 114 request states that the USEPA was requesting this information to determine

whether HNCC was complying with the Clean Air Act.  The request also advises that the USEPA

may use the information submitted by HNCC in an administrative, civil, or criminal action.  The

Section 114 request sought factual information, including all instances and relevant dates/times

recorded since February 1, 2009, when any bypass vent on unit P901 or P902 was open and the

percentage of total emissions vented from the bypass vents; whether the PLAA or OEPA was

notified about the bypass events; all instances of CEMS downtime and deviations from the CAA,

including emissions limits, recorded since February 1, 2009; and all instances of mercury sorbent

---

(G) provide such other information as the Administrator may reasonably require. . . .

trap monitor downtime and deviations from the CAA, including emissions limits, recorded since September 2008. The Section 114 request also directed HNCC to perform stack tests to determine emissions of certain chemical compounds. (Doc. 162, Ex. 15).

Tabs 51 and 52 contain draft letter responses to the December 2009 Section 114 request from the USEPA. Tab 51 contains outside counsel Anthony Sullivan's December 28, 2009 edits to earlier drafts, including the draft at Tab 52. *See* Ex. 36 (submitted *in camera*; cover email to Tab 51). The draft at Tab 52 reflects Chris Sharp's comments to a "template" draft response provided by outside counsel Sullivan. *See* Ex. 30 (submitted *in camera*; cover email to Tab 52). The document at Tab 60 is a draft response to the December 4, 2009 Section 114 information request that was prepared by SunCoke Corporate Environmental Engineer Anna Tang and environmental consultant/Principal at URS Corporation John Carson at the request of Sunoco in-house counsel Runyon. (Doc. 161, App. B, Sharp Decl., ¶ 41).

The draft responses to the Section 114 request are not protected as work product. Rule 26(b)(3) excludes from work product protection "materials assembled in the ordinary course of business, or *pursuant to public requirements unrelated to litigation*, or for other non-litigation purposes." Fed. R. Civ. P. 26(b)(3) Advisory Committee Notes (emphasis added). *See National Union Fire Ins. Co.*, 967 F.2d at 984 (citing Advisory Committee Notes ); *Martin*, 983 F.2d at 1260-61 (citing Advisory Committee Notes). "This exclusion from work product protection of materials assembled 'pursuant to public requirements unrelated to litigation' applies 'even if the party is aware that the document may also be useful in the event of litigation.'" *In re Raytheon Sec. Litig.*, 218 F.R.D. 354, 359 (D. Mass. 2003) (quoting *Pacamor Bearings v. Minebea Co.*, 918 F. Supp. 491, 513 (D. N.H. 1996)). *See California ex. rel. Wheeler v. Southern Pacific*

55

*Transportation Co.*, No. CIV S-92-1117, 1993 WL 816066, at *4 (E.D. Cal. Sept. 2, 1993)

(documents required to be prepared under CERCLA are not protected as work product even

though litigation involving that information is probable or in existence).  *See also Goosman v. A.*

*Duie Pyle, Inc.,* 320 F.2d 45, 52 (4th Cir. 1963) (declining to extend work product protection to

documents because "[t]hey were made in the ordinary course of business under [Interstate

Commerce Commission] regulations and do not represent the lawyer's work product within the

holding in *Hickman v. Taylor*").  The rationale for this rule was explained by one court: "Because

the document would have been created for non-litigation reasons anyway, disclosure of the

information therein would not disadvantage its creator, or advantage his opponent, by revealing

the creator's legal strategy or tactics; thus, the document's release in discovery would not

contravene the policies supporting the work product rule."  *Stout v. Illinois Farmers Ins. Co.*, 150

F.R.D. 594, 604 (S.D. Ind. 1993).

        The documents found at Tabs 51, 52, and 60 were created to respond to the USEPA's

Section 114 request for specific, factual information about emissions from HNCC.  Although the

*Graff* litigation had already been filed, the driving force behind the communications was for

business and regulatory purposes, and the documents would have been prepared regardless of

whether the plaintiffs had filed suit.  In the normal course of business, HNCC, like other owners

or operators of an emission source, is required to periodically answer specific questions and/or

provide information to the USEPA about emissions pursuant to federal regulations.  Thus, the

responses to the Section 114 requests would have been "prepared in substantially the same

manner irrespective of" the *Graff* or any other anticipated litigation.  *Roxworthy*, 457 F.3d at

593-94; *see also Adlman*, 134 F.3d at 1202 (documents "that would have been created in

56

essentially similar form irrespective of the litigation" are not protected as work product).  The draft letters, tables, and emails generated in response to the USEPA's Section 114 requests were created to comply with HNCC's obligations under the Clean Air Act and not in anticipation of litigation or because of the *Graff* litigation.  Therefore, the documents found at Tabs 51, 52, and 60, and those like them, are not protected as work product.

Defendants further claim that the draft Section 114 responses found at Tabs 51, 52, and 60 are protected by the settlement privilege.  Defendants contend these draft documents were prepared in an effort to satisfy the Section 114 requests and in furtherance of defendants' overall goal of reaching a resolution with the USEPA regarding the alleged violations.  In support, defendants claim that these documents would not have been prepared but for the receipt of the December 8, 2008 NOV, which marked the commencement of their settlement negotiations with the USEPA.

In opposition, plaintiffs assert there is no evidence that these draft documents were exchanged with or contain communications made to the USEPA or other parties to the negotiations.  As such, plaintiffs argue that these documents are discoverable as they are not the inherently unreliable types of communications that the settlement privilege is designed to protect.  Plaintiffs contend that the settlement privilege is limited to documents and communications created in furtherance of settlement and that documents and/or drafts created that are merely related to settlement negotiations, like the documents at Tabs 51, 52, and 60, are not protected.

### a. The Settlement Privilege

The Sixth Circuit has recognized a "settlement privilege" under federal law pursuant to which "[s]tatements made in furtherance of settlement are privileged and protected from third-

party discovery." *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 977

(6th Cir. 2003).  The court in *Goodyear* relied on four basic rationales in determining that "any

communications made in furtherance of settlement are privileged." *Id*. at 983.  First, the Court

recognized there is "a strong public interest in favor of secrecy of matters discussed by parties

during settlement negotiations." *Id*. at 980.  The court acknowledged that for "settlement talks to

be effective, parties must feel uninhibited in their communications." *Id*.  The court explained:

> Parties are unlikely to propose the types of compromises that most effectively lead
> to settlement unless they are confident that their proposed solutions cannot be used
> on cross examination, under the ruse of "impeachment evidence," by some future
> third party.  Parties must be able to abandon their adversarial tendencies to some
> degree.  They must be able to make hypothetical concessions, offer creative quid pro
> quos, and generally make statements that would otherwise belie their litigation
> efforts.  Without a privilege, parties would more often forego negotiations for the
> relative formality of trial.  Then, the entire negotiation process collapses upon itself,
> and the judicial efficiency it fosters is lost.

*Id*.

Second, the court relied on a historical tradition of affording settlement communications

confidentiality. *Id*.  Third, the Sixth Circuit recognized that the truthfulness of statements made

during the course of settlement negotiations is inherently questionable. *Id*. at 981.  The court

stated that such statements are typically marked by "numerous instances of puffing and

posturing" as they are not directed to the merits of the claim at issue. *Id*. (citation omitted).

Moreover, statements made during settlement negotiations may be based on assumed facts which

would be "highly misleading if allowed to be used for purposes other than settlement." *Id*.

(citation omitted).  Finally, the court determined that if no settlement privilege were in place,

undesirable consequences would result.  The court noted as an example that parties might have to

engage in third-party discovery and obtain depositions of those individuals present at the

settlement negotiations given the likelihood that no transcripts of settlement talks exist.  *Id*. at 982.

The Sixth Circuit in *Goodyear* distinguished settlement talks from the settlement relationship or agreement itself.  The court emphasized that "the relationship itself is not privileged, but only the underlying communications."  *Id*. at 982 (citations omitted).  *See QSI-Fostoria, D.C., LLC v. BACM 2001-1 Cent. Park., West, LLC*, No. 02-07466, 2006 WL 2010791, at *2 (N.D. Ohio July 17, 2006) (settlement privilege does not extend beyond actual negotiations to the terms of the final agreement).  *See also Grupo Condumex, S.A. de C.V. v. SPX Corp.*, 331 F. Supp.2d 623, 629 (N.D. Ohio 2004); *Thornton v. State Farm Mutual Auto Ins. Co., Inc.*, No. 1:06-cv-00018, 2006 WL 3499986, at *3 (N.D. Ohio Dec. 5, 2006).

The Court is not aware of any decision by a court in the Sixth Circuit that has extended the settlement privilege recognized in *Goodyear* to statements or documents which have not been communicated to other parties or are not related to settlement communications.  Nor has the settlement privilege been extended to documents that have been communicated to other parties, but which were not authored or created for the purpose of settlement negotiations.  To the contrary, district court decisions applying the settlement privilege subsequent to *Goodyear* make clear that the ruling in that case is "quite limited."  *See Westlake Vinyls, Inc. v. Goodrich Corp.*, No. 5:03-CV-00240-R, 2007 WL 1959168, at *3 (W.D. Ky. June 29, 2007).  "*Goodyear* does not create a broad privilege protecting from discovery any document or communication arguably related to settlement negotiations, fruitful or otherwise.  Rather, by its own language, it protects only 'communications made in *furtherance* of settlement.'"  *Id*. (citing *Goodyear*, 332 F.3d at 983) (emphasis added by *Westlake*).  *See Grant, Konvalinka & Harrison v. U.S.*, No. 1:07-cv-88,

59

2008 WL 4865571, at *9 (E.D. Tenn. June 27, 2008) (only statements made in furtherance of a settlement are protected from third-party disclosure); *Thornton*, 2006 WL 3499986, at *3 (the settlement privilege "does not apply to any document simply because it is exchanged during settlement" but "[r]ather, the issue is whether the particular communication was authored or created for the purpose of settlement negotiations."); *Grupo Condumex*, 331 F. Supp.2d at 629 (privilege does not extend to documents exchanged during settlement negotiations but not authored or created for purpose of settlement negotiations).

