IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Glenn Graff, *et al.*, | : | |
| | : | No. 1:09-cv-670 |
| Plaintiffs, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Dismissing the First Cause of |
| Haverhill North Coke Company, *et al.*, | : | Action in Part and Dismissing the Second |
| | : | Cause of Action |
| Defendants. | : | |

This matter is before the Court on Plaintiffs' Brief of Violations that Can Proceed after

Entry of Illinois Consent Decree (Doc. 277) and Defendants' Brief in Support of Barring

Plaintiffs' Clean Air Act Claims on the Basis of Res Judicata and Mootness (Doc. 278).

## I.    PROCEDURAL BACKGROUND

### A.    *Graff, et al. v. Haverhill North Coke Company, et al.*

Plaintiffs Glenn Graff, Kelly Graff, Hildreth Maddox, and Peggy Maddox (collectively,

"Plaintiffs" or "the Graff Plaintiffs") initiated this environmental citizen suit against Defendants

Haverhill North Coke Company ("Haverhill North") and SunCoke Energy, Inc. ("SunCoke"), the

parent company of Haverhill North, on September 14, 2009.  (Doc. 1.)  A Haverhill North coke

processing plant ("the Facility") operates in the vicinity of Plaintiffs' real property.  Plaintiffs

allege that certain excess emissions from the Facility violate their rights under federal and state

law.  Plaintiffs assert claims pursuant to the Clean Air Act ("CAA"), 42 U.S.C. § 7401 et

seq., the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., and

Ohio law.

Plaintiffs filed their First Amended Complaint on October 12, 2009.  (Doc. 7.)  Plaintiffs

assert the following causes of action:

(1)     Violation of the CAA (violations of permits, the state implementation
        plan, and regulations)
(2)     Violation of the CAA (violations of the malfunction reporting
        requirements  in the state implementation plan)
(3)     Violation of the CAA (violation of nuisance provisions in the state
        implementation plan)
(4)     Violation of the RCRA
(5)     Negligence
(6)     Nuisance
(7)     Trespass
(8)     Ultrahazardous or Abnormally Dangerous Activity
(9)     Negligent Infliction of Emotional Distress
(10)    Intentional Infliction of Emotional Distress

(*Id.*)

**B.      *United States v. Gateway Energy & Coke Co., LLC***

A separate action was filed on June 26, 2013 by the United States, the State of Ohio, and

the State of Illinois (collectively, "the Governments") against Haverhill Coke Company, LLC,

Gateway Energy Coke Company, LLC, and SunCoke Energy, Inc. (collectively, "the Illinois

Defendants") for Clean Air Act violations at the Facility in Ohio and a second plant in Illinois.

*U.S. v. Gateway Energy & Coke Co., LLC*, No. 3:13-cv-616 (S.D. Ill.).  The following statement

of background facts was provided in a Memorandum and Order dated November 7, 2014 in the

Illinois case:

> [The Governments] seek injunctive relief and civil penalties against GECC, HCC
> and SunCoke for violations of [the CAA, the Illinois Environmental Protection
> Act, Ohio Revised Code chapter 3745, and the implementing regulations].  The
> claims relate to two facilities – the "Gateway Facility" in Granite City, Illinois,
> owned and operated by GECC and SunCoke and the "Haverhill Facility" in
> Franklin Furnace, Ohio, owned and operated by HCC and SunCoke.  Both
> facilities manufacture metallurgical coke utilizing the same horizontal heat
> recovery coke oven technology to produce coke and employ the same air
> pollution control devices to minimize emissions from the cokemaking process.
>
> In December 2008, the Governments issued the first Notice of Violations
> ("NOV") for the alleged CAA violations at the Haverhill Facility.  Since that
> time, the Governments issued numerous NOVs for Haverhill Facility and one for
> the Gateway Facility.  Because of the similarities of the facilities and the
> violations, the Governments initiated negotiations with defendants in 2010 to

resolve the alleged violations. Since 2010, the parties have participated in extensive negotiations, exchanged many drafts of the proposed consent decree and exchanged many documents. The proposed consent decree culminated after a years-long process of extensive fact-finding, settlement discussion, and independent agency evaluation of the potential case against each defendant. During this process, the United States had numerous telephone calls and met in person with counsel for the proposed intervenors [the Graffs and Maddoxes] at their request to consider any information the proposed intervenors might with to [*sic*] provide regarding the Haverhill facility. As the parties neared settlement, the Governments, with defendants' permission, shared a draft of the proposed consent decree with the proposed intervenors, who provided comments on October 9, 2012 and January 23, 2013. The [G]overnments carefully reviewed written comments by the proposed intervenors on the draft consent decree.