The parties have not brought to the Court's attention any published decision by a court in the Sixth Circuit that has extended the settlement privilege recognized in *Goodyear* beyond "settlement communications."  Defendants contend that the district court in *Scotts Co. LLC v. Liberty Mutual Ins. Co.*, No. 2:06-cv-899, 2007 WL 1723506 (S.D. Ohio June 11, 2007), held that "all manner of documents – including database entries, spreadsheets, PowerPoint presentations – may be privileged if prepared to further settlement."  (Doc. 161 at 19). However, the district court in *Scotts Co.* did not render this broad holding.  In *Scotts Co.*, the defendant objected to the assertion of the settlement privilege for privilege log documents that on their face did not appear to be "communications" in furtherance of settlement, such as notes, database entries, spreadsheets, and PowerPoint presentations.  The court upheld the withholding of the documents under the settlement privilege, noting that the privilege applies "only to communications created for the purpose of settlement negotiations" and that the plaintiff had adequately explained how certain documents listed on the privilege log that did not "appear" to be communications were in fact communications covered by the settlement privilege.  *Id.* at 4.

60

The court gave no indication that *any* type of document prepared to further settlement is privileged, irrespective of whether the document is communicated to another party.

None of the other cases discussed by the parties in their filings indicate that a document is covered under the settlement privilege simply because it has been created in furtherance of settlement negotiations. Instead, the courts in these decisions all reference "communications," implying an exchange of information, and appear to require that documents must have been created or authored for settlement purposes and that the matters for which the privilege is sought qualify as "settlement communications." *See Thornton*, 2006 WL 3499986, at *3 ("the issue is whether the particular *communication* was authored or created for the purpose of settlement negotiations") (emphasis added); *Grupo Condumex*, 331 F. Supp.2d at 629 ("Documents created for some other purpose do not get clothed in a settlement privilege just because they are exchanged during negotiations. Rather they must be the type of *communications* that the privilege was designed to protect. . . .") (emphasis added); *Westlake*, 2007 WL 1959168, at *3 ("by its own language, [*Goodyear*] protects only 'communications made in furtherance of settlement.'").[25]

Accordingly, the Court's review of the case law, in light of the policy considerations underlying the settlement privilege as articulated by the Sixth Circuit in *Goodyear*, leads to the conclusion that in order for a statement or document to be entitled to protection from disclosure under the settlement privilege recognized in *Goodyear*, two requirements must be satisfied: (1)

---

[25] The *Westlake* court's discussion and reasoning do not evince an intent to protect documents that have been prepared for settlement purposes but have not been communicated in any manner as defendants here suggest. To the contrary, the court in *Westlake* recognized that "*Goodyear* does not create a broad privilege protecting from discovery any document or communication arguably related to settlement negotiations, fruitful or otherwise. Rather, by its own language, it protects only '*communications* made in furtherance of settlement.'" *Westlake Vinyls*, 2007 WL 1959168, at *3 (quoting *Goodyear,* 332 F.3d at 983) (emphasis added).

61

the statement or document must qualify as a "communication," *i.e.*, a document or statement exchanged between the parties during settlement negotiations, and (2) the document must have been authored or created for the purpose of settlement negotiations.

The Court finds that the draft response contained at Tab 51 is not protected by the settlement privilege. While the draft was apparently prepared during the course of ongoing discussions with the USEPA, the content of the draft pertains to scheduling issues regarding defendants' Section 114 response to requested information and testing. This commonplace draft letter has none of the characteristics of communications exchanged in furtherance of settlement that the *Goodyear* court intended to protect, such as "puffing and posturing." *See Goodyear*, 332 F.3d at 977. Rather, it is a standard letter between counsel discussing the practicalities of providing requested information and, although it is arguably related to settlement negotiations, it is not protected from disclosure by the settlement privilege. *See Grupo Condumex*, 331 F. Supp.2d at 629 ("Documents created for some other purpose do not get clothed in a settlement privilege just because they are exchanged during negotiations. Rather, they must be the type of communications that the privilege was designed to protect: namely, those that are inherently unreliable because of the likelihood of puffery.").

Likewise, the documents contained at Tab 52 and Tab 60 may not be withheld from plaintiffs as these documents are not the sort of communications the settlement privilege was designed to protect. The document at Tab 52 contains defendants' draft response to the interrogatory-like Section 114 request issued by the USEPA; the document at Tab 60 is a one-page draft response containing calculations. The Court's *in camera* review reveals that the content of these documents are purely factual and there is no indication that they contain the sort

of unreliable puffery that warrants protection under the settlement privilege.  *See Goodyear*, 332

F.3d at 977.  Further, defendants have failed to provide evidence demonstrating these document

are communications that were exchanged with the USEPA for the purpose of furthering

settlement negotiations and not simply to  respond to a standard Section 114 information request.

Defendants have therefore not met their burden of proof.  Accordingly, the undersigned finds that

the Section 114 response documents are not protected by the settlement privilege and must be

disclosed to plaintiffs.

Defendants also assert that the draft response to the December 4, 2009 Section 114

request found at Tab 60 is protected by the attorney-client privilege.  In support, Corporate

Environmental Manager Sharp avers that he, the SunCoke Corporate Environmental Engineer,

and the Principal at URS Corporation prepared the response to the EPA's Section 114 request

"[a]t the request" of in-house counsel Runyon.  (Doc. 161, App. B, Sharp Decl., ¶ 41).

Defendants' brief makes the sweeping allegation that "all correspondence with USEPA" was

prepared under the direction of counsel by a corporate representative knowledgeable of the

underlying facts who was requested to supply a first cut of the draft response as a means of

communicating factual information to counsel.  (Doc. 161 at 20; *see also* Doc. 161, App. A at

54).  Yet, defendants fail to meet their burden of proof of showing that the preparation of Section

114 draft responses by non-lawyers was for the purpose of assisting SunCoke's attorneys in

providing legal advice to SunCoke.  Contrary to defendants' representation, the Sharp

Declaration fails to disclose the purpose for which in-house counsel made the request for

assistance.  (Doc. 161, App. B, Sharp Decl., ¶ 41).  Defendants also cite to ¶¶ 14, 17 and 21 of

Sharp's declaration (Doc. 161, App. A at 54) in support of their argument, yet these paragraphs

address federal NOVs only and not Section 114 requests.  Likewise, neither Pack's nor Tosi's

declaration address the Section 114 requests.  (Doc. 161 at 20, citing App. B, Tosi Decl., ¶¶ 19,

23; Pack Decl., ¶¶ 17-21, 48).   The mere fact that in-house counsel may have requested

corporate employees to draft a response to the Section 114 request does not establish that the

draft response is subject to the attorney-client privilege because there is no evidence that the draft

response was requested by in-house counsel (or outside counsel) for purposes of providing legal

advice to the client.  *Upjohn*, 449 U.S. at 394.  *See also Health Alliance of Greater Cincinnati*,

2009 WL 5033940, at *2.  Therefore, the draft response to the Section 114 request found at Tab

60 and like documents are not protected by the attorney-client privilege.

### 2.  Documents responsive to federal NOVs (Tabs 53-59)

The documents found at Tabs 53-59 consist of cover emails, draft letters, and draft tables

(as attachments to the draft letters) which were created in connection with defendants' responses

to federal NOVs issued December 8, 2008, April 15, 2009, and February 17, 2010.  Defendants

present evidence that following receipt of HNCC's first NOV in 2005, it has been SunCoke's

policy for the Corporate Environmental staff (Delauna Pack and Chris Sharp) to discuss the NOV

with HNCC's staff to determine the circumstances giving rise to the NOV.  These SunCoke

employees would then take the information they acquired to legal counsel and seek legal advice

on a response strategy.  After receiving legal advice, they would draft an initial version of

defendants' NOV response as a means to convey supporting factual information to counsel.

After working with legal counsel to revise the initial draft and prepare a satisfactory response to

the NOV, the response letter would be finalized and sent to the applicable agency.  (Doc. 161,

App. B, Sharp Decl., ¶¶ 14-16, Pack Decl., ¶¶ 17-19, Tosi Decl., ¶¶ 19, 23).  SunCoke formed

64

the "NOV Strategy Team" after the USEPA issued a NOV in December 2008 for purposes of

developing an overall strategy for resolving USEPA's allegations and responding to the NOVs.

(Doc. 161, App. B, Pack Decl., ¶ 44, Sharp Decl., ¶ 17).  The NOV Strategy Team was

comprised of Corporate Environmental staff (Delauna Pack and Chris Sharp), senior

management, in-house counsel, engineering/technology employees, outside counsel, and support

team members.  (*Id.*, Ex. A).  The NOV Strategy Team communications and work were

considered confidential and privileged by its members.  (Doc. 161, App. B, Pack Decl., ¶¶ 47-48,

Sharp Decl., ¶¶  20-21).

Tabs 53, 54, and 57 are a cover email, draft response letter, and draft table responding to

a federal NOV issued April 15, 2009, and reflect comments from in-house counsel, outside

counsel, and the Corporate Environmental staff.  Tabs 55 and 56 are similar responses to the

federal NOV issued December 8, 2008.  Tab 59 is a draft response to questions posed to Mr.

Sharp by Gina Harrison of the USEPA, and Tab 58 is a chain of two emails seeking information

from Pack to HNCC's Environmental Manager and Sharp seeking information to finalize a

response to the federal NOV issued on February 17, 2010.