The same day the complaint was filed, the United States filed a notice of lodging of the proposed consent decree in this case that would resolve defendants' CAA liability for all alleged CAA violations, including resolution of all NOVs, and for future CAA violations associated with installation of the redundant Heat Recovery System Generators (Doc. 3). The proposed consent decree would require: (1) the installation of process equipment to provide redundancy that will allow hot cooking gases to be routed to a pollution control device instead of vented directly to the atmosphere in the event of equipment downtime; (2) installation of a continuous emissions monitor for sulfur dioxide at one bypass vent per process unit (two at the Haverhill Facility and one at the Gateway Facility); (3) payment of a civil penalty of $1.995 million, of which 1.27 million will go to the United States, $575,000 to the State of Illinois, and $150,000 to the State of Ohio; and (4) performance of a lead hazard abatement supplemental environmental project at a cost of $255,000 at the Gateway Facility. Thereafter, the United States published that notice of lodging in the Federal Register for public comments. The proposed intervenors requested extensions of time of the comment period twice and the Governments allowed these requests; thus extending the comment period to October 3, 2013. The proposed intervenors timely filed comments. Also, the Governments received about 1800 pages of additional material from the proposed intervenors after the close of the comment period.

(No. 3:13-cv-616, Doc. 45 at PageID 818–20.)

As indicated in the excerpt, the Graff Plaintiffs sought to intervene in the Illinois case.

The Honorable David R. Herndon denied their intervention in the Memorandum and Order. (*Id.* at PageID 827.) On November 10, 2014, Judge Herndon entered the Consent Decree. (No. 3:13-cv-616, Doc. 47.) It now governs the operation of the Facility.

C.      **Current Dispute**

The issue before the Court is the extent to which the Illinois Consent Decree precludes the Graff Plaintiffs from obtaining relief on the claims in this citizen suit.  The parties agree that the Consent Decree does not bar the non-CAA claims stated in the First Amended Complaint. (Doc. 276 at PageID 6164.)  Therefore, the Graff Plaintiffs can proceed on the Fourth through Tenth Causes of Action in the First Amended Complaint.  The parties disagree as to the extent to which the Consent Decree bars the CAA claims—claims pleaded in the First, Second, and Third Causes of Action of the First Amended Complaint.  Plaintiffs assert that the Consent Decree should bar only the CAA claims in this suit that overlap with claims resolved in the Consent Decree.  Defendants contend that First, Second, and Third Causes of Action should be dismissed as barred by the preclusive effect of the Consent Decree.[1]

**II.      THE RELEVANT LEGAL STANDARDS AND THE CONSENT DECREE**

**A.      Clean Air Act**

The framework of the Clean Air Act is relevant to this inquiry of whether Plaintiffs' claims for CAA violations are barred by the Consent Decree entered in the Illinois case.  "The federal Clean Air Act is a model of cooperative federalism [which] requires each State to establish a state implementation plan (SIP) to limit emissions in accordance with national ambient air quality standards set by the federal EPA."  *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 467 (6th Cir. 2004) (citing 42 U.S.C. §§ 7409(b)(1) and 7410(a)(1)).  Violations of a state SIP can be remedied through federal CAA enforcement actions.  *See id.* at 475 (citing 42 U.S.C. § 7604(a)(1) & (f)).  "[T]he provisions of the particular state's SIP determine what conduct is

---

[1]  Defendants also contend that the Graff Plaintiffs' CAA causes of action should be dismissed because the Graff Plaintiffs will not be entitled to relief.  This alternative argument is more appropriate for summary judgment briefing.  The Court will defer consideration of the argument until that time.

actionable under the CAA." *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 480 F.3d 410, 418 (6th Cir. 2007).

The CAA authorizes citizen suits against "any person" who is alleged to have violated or be in violation of an emission standard or limitation imposed by the CAA. 42 U.S.C. § 7604(a). The plaintiffs in citizen suits "seek relief not on their own behalf but on behalf of society as a whole." *Ellis*, 390 F.3d at 477. The CAA serves primarily public interests and "personalized" remedies for citizens are not a priority. *Id.* "Congress . . . has provided an interstitial role for private parties in enforcing the statute." *Id.* at 475 (internal quotation and citation omitted).

Individual plaintiffs are required to give notice of the alleged violations at least sixty days prior to filing suit. 42 U.S.C. § 7604(b)(1)(A). Plaintiffs cannot commence a citizen suit "if the Administrator or State has commenced and is diligently prosecuting a civil action in a court of the United States or [of] a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any person may intervene as a matter of right." 42 U.S.C. § 7604(b)(1)(B). Subsection 7604(b)(1)(B) is not directly applicable here because the Graff Plaintiffs filed their citizen suit before the Governments instituted the Illinois suit.

## B.     Res Judicata Principles

Res judicata, or claim preclusion, bars the litigation of a claim when four elements are met: (1) the prior decision was a final decision on the merits; (2) the present action is between the same parties or their privies as those to the prior action; (3) the claim in the present action was or should have been litigated in the prior action; and (4) an identity of the causes of action exists between the prior and present actions. *See Mitchell v. Chapman*, 343 F.3d 811, 819 (6th Cir. 2003); *Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 (6th Cir. 1995).