Defendants assert protection under the attorney-client and settlement privileges and under

the work product doctrine for the documents found at Tabs 53 through 59.  Of these documents,

defendants' privilege log asserts attorney-client privilege only for Tabs 53 and 57.  Therefore,

defendants have waived the attorney-client privilege for Tabs 54, 55, 56, 58, and 59.  *See Banks*,

241 F.R.D. at 386; *Rhoads Indus.,* 254 F.R.D. at 221, 226.

The documents found at Tabs 53 and 57 are protected by the attorney-client privilege.

The email at Tab 53 and the draft table at Tab 57 that was created by corporate employees and

sent to counsel (Ex. 31 to defendants' brief submitted *in camera*) (cover email to Tab 57) were prepared at counsel's request and in furtherance of counsel's provision of legal advice to defendants.  These documents fall squarely within the protection of the attorney-client privilege outlined by the Supreme Court in *Upjohn*.  The corporate representatives (Sharp and Pack) worked with counsel to obtain legal advice and understood that communications with counsel regarding their response to the federal NOV were confidential and subject to the attorney-client privilege.  (Doc. 161, App. B, Pack Decl., ¶¶ 13-14; App. B, Sharp Decl., ¶¶ 12-13).  The documents at Tabs 53 and 57 contain confidential communications between outside counsel and client corporate representatives made for purposes of enabling counsel to provide legal advice to defendants in response to the April 2009 federal NOV.  *Upjohn*, 449 U.S. at 394.  Therefore, the documents contained at Tabs 53 and 57, and documents like those found at Tabs 53 and 57 that consist of cover emails, draft letters, and draft tables (as attachments to the draft letters) which were created in connection with defendants' responses to federal NOVs, are protected by the attorney-client privilege and may be withheld from plaintiffs (provided defendants asserted the attorney-client privilege on the privilege log).

Whether the documents contained at Tabs 54, 55, 56, 58, and 59 are protected as work product depends on whether they were created in anticipation of litigation.  Defendants have met their burden of showing the documents contained at Tabs 54, 55, 56, 58, and 59 are protected as work product.[26]  In response to the federal NOVs from the USEPA, defendants elicited the advice of outside counsel to formulate a response.  The participation of counsel is one factor that weighs in favor of a finding that a document is work product.  *See Transocean Deepwater, Inc.*, 2010

---

[26]The Court declines to reach defendants' claim of settlement privilege for these documents.

WL 5374744, at *3; *Elec. Data Sys. Corp.*, 2003 WL 21653414, *5; *Wikel*, 197 F.R.D. at 495.

Counsel, in turn, requested Corporate Environmental Staff to provide the relevant factual

background via draft letters and draft tables.  The email documents reflect information either

needed or provided for purposes of responding to the federal NOVs.  The Court finds that the

emails, draft letters, and draft tables were prepared because of the prospect of litigation.[27]  By the

latter half of 2008, several events had occurred to lead defendants to reasonably believe that the

prospect of litigation from either an administrative agency or a citizen was more than a remote

possibility.   In August of 2008, Director of Corporate HES Pack met with PLAA Director

Charles about citizen complaints (including those from Kelly Graff) over emissions from HNCC

and the OEPA had ordered Pack to meet with Middletown residents in mid-August to answer

questions about citizen complaints against HNCC and its history of noncompliance.

Additionally, the OEPA issued a NOV to HNCC in August 2008.  In September 2008, the

USEPA made an unannounced visit to HNCC, which was followed shortly by another NOV

against HNCC by the OEPA in October 2008.  That same month, defendants received notice

from the PLAA that Kelly Graff had lodged complaints of "green oven" smells, other odors, and

particulate releases allegedly from HNCC.  Then, when the USEPA issued its first NOV to

HNCC on December 8, 2008, HNCC was advised that it was in violation of the Clean Air Act

and associated state or local pollution control requirements.  (Doc. 162, Ex. 4).  The Notice set

forth in detail the provisions of law that HNCC allegedly violated and advised that HNCC may

be subject to an administrative compliance order, an administrative penalty order, a judicial civil

action, and a judicial criminal action.  *Id*.  HNCC was also advised it could request a conference

---

[27]As previously indicated, proceedings before administrative tribunals that are of an adversarial nature are
considered "litigation."  8 Wright & Miller, Federal Practice & Procedure, § 2024.

to discuss the violations alleged in the NOV and that HNCC "may have an attorney represent you" at this conference.  *Id.*  These documents were not prepared in the ordinary course of business, but rather in response to a potential administrative, civil, or criminal action for alleged violations of the Clean Air Act.  *See Cambrians for Thoughtful Dev.,* 2007 WL 5618671, at *2. Given the series of events faced by defendants leading up to the December 2008 federal NOV, defendants faced potential claims for violations of federal and state air quality laws that reasonably could result in litigation.  The likelihood that the USEPA might take legal action against defendants was more than a remote possibility and the evidence presented demonstrates that the documents prepared in response to the December 2008 federal NOV were prepared because of the prospect of litigation.  In view of the nature of the emails, tables, and draft letters, as well as the factual circumstances surrounding their creation, these documents can fairly be said to have been prepared because of the prospect of litigation.  Therefore, the documents prepared in response to the December 2008 federal NOV, and by implication those prepared in response to the subsequent federal NOVs in April 2009 and February 2010 and the request for information by USEPA Gina Harrison in October 2009, are therefore protected work product. The documents contained at Tabs 54, 55, 56, 58, and 59, and those like them, are protected as work product and may be withheld from plaintiffs.

### 3. Substantial Need for Documents Found at Tabs 54, 55, 56, 58, and 59

Defendants' final responses to the federal NOVs is a matter of public record which plaintiffs have already or may in fact obtain.  Plaintiffs thus have or can obtain the underlying factual information responsive to the federal NOVs and the Court cannot discern any remaining

substantial need for the communications relating to the draft letters, tables and emails in response to the federal NOVs.  *See* Fed. R. Civ. P. 26(b)(3)(A)(ii).

## V.  GENERAL COMMUNICATIONS (TABS 61-70)

Defendants contend that certain general communications, as exemplified by Tabs 61 through 70 of the documents presented for *in camera* review, are protected from disclosure by the settlement privilege, the attorney-client privilege, and/or the work product doctrine.[28]  *See* Doc. 161 at 19; Doc. 161, App. A at 59-74.

### A.  Tabs 61, 64, and 65

Defendants assert that the documents contained at Tabs 61, 64, and 65, materials exchanged with the USEPA pursuant to their settlement negotiations, are protected from disclosure pursuant to the settlement privilege.  Tab 61 contains the USEPA's "opening statement" from the first conference with SunCoke, which was held pursuant to 42 U.S.C. § 7413 (Section 13)[29]; Tab 64 is a final version of a memorandum from SunCoke's outside counsel to counsel for the USEPA addressing the USEPA's request for an economic analysis related to the outstanding NOVs; Tab 65 is comprised of a draft agreement between HNCC and the USEPA regarding tolling the statute of limitations for potential civil actions while settlement negotiations are ongoing.  Defendants contend that these documents are protected by the settlement privilege because they were documents conveyed to the USEPA for the purpose of furthering settlement.  Specifically, defendants assert that the document at Tab 61 would not exist but for the receipt of the December 8, 2008 NOV – the event that defendants contend marks the beginning of their

---

[28] Defendants have withdrawn their privilege claims for Tab 67 and indicate that they intend to produce this document to plaintiffs.  *See* Doc. 161, App. A at 71.

[29] Section 13 provides the recipient of the NOV an opportunity to confer with the EPA Administrator concerning the alleged violation prior to the issuance of an order relating to the alleged violations.  42 U.S.C. § 7413(a)(4).

ongoing settlement discussions with the USEPA – and the purpose of the document clearly indicates that the documented meeting was intended to preclude litigation in favor of working with the USEPA to address the purported violations.  Likewise, defendants claim Tab 64 is protected as it is a communication that was conveyed to counsel for the USEPA with the sole purpose of providing requested information during the course of negotiation discussions and that the document at Tab 65, the tolling agreement, would not exist but for its purpose in facilitating settlement negotiations.

Plaintiffs deny the settlement privilege applies to Tab 61 asserting there is no evidence that the "opening statement" document was created in furtherance of settlement negotiations. Plaintiffs argue that the document was created in response to defendants' request for a routine conference with the USEPA as permitted by Section 13 and does not support an inference that the USEPA intended to engage in settlement discussions.  With respect to Tab 64, plaintiffs concede that this document is likely protected by the privilege as it was created for the purpose of settlement and exchanged with counsel for the USEPA.  Accordingly, plaintiffs request only that the underlying facts contained within this document be produced to them if this Court's *in camera* review supports a finding that it is protected by the settlement privilege.  Further, plaintiffs no longer seek the tolling agreement contained in Tab 65.  *See* Doc. 163 at 45.

A review of the document at Tab 61 demonstrates that it is protected by the settlement privilege.  On its face, it is clear that the document was created by the USEPA for the sole purpose of engaging in discussions with defendants about the December 2008 NOV.  While plaintiffs correctly note that the "opening statement" was created pursuant to a Section 13 conference, the document evinces that the conference was the first step in ongoing settlement

70

discussions.  As the record demonstrates that defendants engaged in ongoing discussions with the

USEPA in an attempt to resolve the NOVs without resorting to litigation, the undersigned finds

that the opening statement at Tab 61 was "made in furtherance of settlement [and consequently

is] privileged and protected from third-party discovery."  *Goodyear*, 332 F.3d at 977; *Grupo*

*Condumex*, 331 F. Supp.2d at 629.

  The Court's review of Tab 64 supports a finding that the document is protected by the

settlement privilege.  This document is a direct communication between counsel for defendants

and the USEPA regarding the entities' attempts to resolve the NOVs.  Each page of the document

includes the label "CONFIDENTIAL SETTLEMENT COMMUNICATION," the substance is

wholly directed at working towards a settlement agreement, and the document would not exist

but for their attempt to resolve the NOVs.  As such, it is subject to protection under the

settlement privilege.  *Id*.