The Consent Decree in the Illinois case is a final decision on the merits for purposes of res judicata. *See Huguley v. Gen. Motors Corp.*, 999 F.2d 142, 146 (6th Cir. 1993) (stating that consent decrees have a res judicata effect). The Graff Plaintiffs do not dispute that they are in privity with the State of Ohio, a party in the Illinois suit. *Cf. Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d 1464, 1470 (10th Cir. 1993) ("When a state litigates common public rights, the citizens of that state are represented in such litigation by the state and are bound by the judgment."). The Ohio Attorney General brought the Illinois suit on behalf of "the People of Ohio." (No. 3:13-cv-616, Doc. 2 at PageID 5.) Moreover, Judge Herndon found that the Graff Plaintiffs "participat[ed] actively" in the Illinois case "as if they were parties." (No. 3:13-cv-616, Doc. 45 at PageID 819, 826.) They consulted with the Governments, submitted 1800 pages of documents for the Governments to review, and submitted written comments about the proposed consent decree before it was approved by Judge Herndon. (*Id.*)

The primary dispute in this case involves whether the fourth element is met. "Identity of causes of action means an 'identity of the facts creating the right of action and of the evidence necessary to sustain each action.'" *Mitchell*, 343 F.3d at 819 n. 6 (quoting *Westwood Chem. Co. v. Kulick*, 656 F.2d 1224, 1227 (6th Cir. 1981)); *see also Hobart Corp. v. Dayton Power & Light Co.*, 997 F. Supp. 2d 835, 849 (S.D. Ohio 2014) (same). The Sixth Circuit has explained that if two claims arise from the same transaction or are based on a common nucleus of operative facts, then the claims share an identity and should be brought in the same suit. *Nguyen ex rel. U.S. v. City of Cleveland*, 534 F. App'x 445, 451 (6th Cir. 2013.) However, when a "a plaintiff alleges an ongoing course of harmful conduct, as with a nuisance . . . , the task of pinpointing the transaction becomes more challenging." *Id.* at 452. A single course of conduct, such as "an abatable nuisance[,] may frequently give rise to more than a single cause of action." *Lawlor v.*

*Nat'l Serv. Corp.*, 349 U.S. 322, 329 (1955). "If a plaintiff sues a defendant more than once based on an ongoing course of conduct, the doctrine of claim preclusion will typically not prevent the plaintiff from asserting a cause of action that arose after the first suit was decided." *Nguyen*, 534 F. App'x at 452.

## C.     Effect of the Consent Decree on Res Judicata Analysis

"Generally speaking, when the contours of a private plaintiff's suit and the Government's suit coincide . . . the former must be dismissed." *Ellis*, 390 F.3d at 476. However, "touchstone of the res judicata effect" of a consent decree "is the consent decree itself." *Id.* at 473. "The basically contractual nature of consent judgments has led to general agreement that preclusive effects should be measured by the intent of the parties." 18A Fed. Prac. & Proc. Juris. § 4443 (2d ed.). Where the terms of a consent decree are ambiguous, the district court's interpretation of the consent decree deserves substantial deference. *Ellis*, 390 F.3d at 473. "[R]es judicata bars only those violations covered by [a] penalty order" in environmental cases "[b]ecause each permit violation gives rise to a separate cause of action." *The Old-Timer Inc. v. Blackhawk-Centr. City Sanitation Dist.*, 51 F. Supp. 2d 1109, 1118 (D. Colo. 1999); *see also Citizens Legal Envir. Action Network, Inc. v. Premium Standard Farms, Inc.*, No. 97-6073-CV-SJ-6, 2000 WL 220464, at *7 (W.D. Mo. Feb. 23, 2000) (stating that CAA claims in a second lawsuit are barred only to the extent that they "allege the precise violations" described in the first lawsuit because "each violation of . . . the CAA involves its own nucleus of operative facts").

Therefore, the Court must examine the terms of the Consent Decree in the Illinois suit to determine its preclusive effect on the Graff Plaintiffs' claims here. The "express purpose" of the parties for entering into the Consent Decree was broadly described in paragraph 7 as being to "further the objectives of the [CAA] . . . and with respect to the Haverhill Facility, the objectives

of Chapter 3704 of the Ohio Revised Code."  (No. 3:13-cv-616, Doc. 47 at PageID 839.)  The

Consent Decree also stated at paragraph 7 that "[a]ll plans, reports, construction, maintenance

and other obligations in this Consent Decree or resulting from the activities required by this

Consent Decree shall have the objective of causing Defendants to come into and remain in full

compliance with the terms of its applicable permits and the [Clean Air] Act, and Chapter 3704 of

the Ohio Revised Code for the Haverhill Facility."  (*Id.* at PageID 839–40.)

Nonetheless, despite the broadly worded objective, the Consent Decree more narrowly

defined the scope of claims resolved in the case.  The Consent Decree at paragraph 115 stated

that it "resolves the civil claims of the United States, the State of Illinois and the State of Ohio

through the Date of Lodging for the violations alleged in the Complaint filed in this action, and

the violations alleged in the Notices of Violation relating to the Gateway and Haverhill facilities

sent to Defendants by EPA, Illinois EPA, and Ohio EPA prior to the Date of Lodging referenced

in Appendix 3."  (*Id.* at PageID 890, 917.)[2]  Appendix 3 to the Consent Decree identified four

Notices of Violation ("NOVs") issued to Haverhill by the federal EPA and eleven NOVs issued

to Haverhill by the Ohio EPA and the Portsmouth Local Air Agency.  (*Id.* at PageID 917.)  Two

of the NOVs issued by the federal EPA and seven of the NOVs issued by the Ohio

EPA/Portsmouth Local Air Agency were issued prior to the date the Graff Plaintiffs initiated the

instant suit against Defendants on September 14, 2009.  (*Id.*)