  **B.  Tab 62**

  Defendants claim that the document at Tab 62 is protected from disclosure by both the

settlement privilege and attorney-client privilege.  Tab 62 consists of a March 2009 email chain

forwarded to Delauna Pack from Chris Sharp and includes information regarding defendants'

progress towards responding to a February 2009 Section 114 request from the USEPA.

Defendants contend that this document is subject to protection under the attorney-client privilege

because although it contains non-attorney recipients, these individuals were gathering factual

information and data in order to assist their attorneys in providing legal advice on responding to

the Section 114 request.  Plaintiffs deny the document is protected by the attorney-client privilege

71

because non-attorneys are included in the emails and defendants did not assert the email chain reflects legal advice or produce any evidence to that effect.

Review of the email chain, in conjunction with the evidence submitted by defendants, does not support a determination that Tab 62 is protected from disclosure by the attorney-client privilege.  As discussed above in connection with Tab 60, defendants have not met their burden of proof demonstrating that the draft responses to Section 114 requests prepared by non-lawyers were done for purposes of assisting SunCoke's attorneys in providing legal advice to SunCoke for the reasons set forth at pp. 63-64, *supra*.  Defendants also cite to ¶¶ 20, 22, and 27 of Sharp's declaration (Doc. 161, App. A at 60), yet these paragraphs address federal NOVs only and not Section 114 requests.  None of those paragraphs even mention "Section 114 requests" and the terminology used in ¶¶ 20, 22, and 27 strongly implies that the "documents" referenced therein relate to NOVs and not Section 114 requests.  For example, Sharp states that "the NOV Strategy Team has developed many types of documents to support SunCoke's *resolution* of USEPA's *allegations*. . . ."  (Doc. 161, App. B, Sharp Decl., ¶ 22) (emphasis added).  In contrast to a NOV, a Section 114 request from the USEPA does not contain "allegations" of violations or wrongdoing that need to be "resolved" by defendants.  *See, e.g.*, Doc. 162, Ex. 11.  In addition, the mere fact that in-house counsel may have requested corporate employees to draft a response to the Section 114 request does not establish that the draft response is subject to the attorney-client privilege.  There is no evidence that the draft responses were requested by in-house counsel (or outside counsel) for purposes of providing legal advice to the client.  *Upjohn*, 449 U.S. at 394.  As previously indicated, the Sharp Declaration fails to disclose the purpose for which in-house counsel made the request for assistance.  (Doc. 161, App. B, Sharp Decl., ¶ 41).  The

undersigned finds that Tab 62 and documents like it are not protected by the attorney-client privilege.

In addition, for the reasons stated at pp. 62-63, *supra*, Tab 62 is not protected from disclosure by the settlement privilege.  It is simply not the type of communication the settlement privilege was intended to protect.  *See Goodyear*, 332 F.3d at 977.   Nor have defendants provided evidence showing this document is a communication that was exchanged with the USEPA for the purpose of furthering settlement and not simply a response to a standard Section 114 information request that defendants were obligated to provide regardless of any settlement negotiations with the USEPA over federal NOVs.  Therefore, the Section 114 document found at Tab 62 and those like it are not protected by the settlement privilege and must be disclosed to plaintiffs.

### C.  Tabs 63 and 68

Defendants in their brief contend that Tabs 63 and 68 are protected from disclosure by the attorney-client privilege, the settlement privilege, and the work product doctrine.  However, defendants' privilege log does not assert work product protection for Tabs 63 and 68. Defendants' failure to assert the work product protection in a timely manner amounts to a waiver of that protection.  *See Banks*, 241 F.R.D. at 386; *Rhoads Indus.,* 254 F.R.D. at 221, 226. Consequently, the Court's review of these documents is limited to whether they are protected by either the attorney-client or settlement privilege.

Tabs 63 and 68 are email chains between counsel and defendants' corporate employees. The content of the emails involve NOV data compiled for a May 2009 meeting with the USEPA. The email chain at Tab 63 was sent by Delauna Pack to Sunoco's in-house attorneys, Michael

Bourque and Lisa Runyon, and outside counsel Anthony Sullivan, and copied to corporate employees John Essman, Michael White, Chris Sharp, and Michael Thomson; the reply email from Bourque was sent to Pack and the other previous recipients.  Tab 68 was sent by Chris Sharp to Anthony Sullivan and Delauna Pack; Ms. Pack forwarded this email to John Essman and Chris Sharp in order to gather information from these individuals in preparation for the USEPA meeting.

Defendants assert these documents are protected from disclosure by the attorney-client privilege because they are communications between their counsel and corporate employees created with the purpose of providing counsel with information necessary for their presentation to the USEPA; further, the email at Tab 68 includes counsel's advice regarding strategy and position points to a select group of non-attorney employees.

Plaintiffs argue that defendants' failure to state that the emails include a request for or the provision of legal advice precludes application of the attorney-client privilege for these documents.  Plaintiffs also note that it appears the communications exchanged are merely editorial comments and not legal advice.

The Court's review of Tabs 63 and 68 supports defendants' contention that these documents are protected by the attorney-client privilege.  The emails contain the thoughts and opinions of defendants' employees and attorneys on defendants' strategy for preparing a response to the USEPA NOVs.  Plaintiffs' presumptive characterization of the comments made by defendants' attorneys as merely editorial is inaccurate.  The email chain contained at Tab 63 contains confidential legal advice and strategy communicated directly to defendants' corporate employees; consequently, it is protected from disclosure under the attorney-client privilege.  *See*

*Reed*, 134 F.3d at 355-56.   In light of this finding, it is unnecessary to address defendants' claim that the documents are further protected by the settlement privilege.

### D.  Tabs 66 and 69

Defendants contend that the documents at Tabs 66 and 69 are protected by the attorney-client privilege, as well as the work product doctrine and settlement privilege.  Tab 66 is an August 2009 draft memorandum prepared by outside counsel at the request of Corporate HES Director Pack and addressed to SunCoke VP of Operations White.  The memorandum summarized for SunCoke's management the legal basis for certifying compliance under federal regulations for all of SunCoke's Ohio facilities, including HNCC, for purposes of obtaining a permit for SunCoke's Middletown facility.  (Doc. 161, App. B, Tosi Decl., ¶¶ 7-8).  Tab 69 consists of notes on compliance issues created during a June 2009 strategy meeting which was attended by SunCoke employees and outside counsel.  These notes were later distributed to defendants' corporate employees.  Notes taken on a whiteboard during this meeting which reflect the opinions of defendants' counsel were forwarded to defendants' in-house and outside counsel and to a URS environmental consultant.  (Doc. 161, App. B, Tosi Decl., ¶ 9).  Defendants assert that attorney-client privilege attaches to the memorandum and notes because they contain legal advice regarding their strategy for resolving the NOVs and notes of a confidential discussion containing legal advice and strategy provided by counsel.  (Doc. 161, App. B, Pack Decl. ¶¶ 12-14).

Plaintiffs appear to concede that Tab 66 is likely protected by the attorney-client privilege given Mr. Tosi's averments.  As such and on the condition that the Court comes to this conclusion, plaintiffs request that the underlying facts contained within the memorandum be

produced.  Regarding Tab 69, plaintiffs challenge defendants' claim of attorney-client privilege for the entire June 2009 meeting and assert they are entitled to the notes in a redacted form because it appears that the exchange of legal advice was only part of the meeting based on defendants' representations.  (Doc. 163 at 49, citing *Marten v. Yellow Freight System, Inc.*, No. 96-2013, 1998 WL 13244, at *8 (D. Kan. Jan. 6, 1998) (notes of a meeting where legal advice was incidental to primary purpose of analyzing best business practices are discoverable)).

Upon review of the memorandum contained at Tab 66, the undersigned finds that the document is protected from disclosure by the attorney-client privilege.  The memorandum contains legal advice from defendants' outside counsel requested by and communicated to defendants, and there is no evidence that defendants have waived the privilege.  Accordingly, the document is protected from disclosure.  *See Reed*, 134 F.3d at 355-56.  Likewise, the document at Tab 69 is protected.  Tab 69 consists of notes containing the legal opinions of defendants' counsel which were forwarded by Ms. Pack to other members of defendants' legal team as well as their hired environmental consultant.  In light of the circumstances in which this information was obtained and transmitted – pursuant to a meeting designed to advise defendants on resolving the USEPA NOVs and forwarded by Ms. Pack, a lead member of defendants' NOV Strategy Team – the notes of defendants' attorneys' legal opinions are protected by the attorney-client privilege as they were collected and transmitted by Ms. Pack in order to relay information requested by attorneys.  *See SmithKline Beecham Corp.*, 232 F.R.D. at 477.  In light of these findings, the Court declines to reach defendants' assertion that these documents are subject to protection under the work product doctrine or settlement privilege.

**E. Tab 70**

Tab 70 contains a December 2009 email from Corporate HES Director Pack to HNCC's Environmental Manager Kinder and HNCC General Manager Essman, that was copied to Chris Sharp and Michael White. The subject of the communication is an update regarding defendants' response to the USEPA's December 2009 Section 114 request. Defendants' brief asserts Tab 70 is protected by the attorney-client privilege, work product doctrine, and settlement privilege. Yet, defendants' privilege log fails to assert the attorney-client privilege for this document. Consequently, this claim is waived. *See Banks*, 241 F.R.D. at 386; *Rhoads Indus.,* 254 F.R.D. at 221.

In addition, for the reasons stated in connection with defendants' responses to the Section 114 request set forth at pp. 63-64, *supra*, Tab 70 is not subject to work product protection. The email at Tab 70 that was generated in response to the USEPA's Section 114 request was created to comply with HNCC's obligations under Section 114 of the Clean Air Act and not in anticipation of litigation or because of the *Graff* litigation. Therefore, the document found at Tab 70, and those like it, are not protected as work product.

Finally, defendants contend that the document is protected by the settlement privilege as the email was created in response to the USEPA's Section 114 request, which defendants state was part of the overarching settlement negotiations with the USEPA. Defendants claim that the email would not have been generated were it not for the ongoing settlement discussions, nor would they have been talking with the USEPA regarding the information contained within the email.