_____

[2] The Consent Decree also resolves claims of the Governments "for the regulatory and permit provisions for
which violations are alleged in the Complaint resulting from Defendants' performance of the requirements set forth
in Section IV.A (Redundant HRSG Project), conditioned upon satisfactory performance of the requirements set forth
therein.  Provided that Defendants perform the requirements of Section IV.A (Redundant HRSG Project) at the
Middletown Facility, the Consent Decree would then resolve the civil claims of the United States and the State of
Ohio for emissions violations during the time period of and resulting from Defendants' performance of the
requirements set forth in Section IV.A (Redundant HRSG Project) at the Middletown Facility, conditioned upon
satisfactory performance of such requirements."  (Case No. 3:13-cv-616, Doc. 47 at PageID 890.)  Neither party
contends that the Redundant HRSG Project issue is relevant to the res judicata issue.

Paragraph 117 addressed the res judicata effect of the Consent Decree as to "any subsequent administrative or judicial proceeding initiated by the United States, Illinois or Ohio." (*Id.* at PageID 891.)  It stated that Illinois Defendants shall not assert or maintain a claim or defense based on principles of waiver, res judicata, preclusion, or any "other defenses based upon any contention that the claims raised by the [Governments] in the subsequent proceeding were or should have been brought in the [Illinois case], except with respect to claims that have been specifically resolved pursuant to Paragraph 115 of this Decree." (*Id.*)  Paragraph 117, therefore, narrowed traditional res judicata principles by stating that the Consent Decree only has a preclusive effect as to the claims actually resolved in the Consent Decree.  Defendants assert that paragraph 117 was not directly applicable to the issue of whether res judicata bars the Graff Plaintiffs' claims because their claims are not brought by the Governments nor are they asserted subsequent to the Consent Decree.  Nonetheless, the Court already has concluded that the Graff Plaintiffs are in privity with the State of Ohio.  Moreover, it is instructive that the intent of the Consent Decree as expressed in paragraphs 115 and 117 was to specifically limit the res judicata effect to the claims for violations asserted in the Illinois Complaint and in the NOVs.

Paragraph 118 provided that "Defendants are responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein." (*Id.* at PageID 891–92.)  It stated further that the Governments "do not, by their consent to entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CAA." (*Id.* at PageID 892.)  Paragraph 119 stated that "[e]xcept as otherwise provided by law, this Consent Decree . . .

9

does not limit the rights of third parties, not party to this Consent Decree, against Defendants."
(*Id.*)

The Court reads the foregoing provisions of the Consent Decree to limit the res judicata effect of the Consent Decree such that it has a narrower preclusive effect than traditional res judicata principles.  Traditional res judicata principles limit parties and their privities from bringing both claims which were asserted in an earlier lawsuit and claims which should have been asserted in an earlier lawsuit.  *See Nguyen*, 534 F. App'x at 451, 453 & n. 2 (stating that a plaintiff is barred from asserting in a second lawsuit CAA claims which he should have asserted in the first lawsuit); *Mitchell*, 343 F.3d at 819 (stating res judicata elements).  However, the res judicata effect in this case, as in *Ellis*, is governed by the terms of an applicable consent decree. The parties in the Illinois case entered into a Consent Decree with narrow provisions on res judicata.  The Consent Decree did not resolve all existing CAA violations, but in relevant respect it resolved those claims for violations alleged in the Complaint and the NOVs.  This narrow res judicata effect left open an avenue for the Graff Plaintiffs to pursue claims for CAA violations which were not alleged by the federal EPA, the Ohio EPA, or the Portsmouth Local Air Agency in the NOVs and were not alleged by the Governments in the Illinois Complaint.

## III.    ANALYSIS

### A.    Overlapping Violations in the First Cause of Action and the Second Cause of Action

The Graff Plaintiffs agree that the following violations of the CAA alleged in the First Cause of Action of their First Amended Complaint also were alleged in the Illinois case or the NOVs:

- Exceedences of Sulfur Dioxide and Particulate Emissions Limits for Bypass Vents (Coke Batteries A, B, C, and D - Units P901 and P902) (Doc. 7, ¶ 120-129);

- Sulfur Dioxide Emission Limits Violations from the Waste Gas Stack (Coke Batteries A and B – Unit P901 and Coke Batteries C and D- Unit P902) (Id., ¶ 130-136);
- Violating Continuous Emission Monitoring (CEM) Requirements (Coke Batteries A and B - Unit P901 and Coke Batteries C and D – Unit P902) (Id., ¶ 154-158);
- Violations of Requirements to Not Open More Than One Bypass Vent Simultaneously, and Excessive Bypass Venting (P901 and P902) (Id., ¶ 159-162);
- Exceedences of Bypass Venting Limits (P901 and P902) (Id., ¶ 163-167);
- Exceeding Maximum Daily Wet Coal Usage Rate of 2400 ton[s] per day limit for P901 and P902 (Id., ¶ 177-180); FGD Baghouse Pressure Drops Outside the Specified Permit Range (P901 and P902) (Id., ¶ 181-184);
- Common Tunnel Temperature Outside Specified Permit Range (P901) (Id., ¶ 189-192); and
- Excessive Downtime for Sorbet Trap Monitoring System (P902) (Id., ¶ 193-196).