The email is a communication from Ms. Pack to several of defendants' corporate employees updating them on the status of defendants' response to the USEPA's Section 114 request. While the email is a communication, the undersigned cannot conclude that it contains protected statements made in furtherance of reaching a settlement agreement. The communication concerns defendants' efforts in gathering information and briefly relates conversations between Ms. Pack and counsel for the USEPA regarding the specific data requested. The email reflects a status update and a discussion with EPA employees, neither of which has the characteristics of the types of communications that the settlement privilege was intended to protect from disclosure. *See Goodyear*, 332 F.3d at 980 (the settlement privilege applies to protect the secrecy of matters discussed between parties during settlement negotiations; to promote uninhibited discussions; and in acknowledgment of the fact that settlement communications are untrustworthy as they are often marked by "instances of puffing and posturing."). Rather, the email contains a straightforward account of conversations held between Ms. Pack and counsel for the USEPA and an update on compliance with the USEPA's Section 114 request. On its face, the purpose of the document was to provide organizational information to defendants' corporate employees and is not a statement made to further settlement. Nor is there any evidence Tab 70 was communicated by defendants to the USEPA during settlement negotiations. As such, the undersigned finds that the email contained at Tab 70 is not protected by the settlement privilege. Accordingly, the document at Tab 70 and those like it are not protected by the settlement privilege and must be produced to plaintiffs.

## VI.  NOV PRESENTATIONS, SPREADSHEETS, GRAPHS (TABS 71-80)

Defendants assert that certain NOV presentations, spreadsheets, and graphs found at Tabs 71-75 and 77-80, as well as the email chain contained in Tab 76, are not subject to disclosure as they are protected by the attorney-client privilege, the settlement privilege, and/or the work product doctrine.

### A.  Power Point presentations (Tabs 71, 73, 74, 77)

Tabs 71, 73, 74, and 77 include drafts of PowerPoint presentations which were created at the request of defendants' counsel to provide an update on the status of the NOVs.  The presentations at Tabs 71 and 73 are drafts of a presentation prepared in May 2009.  The Tab 73 draft presentation was included as an attachment to a February 27, 2009 email from Michael White, SunCoke's Vice President of Operations, to Boris Reyes, a SunCoke corporate engineer and project manager, James Skipworth, SunCoke's chief plant engineer, and copied to HNCC General Manager Essman.  The Tab 71 draft presentation was sent as an email attachment on May 13, 2009, from Delauna Pack to defendants' in-house counsel Michael Bourque and Lisa Runyon; the Tab 74 presentation was sent as an attachment later that day from Ms. Pack to Mr. Bourque and Ms. Runyon, as well as to outside counsel Anthony Sullivan and copying John Essman, Michael White, Chris Sharp, and Michael Thomson.  Lastly, Tab 77 was prepared in October 2009 and sent as an attachment in an email from Mr. Essman to Ms. Pack in order to obtain her comments on revisions made.

Defendants argue that the cover emails accompanying these documents demonstrate that the PowerPoint presentations were prepared by defendants' employees and counsel in preparation for meetings with the USEPA to discuss resolution of the NOVs.  (Exs. 18, 40, 41 to defendants'

79

brief submitted *in camera*).  As these documents were exchanged only among individuals directly involved in preparing defendants for taking part in the NOV negotiations with the USEPA and contain strategy and talking points for the settlement discussions, defendants claim they are communications exchanged internally for the purpose of furthering settlement and are protected by the settlement privilege.  In support, defendants cite to Chris Sharp's declaration in which he avers that he prepared these Power Point presentations at the request of the NOV Strategy Team to prepare defendants for negotiations with the USEPA and that he and Ms. Pack sought information from other members of the NOV Strategy Team in their efforts to provide defendants' counsel with requested information.  (Doc. 161, App. B, Sharp Decl., ¶¶ 24-25).

Plaintiffs contend these documents are not subject to the settlement privilege because defendants have not asserted that the documents were exchanged with the USEPA during settlement negotiations.  Plaintiffs note that the draft presentations were only exchanged internally with members of the NOV Strategy Team and counsel and surmise that the drafts appear to contain factual data, as opposed to statements communicated with the aim of reaching settlement with the USEPA.  As such, plaintiffs claim that the documents are not protected by the settlement privilege and are discoverable.

The Court, upon review of these draft documents, determines they are not protected by the settlement privilege.  The documents at Tabs 71, 73, 74, and 77 are drafts of Power Point presentations.  Yet, there is no evidence that any *final version* of these Power Point presentations was ever communicated to the USEPA during settlement negotiations.  Defendants allege that these presentations "were prepared for Defendants' *internal* reference during a May 14, 2009 meeting with USEPA."  (Doc. 161 at 74) (emphasis added) (citing Ex. 40 to defendants' brief

submitted *in camera* (cover email to Tab 74)). The Court's *in camera* review of Exhibit 40 shows that with the exception of one graph, these documents do not represent drafts of a final Power Point presentation that was shared with or communicated to the USEPA during its meeting with defendants. Accordingly, the settlement privilege does not apply to these documents, with the exception of the one graph referenced in Exhibit 40.[30]

Nevertheless, the Court finds that the documents found at Tabs 71, 73, and 77[31] are protected from disclosure under the attorney-client privilege as presentations created in connection with defendants' responses to a federal NOV for the reasons stated in connection with Tabs 53 and 57 at pp. 65-66, *supra*. *Upjohn*, 449 U.S. at 394. Therefore, the Power Point presentations found at Tabs 71, 73, and 77, and those like them for which the attorney-client privilege is asserted (and supported by the privilege log) may be withheld from plaintiffs.

**B. Spreadsheets and graphs (Tabs 72, 75, 76, 78-80) and Power Point presentation (Tab 74)**

The documents contained in Tabs 72, 75, and 78-80 consist of spreadsheets and graphs purportedly prepared at the request of counsel for defendants and the NOV Strategy Team. Tab 72 is a spreadsheet that was attached to an August 3, 2009 email chain sent by Chris Sharp to Delauna Pack and forwarded to in-house counsel Runyon. (Ex. 42 to defendants' brief submitted *in camera*). Sharp created the spreadsheet at the request of in-house counsel and Pack, and the

---

[30] The Court believes that the settlement privilege would apply to *draft* Power Point presentations where the *final* version of such presentations was communicated to the EPA during the course of a settlement meeting. It is undisputed that a final version of a document such as a Power Point presentation that was created in furtherance of settlement negotiations and communicated to the USEPA in the course of settlement negotiations would be protected by the privilege. It would be contrary to the policies underlying the settlement privilege to disallow protected status to the drafts of a final version ultimately communicated in a settlement negotiation.

[31] Defendants did not assert attorney-client privilege for Tab 74 and therefore have waived this protection for Tab 74. Nevertheless, the Court finds the presentation found at Tab 74 is protected as work product as discussed in connection with the spreadsheets and graphs discussed below.

spreadsheet set forth the reasons attributed to malfunctions of the HNCC Powder Activated

Carbon (PAC) unit and corresponding corrective actions.  (Doc. 161, App. B, Sharp Decl., ¶ 32).

Sharp then used the spreadsheets to prepare graphs, presentations, and malfunction write-ups to

prepare for negotiations with the USEPA.  (Id., ¶ 24).  Tab 78 contains a similar PAC

spreadsheet for a longer time period which was prepared by Mr. Sharp at the request of Ms.

Runyon which was included as an attachment in an email from Mr. Sharp to a SunCoke

corporate environmental engineer, forwarded from a prior email from HNCC's environmental

manager.  (*Id*. at ¶¶ 22-24; Ex. 43 to defendants' brief submitted *in camera*).  Tabs 75, 79, and 80

include spreadsheets also created by Mr. Sharp at the request of Ms. Runyon after HNCC

received the December 2008 NOV.  *Id*.   The spreadsheet at Tab 80 was attached to a May 2009

email between Mr. Sharp and members of the NOV Strategy Team (Doc. 162, Ex. 44); the

spreadsheets at Tabs 75 and 79 were not part of any correspondence.  Tab 76 contains a

December 30, 2008 email chain from a URS consultant to a SunCoke environmental engineer

and copied to Delauna Pack, Chris Sharp, and URS Principal Carson regarding the recipients'

prior request for a graph of emission averages for the period pertaining to the December 2008

federal NOV.

    Although defendants assert attorney-client privilege for all of these documents, the only

document for which the privilege log asserts attorney-client privilege is Tab 72.  Therefore,

defendants have waived the attorney-client privilege for Tabs 75, 76, and 78-80.  *See Banks*, 241

F.R.D. at 386.

    The Court finds that the document found at Tab 72 is protected from disclosure under the

attorney-client privilege as a spreadsheet created in connection with defendants' response to the

federal NOV for the reasons stated in connection with Tabs 53 and 57 at pp. 65-66, *supra.*

*Upjohn*, 449 U.S. at 394.  Therefore, the spreadsheet found at Tab 72, and those like it for which

the attorney-client privilege is asserted (and supported by the privilege log) may be withheld

from plaintiffs.

      Defendants also contend that the documents found at Tabs 75, 76, and 78-80 are

protected by the settlement privilege as they were created solely in preparation for settlement

negotiations with the USEPA.  There is no evidence that these spreadsheets or emails were

communicated to or shared with the USEPA in order to further settlement discussions.  Rather, it

appears Mr. Sharp created the spreadsheets to compile data and factual information into a

digestible format to assist defendants' NOV Strategy Team and legal counsel in understanding

the history of various equipment malfunctions.  Such pure factual information is not the type of

communication the settlement privilege was designed to protect.  With regard to the email chain

at Tab 76, aside from references that the data was gathered in response to the NOV, there is no

indication that the information contained in the email chain was communicated to the USEPA to

advance settlement nor do defendants cite to any affidavit evidence demonstrating as much.  The

mere fact that the email and its contents would not have been created but for the receipt of the

NOV is insufficient to establish that is protected from disclosure under the settlement privilege.