(Doc. 277-2 at PageID 6198–99.)

Plaintiffs have agreed not to seek relief on the overlapping CAA violations in the First Cause of Action.  (Doc. 276 at PageID 6164.)  Similarly, Plaintiffs have agreed not to seek relief for the alleged CAA violations in the Second Cause of Action.  (*Id.*)  However, they ask that the Court not dismiss claims based on the overlapping violations because the violations are "relevant to tort claims."  (Doc. 277 at PageID 6169 n.4.)

The Court will not strike any factual allegations in the First Amended Complaint. However, the Court will dismiss the subclaims stated in paragraphs 120–29, 130–36, 154–58, 159–62, 163–67, 177–80, 181–84, 189–92, and 193–96 of the First Cause of Action and the entirety of the Second Cause of Action.  Dismissal of these CAA claims should not hamper the Graff Plaintiffs' ability to seek relief on their common law claims.

**B.      Purportedly Non-Overlapping Violations in the First Cause of Action**

The Graff Plaintiffs contend that multiple subclaims within the First Cause of Action are

not barred by the Illinois Consent Decree.  Plaintiffs contend that the following categories of

violations were not alleged in the Illinois case or the resolved NOVs:

- Violations of the PM/PM10 hourly emissions rate for HRSG bypass vent stacks (Graff Compl., Doc. 7, ¶ 137–141, p. 31);
- Violations of the visible emissions limit for the P902 main stack (Id., ¶ 142–145, p. 31–32);
- Failure to employ required control measures and visible emissions violations for the coal and coke handling, storage, and transfer operations (Id., ¶ 117–119, 146–153, p. 28, 32–33);
- Failing to visually inspect each oven prior to pushing (Id., ¶ 117–119, 168–176, p. 28, 35–36);
- Failure to maintain hot car multiclone pressure outside specified permit range (Id., ¶ 185–188, p. 38);
- Failure to process waste gas with lime spray dryers (Id., ¶ 197–200, p. 39); and
- Failure to process waste gas with use of a baghouse (Id., ¶ 201–203, p. 40).

(Doc. 277-2 at PageID 6198.)  In response, Defendants provided a table summarizing each

subclaim in the First Cause of Action and then listing the purportedly comparable violations

asserted in the NOVs and the Illinois Complaint.  (Doc. 278-6 at PageID 6801–12.)  The Court

will examine each subclaim separately.

**1.      Paragraphs 137–41 of the First Amended Complaint**

The Graff Plaintiffs allege in this subclaim that the Defendants violated the Facility's

PSD Permit[3] limit for PM/PM$_{10}$ hourly emission standards from the P901 bypass vent stacks.

Plaintiffs further allege that the PM/PM$_{10}$ emissions exceeded the emissions limit of 12.86

pounds per hour.  (Doc. 7 at PageID 79.)  The EPA alleged a similar violation of PM/PM$_{10}$

emission rates in the February 17, 2010 NOV.  (Doc. 278-1 at PageID 6564, 6567–68, 6570.)

---

[3] The PSD Permit is a "prevention of significant deterioration" permit.  The Graff Plaintiffs allege that federal regulations under the CAA, including inter alia 40 C.F.R. § 52.21, preclude the construction of new major sources or major modifications without a PSD permit.  (Doc. 7 at PageID 60.)

The Consent Decree at paragaph 115 resolved "the violations alleged in the Notices of Violation relating to the Gateway and Haverhill facilities sent to Defendants by EPA."  (No. 3:13-cv-616, Doc. 47 at PageID 890, 917.)  The Court finds that the subclaim stated in Paragraphs 137–41 of the First Amended Complaint is barred by the preclusive effect of the Consent Decree.

### 2.  Paragraphs 142–45 of the First Amended Complaint

The Graff Plaintiffs allege in this subclaim that the PSD Permit "prohibits visible particulate emissions from the waste gas exhaust stack(s) from exceeding 10% opacity as a 6-minute average."  (Doc. 7 at PageID 79.)  They further allege that Defendants repeatedly exceeded that limit.  (*Id.*)

Defendants assert that this subclaim overlaps with the allegations made in the July 22, 2010 NOV issued by the EPA.  (Doc. 278-1 at PageID 6602–11; Doc. 278-6 at PageID 6804.)  The cover letter to the NOV states that Haverhill North violated "provisions in its PSD permit that govern daily coal charge limits and baghouse pressure drop requirements from units P901 and P902 coke batteries."  (Doc. 278-1 at PageID 6602.)  The NOV likewise discusses daily wet coal usage rates and pressure drops in the waste gas exhaust baghouse.  The NOV does not allege violations of opacity limits for particulate emissions.

Defendants also assert that this subclaim overlaps with the Fifteenth Claim for Relief in the Illinois case.  (Doc. 278-6 at PageID 6804.)  The Governments alleged a violation of baghouse pressure drop regulations stated in the Haverhill Permit in the Fifteenth Claim.  (No. 3:13-cv-616, Doc. 2 at PageID 33–34.)