As noted above, defendants' position that *Scotts, Inc.* stands for the proposition that all

documents prepared in connection with settlement discussions are privileged is untenable.  For

the privilege to attach, the documents must qualify as "settlement communications."  *See*

*Thornton*, 2006 WL 3499986, at *3.  Therefore, the documents at Tabs 75, 76, and 78-80 are not

protected by the settlement privilege.

Nevertheless, the Court determines that the documents found at Tabs 75, 76, and 78-80, as well as the Power Point presentation found at Tab 74, are protected as work product. Sharp avers that he created the spreadsheets/graphs which conveyed trends, corrective actions, or other messages in response to the federal NOVs and to prepare for negotiations with the USEPA at the request of in-house counsel and the NOV Strategy Team. The email chain at Tab 76 reflects a request for a graph demonstrating emission averages for periods outlined in the December 2008 federal NOV to formulate a response to the NOV. As discussed in connection with the draft federal NOV responses prepared by defendants found at Tabs 54, 55, 56, 58, and 59, *see* pp. 66-68, *supra*, the series of events faced by defendants leading up to the December 2008 federal NOV indicate that defendants faced potential claims for violations of federal and state air quality laws that reasonably could result in litigation. The likelihood of legal action against defendants by the USEPA was more than a remote possibility and the evidence presented demonstrates that the spreadsheets and graphs prepared in response to the December 2008 federal NOV were prepared because of the prospect of litigation. In view of the nature of the spreadsheets, graphs, Power Point presentation, and email, and in light of the factual circumstances surrounding their creation, these documents can fairly be said to have been prepared because of the prospect of litigation. The documents found at Tabs 74, 75, 76, and 78-80, which were prepared in response to the December 2008 federal NOV, and by implication those prepared in response to the subsequent federal NOVs in April 2009 and February 2010, are protected work product. Therefore, documents contained at Tabs 74, 75, 76, and 78-80, and those like them, are protected as work product and may be withheld from plaintiffs.

### C.  Substantial Need for Documents Found at Tabs 74, 75, 76, and 78-80

Plaintiffs are not entitled to these documents under Federal Rule 26(b)(3)(A)(ii) because they have not shown a substantial need for these documents to prepare their case and have not shown they are unable, without undue hardship, to obtain their substantial equivalence by other means.  The spreadsheets and graphs were prepared from data pulled from HNCC's publicly filed reports and agency correspondence.  (Doc. 161, App. B, Sharp Decl., ¶ 23).  Thus, the substantial equivalent of the factual information contained within the documents can be obtained from information already publicly available without the need for the actual documents.

## VII.  REPORTS, STUDIES, AND TECHNICAL DOCUMENTS (TABS 81-89)

In early 2011, the NOV Strategy Team commissioned a study from Babcock & Wilcox Power Generation Group, Inc. (B&W) to analyze the operation of HNCC's flue gas desulfurization (FGD) system and to identify any available upgrades for the system.  (Doc. 161, App. B, Sharp Decl., ¶ 44).  This was done in response to the USEPA's request that SunCoke consider redundancy in HNCC's FGD system.  The NOV Strategy Team "used the information in the B&W report to evaluate relief options to propose to USEPA in settlement negotiations." (*Id*. at ¶ 46).  Tab 81 is an email chain that includes B&W representatives, SunCoke non-attorney representatives, NOV Strategy Team members, and outside counsel (Katherine Gates).  Tab 82 is the B&W study attached to the email.  Defendants assert the documents are protected by the attorney-client and settlement privileges.

The attorney-client privilege does not apply to these documents because there is no evidence that the study undertaken by B&W was requested by counsel for the purpose of assisting counsel in rendering legal advice.  Rather, the study was requested by the NOV Strategy

Team to "analyze how well HNCC's flue gas desulfurization ('FGD') system operated and to identify any upgrades available for the system."  (Doc. 161, App. B, Sharp Decl., ¶ 44).   The former SunCoke Director of Technology directly requested the study from B&W at the direction of the NOV Strategy Team.  (Id., ¶ 45).  Unlike the draft NOV responses and supporting materials (*e.g.*, spreadsheets and presentations) for which defendants presented evidence that counsel specifically requested such information from corporate employees with knowledge for purposes of providing the factual background needed to render legal advice, there is no similar evidence that counsel requested the B&W study as a means to communicate factual information to counsel in order to provide legal advice to defendants in responding to the EPA's request.  *See Upjohn*, 449 U.S. at 394.  The Court is not persuaded by the notation in the email from SunCoke's technology employee that "this is under attorney-client privilege because it impacts the NOV work" that the documents found at Tabs 81 and 82 qualify as attorney-client communications that are entitled to protection.  Simply labeling a document as protected by a privilege does not make it so where a party fails to satisfy all of the criteria for attorney-client privilege.  Therefore, the documents contained at Tabs 81 and 82, and those like them, are not protected by the attorney-client privilege and may not be withheld from plaintiffs on this basis.

     In addition, the B&W study and email chain do not qualify for protection under the settlement privilege.  As indicated above, the Court does not adopt the broad view of the settlement privilege urged by defendants.  Although there is evidence that the B&W study was created for the purpose of providing defendants with information on FGD , there is no evidence that this document was ever communicated to or exchanged with the USEPA during settlement negotiations.  In addition, the email chain and study are not the types of communications that the

privilege was designed to safeguard – those that are inherently unreliable because of the likelihood of puffery or exaggeration.  Therefore, these documents are not protected by the settlement privilege and must be provided to plaintiffs.

The documents found at Tabs 83-89[32] include transmittal cover emails or reports regarding corrective actions taken by HNCC to "mitigate alleged malfunctions."  (Doc. 161, App. A at 87).  The documents were prepared by Delauna Pack and Chris Sharp between December 2008 and May 2009, at the request of counsel, to use as reference points in responding to the December 2008 and April 2009 USEPA NOVs.  (Doc. 161, App. B, Sharp Decl., ¶¶ 26-27; App. B, Pack Decl., ¶¶ 49-50).

Tabs 84-87 and 89 are the so-called "Corrective Action Reports" prepared by Sharp and Pack and Tab 88 is a cover email.  Defendants assert the settlement privilege for these documents.[33]  The Court finds these documents are not protected by the settlement privilege because there is no evidence that the documents were ever communicated to or exchanged with the USEPA during settlement negotiations, and the documents consist of factual or technical data and not the type of communications that the settlement privilege was intended to protect from disclosure (*e.g.*, those containing puffing and posturing).  *See Goodyear*, 332 F.3d at 980.

Nevertheless, the Court determines that the documents found at Tabs 84-87 and 89 are protected as work product.  Pack and Sharp attest that shortly after HNCC received the December 2008 NOV, both in-house and outside counsel requested they prepare summaries of the past corrective actions that had been implemented at HNCC and the actions taken to mitigate the

---

[32]Defendants do not assert a privilege for Tab 83, the cover email to Tab 84, and assert this document has been produced to plaintiffs.

[33]To the extent defendants also argue Tabs 84-87 and 89 are protected by the attorney-client privilege, they have waived the privilege by virtue of their failure to assert the privilege on the privilege log.  *See Banks*, 241 F.R.D. at 386.

87

violations alleged in the NOVs. As discussed in connection with the draft federal NOV

responses prepared by defendants in connection with the documents found at Tabs 54, 55, 56, 58,

and 59, *see* pp. 66-68, *supra*, the series of events faced by defendants leading up to the December

2008 federal NOV indicate that defendants faced potential claims for violations of federal and

state air quality laws that reasonably could result in litigation. The likelihood of legal action

against defendants by the USEPA was more than a remote possibility and the evidence presented

demonstrates that the Corrective Action Reports that were prepared in response to the December

2008 federal NOV were prepared because of the prospect of litigation. In view of the nature of

the Corrective Action Reports and the factual circumstances surrounding their creation, these

documents can fairly be said to have been prepared because of the prospect of litigation. The

Corrective Action Reports found at Tabs 84-87 and 89 which were prepared in response to the

December 2008 federal NOV, and by implication those prepared in response to the subsequent

federal NOVs in April 2009 and February 2010, are protected under the work product doctrine.

Therefore, the documents contained at Tabs 84-87 and 89, and those like them, are protected as

work product and may be withheld from plaintiffs.

### A. Substantial Need for Documents Found at Tabs 84-87 and 89

Plaintiffs contend they are entitled to the Corrective Action Reports contained at Tabs 84-

87 and 89 due to plaintiffs' substantial need for these materials and the undue hardship, or in

many cases impossibility, of obtaining the substantial equivalent elsewhere. Plaintiffs argue they

could not depose witnesses regarding the "many versions" of the Corrective Actions Reports, "in

which many day to day activities were presumably recorded," without referencing a document.

Federal Rule 26(b)(3)(A)(ii) permits discovery of documents otherwise protected as work

product if the documents are otherwise discoverable under Rule 26(b)(1) and the party shows a substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.  Here, the Court's review of the documents submitted *in camera* indicates that plaintiffs can obtain the substantial equivalent of the factual information contained within the Corrective Action Reports without a need for the actual reports. Each report is two pages in length and does not include a report of daily activities as plaintiffs surmise.  A deposition of appropriate witnesses about the corrective actions taken by defendants in response to the federal NOVs would not create an undue hardship on plaintiffs.  Therefore, plaintiffs are not entitled to the documents found at Tabs 84-87 and 89.

### B.  Tab 88

Tab 88 is an email from Chris Sharp to Delauna Pack attaching a copy of the Corrective Action Report found at Tab 89.  Defendants withheld this document on the basis of the attorney-client and settlement privileges.  For the reasons stated in connection with Tabs 84-87 and 89, the email is not protected by the settlement privilege.  However, Tab 88 is protected from disclosure under the attorney-client privilege as an email created in connection with defendants' responses to a federal NOV for the reasons stated in connection with Tabs 53 and 57, *supra* at pp. 65-66. *Upjohn*, 449 U.S. at 394.  Therefore, Tab 88 may be withheld from plaintiffs.