The Consent Decree states that it resolves only the claims of the Governments for *violations* alleged in the Complaint and in the NOVs.  (No. 3:13-cv-616, Doc. 47 at PageID 890.)  To date, the parties have not provided the Court with sufficient information for the Court to

speculate whether baghouse pressure drops might be related to the opacity of particulate

emissions.  Whether or not the issues overlap as a factual matter, it suffices for now for the Court

to determine that neither the EPA in the July 22, 2010 NOV nor the Governments in their

Fifteenth Claim alleged a violation of the PSD Permit's opacity limits for waste gas exhaust

stacks.

   The Court finds that the Consent Decree did not purport to resolve a claim for violation

of the opacity limits for waste gas exhaust stacks.  This subclaim is not barred by the preclusive

effect of the Consent Decree.  Allowing the Graff Plaintiffs to bring this non-overlapping claim

in this suit is consistent with statutory enforcement scheme of the CAA where private citizens

play an "interstitial role . . . in enforcing the statute."  *Ellis*, 390 F.3d at 475 (internal quotation

and citation omitted).

### 3.  Paragraphs 117–19 and 146–53 of the First Amended Complaint

   The Graff Plaintiffs allege several types of violations in this subclaim.  They allege

general violations of "emission limits and operational standards" set forth in the Facility's PSD

Permit.  (Doc. 7 at PageID 76.)  They assert also specific violations of (1) the PSD Permit and

Permit to Install requirements to use "best available control measures that are sufficient to

minimize or eliminate emissions of fugitive dust from coke and coal storage piles[;]" (2) the PSD

Permit and Permit to Install requirements to use "best available control measures for the load-in

and load-out operations associated with coke and coal storage piles[;]" (3) the PSD Permit and

Permit to Install requirements to have "no visible emissions except for one minute in an hour for

coke and coal storage piles[;]" (4) the PSD Permit and Permit to Install requirement to have "no

visible particulate emissions of fugitive dust that exceed 20% opacity as a 3 minute average for

coke and breeze handling and processing, identified as emissions unit F004." (Doc. 7 at PageID 80.)

Defendants state that this subclaim overlaps with violations stated in the July 19, 2005 NOV and the August 19, 2008 NOV issued by the Portsmouth Local Air Agency. (Doc. 278-6 at PageID 6805.) The Court disagrees. The Portsmouth Local Air Agency alleged violations of monitoring and record keeping requirements in the July 19, 2005 NOV. (Doc. 278-1 at PageID 6519–21.) The Portsmouth Local Air Agency alleged violations of the requirement to report malfunctions in the August 19, 2008 NOV. (*Id.* at PageID 6531–32.) It did not directly allege violations of best available control measure standards or visible emission standards in either NOV. Emissions were discussed in relation to monitoring, record keeping, and reporting requirements.

Defendants also assert that the subclaim overlaps with the Governments' allegations in the Sixteenth Claim of the Illinois Complaint. (Doc. 278-6 at PageID 6805.) The Court disagrees with this argument as well. The Governments alleged a violation of the requirements to report malfunctions in the coke screening baghouse in the Sixteenth Claim of the Illinois Complaint. (No. 3:13-cv-616, Doc. 2 at PageID 34–35.)

The violations of emission limits and operational standards asserted in ¶¶ 117–19 and 146–53 do not overlap with the violations resolved in the Consent Decree and they are not barred by res judicata.

### 4. Paragraphs 117–19 and 168–76 of the First Amended Complaint

The Graff Plaintiffs again allege in this subclaim general violations of "emission limits and operational standards" set forth in the Facility's PSD Permit. (Doc. 7 at PageID 76.) More specifically, the Graff Plaintiffs allege violations of requirements for defendants to visually

inspect each coke oven prior to "pushing" and to not "push" the oven unless the visual inspection shows that there is not smoke in the open space above the coke bed and that there is an unobstructed view of the door on the opposite side of the oven.  (Doc. 7 at PageID 83–84.)  The requirements arise from the PSD Permit and the 40 C.F.R. § 63.7293(a).  The regulation provides as follows:

> (a) You must meet the requirements in paragraphs (a)(1) and (2) of this section for each new and existing non-recovery coke oven battery.
>
> (1) You must visually inspect each oven prior to pushing by opening the door damper and observing the bed of coke.
> (2) Do not push the oven unless the visual inspection indicates that there is no smoke in the open space above the coke bed and that there is an unobstructed view of the door on the opposite side of the oven.

40 C.F.R. § 63.7293.  The Graff Plaintiffs also allege a failure to maintain records regarding compliance with the requirement for visual inspections before pushing a coke oven as required by 40 C.F.R. § 63.7334(c).  (Doc. 7 at PageID 84.)

Defendants contend that this subclaim overlaps with the August 19, 2008 NOV in which the Portsmouth Local Air Agency alleged violations of the requirement to report malfunctions.  (Doc. 278-1 at PageID 6531–32; Doc. 278-6 at PageID 6808.)  The Portsmouth Local Air Agency did not allege violations of regulations requiring the visual inspections of coke ovens.  The violations asserted in paragraphs 168–76 do not overlap with the violations asserted in the Consent Decree and they are not barred by res judicata.