## VIII.  MALFUNCTION WRITE-UPS (TABS 90-99)

### A.  Tabs 90-97

The documents at Tabs 90-97 contain malfunction write-ups[34] and related emails.  The

---

[34]Following the receipt of the December 2008 federal NOV, Anthony Sullivan, outside counsel, requested that defendants provide him with reports of corrective actions taken by HNCC to mitigate the allegations contained in the NOV.  These reports, examples of which are contained at Tabs 84 and 89, evolved into malfunction write-ups, each focusing on a distinct malfunction.

malfunction write-ups provide information on the background, root cause, final analysis, next steps/scheduled costs, and improvement recognized or anticipated with each malfunction. Defendants assert these documents are protected by the settlement privilege, attorney-client privilege, and/or work product doctrine.   Defendants fail to assert that Tabs 91 and 94 are protected by the work product doctrine or that Tabs 92, 93, 96, and 97 are protected by the attorney-client privilege in their privilege log; accordingly, they have waived these privileges for these particular documents. *See Banks*, 241 F.R.D. at 386.

None of the documents found at Tabs 90-99 qualify for protection under the settlement privilege.  Defendants argue that because the documents would not exist "but for" receipt of the NOV, they constitute documents prepared in furtherance of settlement negotiations with the USEPA and are privileged.  However, defendants do not identify any evidence that these documents were communicated to the USEPA during the course of settlement negotiations, only that they were created to help defendants prepare.  (Doc. 161, App. B, Sharp Decl., ¶ 24; Pack Decl., ¶¶ 51-55).  While it is clear from a review of the associated emails that these write-ups were created to assist in defendants' preparation for settlement negotiations, the lack of any evidence demonstrating that they were communicated to or shared with the USEPA indicates they do not meet the criteria enunciated in *Goodyear* for settlement privilege protection.  Further, to the extent that the write-ups are factual documents and not inherently unreliable as a result of puffery or "spin," the policy behind the settlement privilege is not served by finding them protected. *Grupo Condumex*, 331 F. Supp.2d at 629.  Therefore, defendants may not withhold the documents found at Tabs 90-99, and those like them, on the basis of the settlement privilege.

The Court's analysis of the attorney-client privilege claim is limited to the documents at

90

Tabs 90, 91, 94, and 95.  Tab 90 contains the final version of the malfunction write-ups; Tabs 91 and 94 contain emails associated with the write-ups; and Tab 95 is a draft version of the write-up. Defendants claim that these documents are protected by attorney-client privilege because the write-ups were created at the request of counsel and in order to assist counsel in preparing for negotiations with the USEPA by enhancing their understanding in order to provide legal advice. (Doc. 161, App. B, Pack Decl., ¶¶ 17-18, 52).  Defendants assert that in-house and outside counsel requested that Delauna Pack assist counsel by gathering information necessary to support counsel's response to the USEPA NOV; one such task involved preparing the malfunction write-ups.  *Id.* at ¶¶ 45, 51-54.

In light of defendants' averments and upon review of the documents submitted, the undersigned finds that the reports and emails at Tabs 90, 91, 94, and 95 are properly protected from disclosure by the attorney-client privilege.  Ms. Pack's declaration demonstrates that these documents were requested by defendants' counsel to aid them in resolving the USEPA NOV.  *Id.* Further, review of the emails at Tabs 91 and 94 supports this averment.  The email at Tab 91 reflects defendants' attempts to gather information from members of the NOV Strategy Team in order to work towards resolving the NOVs; the email at Tab 94 is a communication from Mr. Sharp to defendants' counsel, Lisa Runyon and Louis Tosi, demonstrating that the write-ups were submitted to counsel in order to glean their input and revisions.  Accordingly, the reports at Tabs 90 and 95 and the emails at Tabs 91 and 94 are protected from disclosure under the attorney-client privilege.  *See Upjohn*, 449 U.S. at 394; *The Health Alliance of Greater Cincinnati*, 2009 WL 5033940, at *2.

The documents at Tabs 92, 93, 96, and 97 are protected by the work product doctrine.

91

Tabs 92, 96 and 97 are draft versions of malfunction write-ups.  Tab 93 is an email chain

transmitting and discussing a dump condenser write-up.  These documents were prepared for

ongoing settlement negotiations with the USEPA due to defendants' objectively reasonable

anticipation of litigation.  In November 2009, SunCoke's President asked Pack and Sharp to

prepare summaries of the malfunctions ("malfunction write-ups") that led to the NOVs. (Doc.

161, App. B, Pack Decl., ¶ 51).  Not only were defendants faced with the prospect of litigation as

a result of the NOVs (*see supra* at pp. 66-68), defendants were actively engaged in litigation with

plaintiffs.  In view of the nature of the malfunction write-ups and the factual circumstances

surrounding their creation, Tabs 92, 93, 96, and 97 can fairly be said to have been prepared

because of the prospect of and actual litigation.  Therefore, the malfunction write-ups and

associated emails found at Tabs 92, 93, 96, and 97, and those like them, are protected as work

product and may be withheld from plaintiffs.  As plaintiffs do not assert a substantial need for the

document under Fed. R. Civ. P. 26(b)(3)(A)(ii), Tabs 92, 93, 96, and 97, and those like them,

may be withheld from plaintiffs.

### B.  Tabs 98-99[35]

Tab 98 contains a spreadsheet of bypass events occurring in 2008, including defendants'

assessment of the causes of the events and corrective actions taken.  The spreadsheet was created

by Chris Sharp at the request of the NOV Strategy Team, including in-house counsel Lisa

Runyon, after the USEPA issued the December 2008 NOV.  (Doc. 161, App. B, Sharp Decl., ¶¶

23-24).  Tab 99 contains an email chain between Chris Sharp, in-house counsel, URS Principal

---

[35]The Court notes that the "Joint Submission of Documents Listed on Defendants' Privilege Log" provides
the same identification (ADI ID) number for the documents at Tabs 90 and 99.  On further review, it appears that the
documents contained at Tabs 98 and 99 are both listed on page 124 of defendants' privilege log with the
corresponding ADI ID Nos. 6785444 and 6785441.

Carson, and a SunCoke environmental engineer discussing emissions calculations and attaching the spreadsheet at Tab 98.

Defendants assert the documents at Tabs 98 and 99 are protected by the attorney client and settlement privileges, as well as the work product doctrine.  As defendants' failed to assert protection under the attorney-client privilege in their privilege log, the claim is waived. *See Banks*, 241 F.R.D. at 386.

Tabs 98 and 99 are not protected by the settlement privilege because there is no evidence that the information contained therein was communicated to the USEPA in order to further settlement.  Similar to the documents contained at Tabs 75, 79, and 80, the evidence only establishes that the spreadsheet at Tab 98 and corresponding email at Tab 99 were created by Mr. Sharp to compile information with the assistance of other NOV Strategy Team members in order to provide defendants' employees and counsel with information designed to assist their settlement discussions with the USEPA.  The mere fact that a document was created in preparation of settlement negotiations is not enough to qualify for protection under the privilege; the document must also be a *communication*.  *See Westlake Vinyls*, 2007 WL 1959168, at *3.  As there is no evidence that the spreadsheet was ever communicated to or shared with the USEPA in order to further settlement negotiations, it is not subject to protection by the settlement privilege.

Nevertheless, these documents are protected by the work product doctrine.   The spreadsheet of bypass events contained in Tab 98 reflect the root causes and malfunction analysis that were used by defendants to prepare the malfunction write-ups.  (Doc. 161, App. B, Sharp Decl., ¶ 24).  For the reasons stated in connection with Tabs 92, 93, 96, and 97, the documents found at Tabs 98 and 99 are protected as work product.  As plaintiffs do not assert a substantial

need for the document under Fed. R. Civ. P. 26(b)(3)(A)(ii), Tabs 98 and 99, and those like them, may be withheld from plaintiffs.

## IX. *GRAFF* LITIGATION DOCUMENTS (Tabs 31-40)

Defendants seek protection for documents related to the instant litigation (*Graff* litigation documents). Defendants divide these documents into three categories. First, defendants seek protection for emails exchanged between defendants, in-house counsel, and outside counsel at Shumaker, Loop & Kendrick LLP regarding responses to plaintiff's discovery requests in the *Graff* litigation. (Tabs 31-33, 38). Defendants assert these emails are protected by the attorney-client privilege and, with the exception of the email found at Tab 38, by the work product doctrine. (Doc. 161, App. A at 40). Defendants state that the emails found at Tabs 31-33 are between defendants' counsel and defendants' corporate representatives - Pack, Sharp, Tang, and Essman - each of whom was requested by in-house counsel and corporate executive Michael Thomson to work with outside counsel as needed to support their efforts in the *Graff* litigation. (*Id*. at 39). Defendants assert that the email chain at Tab 38 between the non-attorney representatives does not include counsel among the recipients, but it is clear the dominant intent behind the communications pertained to securing legal advice from counsel. Defendants contend that all of these email communications are protected from disclosure by the attorney-client privilege because they are email chains "with communications between client and counsel"; they relate to strategy and advice for the client's response to plaintiffs' complaint and discovery requests; the purpose of the communications was to secure answers to the questions posed by counsel; and the communications were necessitated by the need to respond to plaintiffs' complaint and requests for discovery. (*Id*. at 40).