### 5.  Paragraphs 185–88 of the First Amended Complaint

The Graff Plaintiffs allege a violation of the PSD Permit requirement that the hot car multiclone pressure be within the two to six inch range for P901.  (Doc. 7 at PageID 86.)  Defendants contend that this subclaim overlaps with the July 19, 2005 and the May 17, 2012 NOVs issued by the Portsmouth Local Air Agency.  (Doc. 278-6 at PageID 6809.)

The Portsmouth Local Air Agency discussed in the July 19, 2005 NOV a situation in which Haverhill North failed to record or document pressure drops in the "pushing multiclone dust collector." (Doc. 278-1 at PageID 6519–21.) However, the Portsmouth Local Air Agency did not allege violations of the PSD Permit requirement regarding the correct range for multiclone pressure in the NOV. Rather, it alleged violations of monitoring and record keeping requirements. (*Id.*)

The Portsmouth Local Air Agency alleged in the May 17, 2012 NOV a multitude of substantive requirements and reporting requirements following a site inspection. (Doc. 278-1 at PageID 6618–23.) The most pertinent violations alleged were for "[f]ailure to record the pressure drop across each multiclone during each push." (*Id.* at 6621.) The Air Agency chose to address the issue noted as a violation of the recording requirements only for multiclone pressure drops, not as a violation of a substantive requirement to maintain the pressure within a certain range. It did not impose a remedy designed to ameliorate any problem with the multiclone pressure measurement.

The Consent Decree states that it resolves the claims of the Governments for *violations* alleged in the Complaint and in the NOVs. (No. 3:13-cv-616, Doc. 47 at PageID 890.) Neither the July 19, 2005 NOV nor the May 17, 2012 NOV asserted a violation of the PSD Permit requirement that the hot car multiclone pressure be within the two to six inch range for P901. The Court will not dismiss this subclaim as barred by the Consent Decree.

### 6. Paragraphs 197–200 and 201–03 of the First Amended Complaint

The Graff Plaintiffs allege in paragraphs 197–200 of the First Amended Complaint that Haverhill North violated the PSD Permit requirement that "waste gas from the coke gas be processed with the use of a lime dryer for units P901 and P902." (Doc. 7 at PageID 87.) They

similarly allege in paragraphs 201–13 that Haverhill North violated the PSD Permit requirement

that "waste gas from coke gas be processed with the use of a lime dryer with a baghouse in order

to control $PM/PM_{10}$." (Doc. 7 at PageID 88.)  Defendants assert that there are comparable

allegations in the May 7, 2012 NOV, other NOVs, and in several claims for relief in the Illinois

Complaint.  (Doc. 278-6 at PageID 6810–12.)

Defendants point to the following allegation in the May 17, 2012 NOV as being relevant

to these subclaims:  "failure to report an SO2 exceedance during FGD malfunction on August 8,

2011 and January 7, 2012 for emissions units P901 and P902, respectively."  (Doc. 278-1 at

PageID 6619.)  The Court acknowledges that it lacks sufficient information at this time to

understand the relationship, if any, between (1) how waste gas from coke gas is processed and

(2) $SO_2$ or $PM/PM_{10}$ emissions from FGD malfunctions.  However, the Court can determine that

the Portsmouth Local Air Agency in the relevant portion of the May 7, 2012 NOV asserted a

violation of a reporting requirement for $SO_2$ exceedances.  (*Id.* at 6619, 6620–21.)  The Air

Agency did not assert a violation of a requirement to process waste gas from coke gas with a

lime dryer.  Similarly, the other NOVs identified by Defendants are for violations of bypass

venting limits and the operation of more than one vent stack.  (Doc. 278-6 at PageID 6811–12.)

Defendants do not even argue that the NOVs allege violations of the PSD Permit requirement

that waste gas from coke gas be processed with the use of a lime dryer.

Defendants also assert that the Governments made a comparable allegation in the

Complaint in the Illinois case in the Sixth, Seventh, Eighth, and Tenth Claims for Relief.  (Doc.

278-6 at PageID 6810–12.)  The Governments asserted violations of Permit regulations

governing the hours per year that bypass venting can occur, $SO_2$ emissions from bypass vent

stacks, PM emissions from bypass vent stacks, the operation of more than one HRSG bypass

vent stack at a time.  (No. 3:13-cv-616, Doc. 2 at PageID 24–29.)  The Complaint does not allege a violation of the PSD Permit requirement that waste gas from coke gas be processed with the use of a lime dryer.

The Court concludes that the Consent Decree does not purport to resolve violations of the PSD Permit requirement that waste gas from coke gas be processed with the use of a lime dryer. These subclaims are not barred by the Consent Decree.

**C.      Third Cause of Action**

Defendants assert that the Third Cause of Action is barred in whole by the Illinois Consent Decree.  The Graff Plaintiffs allege air nuisance in violation of Ohio Administrative Code § 3745-15-07 in the Third Cause of Action.  The air nuisance regulation provides in relevant part as follows:

> [T]he emission or escape into the open air from any source or sources whatsoever, of smoke, ashes, dust, dirt, grime, acids, fumes, gases, vapors, odors, or any other substances or combinations of substances, in such manner or in such amounts as to endanger the health, safety or welfare of the public, or cause unreasonable injury or damage to property, is hereby found and declared to be a public nuisance.  It shall be unlawful for any person to cause, permit or maintain any such public nuisance.