94

The second set of documents for which defendants seek protection consists of emails exchanged between defendants, in-house counsel, and outside counsel at Shumaker, Loop & Kendrick LLP and Beveridge and Diamond PC regarding information gathered to support potential strategies to be employed by defendants in defense of plaintiffs' allegations in the *Graff* litigation.  (Tabs 34-35).  Defendants argue these documents are protected from disclosure by both the attorney-client privilege and the work product doctrine.[36]  (Doc. 161, App. A at 42). Defendants contend that these communications relate to strategy and analysis regarding the client's defense of the litigation filed by plaintiffs, and the purpose of these communications was to discuss information that might support potential defenses to plaintiffs' allegations.  Defendants contend that the fact that these communications extended to defendants' investigator, who was retained by defendants' counsel to assist in the provision of legal advice, does not waive the attorney-client privilege since an "independent contractor serves as a representative of the client to the degree necessary to establish the attorney-client privilege."  *The Health Alliance of Greater Cincinnati*, 2009 WL 5033940, at *2 (internal quotations omitted).  (*Id*. at 43).

The third category of *Graff* litigation documents for which defendants seek protection are documents related to defendants' efforts to gather documents for review and production to plaintiffs.  (Tabs 36, 37, 39, 40).  Defendants contend that the documents are protected from disclosure by the attorney-client privilege as well as by the work product doctrine.[37]  (Doc. 161, App. A at 45-46).  Defendants assert that the documents contain legal advice, opinions, and

---

[36] To the extent defendants argue in their brief that the document found at Tab 34 is protected by the work product doctrine, the Court denies any request to withhold the document on this basis as the only privilege claimed in the privilege log for Tab 34 is the attorney-client privilege.

[37] Defendants did not claim the attorney-client privilege for Tab 40 in the privilege log.  Therefore, to the extent they argue in their brief that the document found at Tab 40 is protected by the attorney-client privilege, the Court denies any request to withhold the document on this basis.

strategy in defense of plaintiffs' complaint and that advice passed from counsel to client as well

as the client's requests for advice are protected by the attorney-client privilege.  *See The Health*

*Alliance of Greater Cincinnati*, 2009 WL 2004350.  (*Id*. at 46).

Plaintiffs indicate in their brief that they do not challenge defendants' withholding of

documents such as drafts of briefs, discovery responses, and email chains between defendants

and their outside counsel relating to draft discovery responses or briefs.  (Doc. 163 at 36).

Plaintiffs assert, however, that they are entitled to all of the underlying facts in the documents at

Tabs 31-40, and in particular any analysis of coal dust complaints such as that apparently found

at Tabs 34 and 35.  (*Id*. at 36-37).

As plaintiffs do not challenge defendants' assertion of attorney-client privilege or work

product protection for these documents and communications which pertain to trial preparation

and strategy, the Court shall address only whether these documents contain underlying facts

which are discoverable.  After reviewing *in camera* the documents included at Tabs 31-39, the

Court finds that the documents do not contain underlying facts which are discoverable.  These

email communications and documents consist largely of documents prepared by counsel or

defendants' corporate representatives, as well as communications among these individuals,

concerning trial preparation and strategy for the *Graff* litigation and they do not contain

underlying facts.  Insofar as the communications defendants seek to withhold or partially redact

concern complaints to the PLAA about coal dust (Tabs 33, 34, 35), that information is readily

obtainable by plaintiffs from the PLAA.  Accordingly, communications between defendants and

their counsel need not be disclosed to plaintiffs simply because those communications refer to

the complaints about coal dust.  To the extent the communications reference any "analysis" (Tab

96

35), the Court's review discloses that such communications contain evaluations of the *legal* implications of the coal dust complaints and the impacts of the complaints on the litigation, and not an analysis of raw data or facts. Therefore, this document contains no discoverable underlying facts.

Defendants assert that the document at Tab 40, which is an index of documents prepared by the client as potentially relevant to the *Graff* litigation, is protected only by the work product doctrine, which plaintiffs do not contest. As this document was prepared by a corporate representative (Tang) in anticipation of litigation, and plaintiffs do not assert a substantial need for the document under Fed. R. Civ. P. 26(b)(3)(A)(ii), Tab 40, and those like it, may be withheld from plaintiffs.

## X. SUFFICIENCY OF PRIVILEGE LOG

Lastly, plaintiffs challenge the sufficiency of defendants' privilege log, claiming that despite having provided seven different versions of the privilege log, defendants have still failed to comply with the requirements as set forth by this Court's August 8, 2011 Order.[38] Specifically, plaintiffs assert that the log still lacks basic information for certain entries, such as the author, recipient, and creation date for documents and fails to provide requisite information, *e.g.*, that a document was created in anticipation of litigation. Plaintiffs request that the Court order defendants to provide a log which adheres to the requirements enunciated in the August 2011 Order.

In response, defendants contend that the log comports with the requirements of Fed. R. Civ. P. 26, which permits the omission of certain details when the volume of the documents withheld would make inclusion unduly burdensome. Defendants assert that they spent significant time revising the log

---

[38]The Court notes that it is aware of only six different versions of the privilege log.

in order to comply with the August 2011 Order and, with the exception of a small minority of entries,[39] have included all requisite details.  In those instances where certain information is not facially apparent, such as the author of a document, defendants have provided the names of a custodian and other descriptive details which they claim provide plaintiffs sufficient information to analyze the privilege claims.

After spending a substantial amount of time reviewing and referring to defendants' privilege log while undertaking the instant *in camera* review, the undersigned finds that the current version of the log is sufficient and declines to require defendants to produce yet another privilege log.  The log provides sufficient detail to permit a determination as to whether a document is potentially protected by defendants' various asserted privileges.  The instant ruling, based on an extensive *in camera* review of nearly 100 documents representative of various categories and subcategories, provides ample guidance to plaintiffs on whether the remainder of the purportedly privileged documents listed in defendants' privilege log are protected from disclosure.  Accordingly, and in the interests of judicial economy and furthering this litigation, plaintiffs' request for an order compelling defendants to further revise the privilege log is denied.

## XI.  DISCOVERY OF UNDERLYING FACTS

As this Court stated in its August 8, 2011 Order, neither the attorney-client privilege nor the work product doctrine applies to prevent the disclosure of underlying facts, regardless of who obtained those facts.  *Upjohn*, 449 U.S. at 395 ("The [attorney-client] privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney.").  *See Oklahoma v. Tyson Foods, Inc.,* 262 F.R.D. 617, 628 -631 (N.D. Okla. 2009) (and

---

[39] Defendants assert that they do not have sufficient information to provide all of the details for hard copies of documents from which they are unable to garner metadata.

numerous cases cited therein); *Koch Materials Co. v. Shore Slurry Seal, Inc.*, 208 F.R.D. 109, 121

(D.N.J. 2002). *See also Fresenius Medical Care Holdings, Inc. v. Roxane Laboratories, Inc.*, No. 2:05-

cv-889, 2007 WL 543929, at *3 (S.D. Ohio Feb. 16, 2007) (to the extent documents contain strictly

factual information, as opposed to legal conclusions or opinions, "that factual information cannot be

immunized from discovery simply by incorporating it into a document which is entitled to work-product

protection"). As a result, the Court in its August 2011 Order required defendants' privilege log to

include whether the documents contain or incorporate *non-privileged* underlying facts. The Court then

proposed what it believed was a potentially workable option for moving discovery along of those non-

privileged underlying facts. The Court directed the parties to meet and confer on a mutually agreeable

discovery method for disclosure of such underlying facts to plaintiffs as the Court believed the parties

were in the best position to determine the most efficient and expedient way to disclose the discoverable

underlying facts contained or incorporated in the documents (*e.g.,* by redaction and production of the

documents as was done with the pre-August 2008 Graff log, or through deposition testimony). That

suggestion proved unworkable and resulted in the massive document review undertaken by the Court in

the instant Order.

Therefore, while the Court reaffirms the principle that the attorney-client privilege and work

product doctrine do not protect underlying facts, the Court will compel no further production or

redaction of the withheld documents to unearth any potential underlying facts. Plaintiffs may inquire

about the relevant facts by deposing the appropriate witnesses or through other discovery vehicles. *See* 8

Wright & Miller, Federal Practice & Procedure, § 2023 ("courts have consistently held that the work

product concept furnishe[s] no shield against discovery, *by interrogatories or by deposition*, of the facts

that the adverse party's lawyer has learned, or the persons from whom he or she had learned such facts,

99

or the existence or nonexistence of documents, even though the documents themselves may not be subject to discovery") (emphasis added); *In re Bank One Sec. Litig.,* 209 F.R.D. 418, 423 (N.D. Ill. 2002) ("Factual information may not be withheld under the work-product doctrine, but must be produced through interrogatories, depositions or other discovery."); *Farran v. Johnston Equip., Inc.*, No. 93–6148, 1995 WL 549005, at *3 (E.D. Pa. Sept. 12, 1995) ("The work product doctrine furnishes no shield against discovery by interrogatories or by depositions of the facts that the adverse party has learned of the persons from whom such facts were learned.").

## XII. CONCLUSION

The Court has attempted to give the parties guidance as to the categories and sub-categories of documents that are protected by the attorney-client privilege, the work product doctrine, and the settlement privilege.  For example, the Court has determined that defendants have not met their burden of proof showing the 2008 URS audit documents are entitled to work product protection.  Accordingly, any 2008 URS audit documents listed on the privilege log for which only the work product protection has been asserted must be produced to plaintiffs.  Similarly, the Court has determined that both the draft and final forms of the URS audit are protected by the attorney-client privilege.  Thus, the final and draft forms of the 2008 URS audit for which the privilege log asserts attorney-client privilege may be withheld from plaintiffs.  Using the guidance provided in this opinion, the parties shall confer with each other to resolve any remaining disputes over the discovery of documents listed on the privilege log.

As fact discovery has been suspended through January 31, 2013, for the documents that the Court has determined no privilege or protection applies, defendants shall produce such documents to plaintiffs

by February 1, 2013.

**IT IS SO ORDERED.**


Date:  11/13/2012                         s/Karen L. Litkovitz
                                          Karen L. Litkovitz, Magistrate Judge
                                          United States District Court