Ohio Admin. Code § 3745-15-07(A).  The Graff Plaintiffs assert that the Consent Decree does not resolve their air nuisance claims.  In support, the Graff Plaintiffs offer the Declaration of Robin Burgess, one of their attorneys, who asserts that none of the Haverhill NOVs listed in Appendix 3 of the Consent Decree allege a violation of Ohio Administrative Code § 3745-15-07. (Doc. 277-5 at PageID 6241.)  Defendants disagree.  Defendants assert that the August 19, 2008 NOV issued by the Portsmouth Local Air Agency specifically addressed nuisance conditions on Plaintiffs' property.  (Doc. 278-6 at PageID 6815.)

The August 19, 2008 NOV alleges conditions which appear to constitute an air nuisance violation of Ohio Administrative Code § 3745-15-07(A):

> On July 14, 2008, I collected samples of both the coal and coke fines/breeze from Haverhill North.  In response to a complaint investigation on Back Road, I collected samples of the black dust on the complainant's property.  Analysis of the complainant's sample via polarizing light microscope found the particulate size of all three samples to be similar and the dust sample collected from the complainant's property was found to compare more closely to the Haverhill North coke fines/breeze sample.  The analysis is a direct indicator that the continued malfunctions of the Coke Screening baghouse are impacting the surrounding residents.

(Doc. 278-1 at PageID 6531–32.)  However, the Portsmouth Local Air Agency did not cite the company for a violation of Ohio Administrative Code § 3745-15-07(A).

Rather, the Portsmouth Air Agency cited Haverhill North for a failure to report malfunctions in the Coke Screening baghouse in violation of Ohio Administrative Code § 3745-15-06, a regulation addressing the malfunction of equipment, scheduled maintenance, and reporting requirements.  (*Id.* at PageID 6531.)  The NOV addressed not only the July 14, 2008 situation described in the excerpt above, but also incidents of baghouse malfunctions on July 6, 2008 and July 15, 2008.  The Portsmouth Local Air Agency chose to address the black dust issue as one resulting in equipment malfunctions and constituting failures to report.  It imposed a remedy pursuant to Ohio Administrative Code § 3745-15-06(D) designed to address a malfunction violation.  (*Id.* at PageID 6531–32.)  The Portsmouth Local Air Agency neither categorized the issue identified as a violation of the air nuisance regulation contained in Ohio Administrative Code § 3745-15-07 nor imposed a remedy for a nuisance violation.

The Consent Decree states that it resolves the claims of the Governments for *violations* alleged in the Complaint and in the NOVs.  (No. 3:13-cv-616, Doc. 47 at PageID 890.)  The August 19, 2008 NOV did not allege a violation of the air nuisance regulation.  Accordingly, the

Court concludes that the Graff Plaintiffs' air nuisance claims stated in the Third Cause of Action are barred by the Consent Decree because overlapping claims were made in the August 19, 2008 NOV.

Defendants similarly argue that the Third Cause of Action should be barred because numerous other NOVs contain statements describing health concerns caused by emissions. (Doc. 278-6 at PageID 6815–17.)  The NOVs, however, do not allege air nuisance violations of Ohio Administrative Code 3745-15-07.  For example, the December 8, 2008 NOV was issued for a violation of sulfur dioxide emission limits and a failure to report a baghouse malfunction. (Doc. 278-1 at PageID 6536–43.)  The April 15, 2009 NOV was issued for a violation of provisions in its PSD permit that govern bypass venting.  (*Id.* at PageID 6544–53.)  The February 17, 2010 NOV asserts violations of PSD permit provisions governing bypass venting, emissions limits, and continuous emissions monitoring standards.  (*Id.* at PageID 6564–73.)  The analysis of the other NOVs is similar.  To repeat, the res judicata effect of the Consent Decree is limited to those claims for violations alleged in the Illinois Complaint and in the NOVs.  Defendants have failed to prove that the Governments alleged air nuisance violations in either the Complaint or in the NOVs.  Accordingly, the Graff Plaintiffs' Third Cause of Action is not barred.

**IV.    CONCLUSION**

For the foregoing reasons, the subclaims stated in paragraphs 120–29, 130–36, 137–41, 154–58, 159–62, 163–67, 177–80, 181–84, 189–92, and 193–96 of the First Cause of Action are **DISMISSED** as precluded by the Consent Decree in the Illinois case.  The Second Cause of Action is **DISMISSED**.  The subclaims stated in paragraphs 117–19, 142–45, 146–53, 168–76, 185–88, 197–200, and 201–03 of the First Cause of Action are **NOT DISMISSED**.  The Third

Cause of Action is **NOT DISMISSED**.  Finally, by agreement of the parties, the Fourth through Tenth Causes of Action are **NOT DISMISSED**.

IT IS SO ORDERED.

S/Susan J. Dlott_____
Judge Susan J. Dlott
United States District Court